Kelvis RHODES, Stephen Wilson, Connie Regan, Jerry Barbee, Sandra Keel, Kebere W. Workue, and Willie Alexander, Individually and on Behalf of All Other Persons Similarly Situated, and Serena McDermott, Bessie Morrow, Ruby Mae Cain, Glen Brooks, Shawntell Jackson, and Willie Mae Keel, Individually, Plaintiffs,

v.

CRACKER BARREL OLD COUNTRY STORE, INC., Defendant.

No. CIV.A. 4:99–CV–0217–HLM.

United States District Court,
N.D. Georgia,
Rome Division.

March 7, 2003.

Joe R. Whatley, Jr., phv, Whatley Drake, Birmingham, AL, Robert L. Wiggins, Jr., phv, Robert F. Childs, Jr., phv, Ann K. Wiggins, phv, Rocco Calamusa, Jr., phv, Gordon, Silberman, Wiggins & Childs, Birmingham, AL, Donald Alexander Sweat, Gardner, Willis, Sweat & Goldsmith, Albany, GA, Dennis Courtland Hayes, phv, NAACP, General Counsel, Baltimore, MD, Grant E. Morris, phv, Office of Grant E. Morris, Washington, DC, David W. Sanford, phv, Herman N. Johnson, Jr., phv, Eric Bachman, phv, Charles Dixon, phv, Jessica Caspe, phv, Gordons, Silberman, Wiggins & Childs, Washington, DC, for plaintiffs.

Robert Maddox Brinson, Brinson, Askew, Berry, Siegler, Richardson & Davis, Rome, GA, Leslie A. Dent, Maureen E. O'Neill, Paul, Hastings, Janofsky & Walker, Atlanta, GA, R. Lawrence Ashe, Jr., Nancy E. Rafuse, Ashe & Rafuse, Atlanta, GA, for defendant.

### ORDER

HAROLD L. MURPHY, District Judge.

This case is before the Court on Plaintiffs' Motion for Class Certification [82], the Report and Recommendation of United States Magistrate Judge Walter E. Johnson [121], and Plaintiffs' Objections to the Report and Recommendation Concerning Class Certification [129].[1]

## I. Standard of Review

28 U.S.C.A. § 636(b)(1) requires that in reviewing a magistrate's report and recommendation, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." The Court therefore must independently consider those factual issues to which the parties object. *Jeffrey S. by Ernest S. v. State Bd. of Educ.*, 896 F.2d 507, 513 (11th Cir.1990); *United States v. Gaddy*, 894 F.2d 1307, 1315 (11th Cir.1990); *LoConte v. Dugger*, 847 F.2d 745, 750 (11th Cir.1988). Legal conclusions, of course, are subject to de novo review regardless of whether a party specifically objects. *United States v. Warren*, 687 F.2d 347, 347 (11th Cir.1982).

## II. Background

### A. Plaintiffs' Allegations

Plaintiffs have accused Defendant of discriminating against Plaintiffs and a class of

---

1. Defendant has questioned whether Plaintiffs filed their Objections in a timely fashion. On January 17, 2003, the Court orally extended Plaintiffs' deadline for filing their Objections through January 24, 2003. Plaintiffs filed their Objections with the Clerk on January 24, 2003; however, the Clerk did not formally accept the Objections for filing on that date because the Objections exceeded the page limits established by a previous Order. On January 27, 2003, the Court entered an Order permitting Plaintiffs to file their sixty-five pages' worth of Objections, and the Clerk filed the Objections as of that date. (Order of Jan. 27, 2003.) Plaintiffs' Objections technically are timely, because Plaintiffs presented the Objections to the Clerk on January 24, 2003.

African–American individuals on the basis of race. Plaintiffs bring this action on behalf of themselves and similarly situated African–Americans to redress Defendant's alleged continuing systemic racial discrimination in employment through the use of discriminatory selection and compensation procedures. (Am.Compl.¶ 1.) Plaintiffs seek a declaratory judgment that Defendant has engaged in systemic racial discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. § 2000e *et seq.* ("Title VII"), and 42 U.S.C.A. § 1981. (*Id.* ¶ 2.) Plaintiffs allege that Defendants have subjected them and the class to a pattern and practice of intentional discrimination and a number of practices that have had an unlawful disparate impact on their employment opportunities. (*Id.* ¶¶ 140, 142–43.)

Plaintiffs seek equitable relief that is allegedly necessary to: (1) make the members of the class whole; (2) undo the effects of Defendant's alleged racial discrimination; and (3) prevent such discrimination from continuing. (Am.Compl.¶¶ 2–3, 26–27, 146–48.) Plaintiffs' equitable claim requested relief in the form of promotions, back pay, attorneys' fees, prejudgment interest, expenses, affirmative restructuring of Defendant's selection and compensation procedures, training, and establishment of a task force on quality and fairness. (*Id.*) Plaintiffs, however, do not seek compensatory or punitive damages.

According to Plaintiffs, employment opportunities with Defendant are structured in terms of pay scale and prestige. Plaintiffs allege that the bottom-level jobs with Defendant include those jobs held by employees who work behind the scenes or in the kitchen in "back-of-the-house" job classifications. (Am.Compl.¶ 8.) Back-of-the-house jobs include the following positions: (1) dishwasher; (2) night maintenance; (3) prep cook; (4) back-up cook; and (5) grill cook. (*Id.*) The middle-level positions with Defendant are positions that have regular interaction with customers in "front-of-the-house" job classifications. (*Id.*) Front-of-the-house positions include: (1) cashier; (2) host or hostess; and

(3) server. (*Id.*) The top-level positions with Defendant are store management positions, including store general manager positions and assistant or associate store manager positions. (*Id.*)

Plaintiffs claim that Defendant denies African–Americans desirable job assignments, promotional opportunities, training, management positions, compensation, and other benefits of employment on the same terms applied to Whites.[2] (Am.Compl.¶ 24.) Plaintiffs allege that Defendant: (1) "channels" African–Americans into positions with limited opportunity for promotion, such as dishwasher; (2) deters African–Americans from seeking promotions, management positions, and desirable job assignments; (3) fails to provide African–American employees with regular evaluations of their skills; (4) ignores, or, in some cases, actively supports, racism among its employees; and (5) fails to enforce policies prohibiting racial discrimination. (*Id.* ¶¶ 24, 141.)

Plaintiffs allege that Defendant routinely advertises for front-of-the-house positions, and both Whites and African–Americans apply for those positions. (Am.Compl.¶ 25.) According to Plaintiffs, Defendant routinely offers White applicants the advertised front-of-the-house positions, but routinely offers African–American applicants back-of-the-house positions as dishwashers. (*Id.*) Plaintiffs allege that Defendant has two workforces as a result of this policy. (*Id.*) One workforce, which is predominately White, enjoys preferential treatment, better job opportunities, and swift advancement into management. (*Id.*) Another workforce, which is primarily African–American, holds a disproportionate share of the back-of-the-house positions, is denied equal terms and conditions of employment, and, with few exceptions, is not allowed to advance. (*Id.*)

Plaintiffs claim that they satisfy the four requirements for class certification set forth in Federal Rule of Civil Procedure 23(a): (1) commonality (Am.Compl.¶¶ 28–30); (2) typicality (*id.* ¶ 31); (3) numerosity (*id.* ¶ 32); and adequacy of representation (*id.* ¶ 33).

---

**2.** Ordinarily, the Court would use the term "Caucasian," rather than "White." The Court, however, uses the term "White" in this Order because Plaintiffs have chosen to use that term in their filings.

Additionally, Plaintiffs allege that they meet the requirements for class certification under Federal Rule of Civil Procedure 23(b)(2). (*Id.* ¶¶ 35–37.)

Plaintiffs seek certification of the following class:

All African–Americans who applied for employment or were employed by Cracker Barrel Old County Store, Inc., at any time since April 9, 1994, or who would have applied during such period in the absence of the employment practices challenged in this lawsuit.

(Pls.' Mot. Class Certification at 1.) Alternatively, Plaintiffs request certification of subclasses. (*Id.* at 2.)

## B. The Parties

In his Report and Recommendation, Judge Johnson discussed background information concerning the parties to this action, Defendant's policies, Defendant's employment practices, and Plaintiffs' witnesses. (Report and Recommendation at 6–77.) The Court has reviewed the depositions, declarations, and documentary evidence filed in this case, and concludes that the Report and Recommendation's background statement pertaining to the parties to this action, Defendant's policies, Defendant's employment practices, and Plaintiffs' witnesses is exceedingly thorough and is correct. The Court sets forth that background statement below.[3]

### 1. Defendant

#### a. Defendant's Organizational Structure and Workforce

Defendant owns and operates a chain of approximately 454 restaurants, or "stores." (Am.Compl.¶ 6.) Defendant's stores are located in approximately forty-one states, primarily in the Southeast, Midwest, Mid–Atlantic, and Southwest. (*Id.*)

Each of Defendant's stores consists of a rustic, country-store style building. (Am. Compl.¶ 7.) Each building contains a dining room, a retail gift shop, a kitchen, and storage areas. (*Id.*)

Each of Defendant's stores employs approximately 100 people over two shifts. (Am.Compl.¶ 9.) Defendant employs approximately 50,000 people in total. (*Id.* ¶ 10.)

Defendant groups its stores into districts, and then groups each district into regions. Store assignments to districts and regions changed during the relevant time period. The sizes of the districts and regions also changed over the relevant time period. From 1995 to 2001, each region had an average of 100 stores, while each district had an average of twelve stores. (Expert Report of Def.'s Experts Joan Haworth and Janet Thornton Dated Mar. 22, 2002 ("Haworth–Thornton Report") at 9–10 (contained in Def.'s Statistical Evidence App.).)

Although the African–American composition of Defendant's employees was relatively stable, averaging twelve percent between 1995 and 2001, the presence of African–American employees in each store varied significantly. (Haworth–Thornton Report at 10.) The presence of African–American employees in each store generally reflected the racial composition of the local labor market. (*Id.*)[4]

Defendant's stores also differ with respect to their local labor markets, pay rates, and the employment and promotion. opportunities available to applicants and employees. (Haworth–Thornton Report at 10.) In Defendant's average store, the primary hourly positions include fifty servers, nineteen dishwashers, nine cashiers, nine hosts or host-

---

3. For the reasons discussed *infra* Part III.B., the Court expressly overrules Plaintiffs' Objection based on Plaintiffs' belief that Judge Johnson made credibility determinations and weighed evidence in arriving at this background statement.

4. For example, the percentage of African–Americans in Defendant's stores varied from 0% in Store Number 8, located in Corbin, Kentucky, and Store Number 443, located in Corydon, Indiana, to 66% in Store Number 455, located in Albany, Georgia. (Haworth–Thornton Report at 10.) Those percentages closely mirrored the percentages of African–Americans among those individuals eighteen or older in the labor markets. (*Id.*) For instance, Corbin, Kentucky had 0.1% African–Americans among those individuals eighteen or older in the labor markets, while Corydon, Indiana had 1.3% and Albany, Georgia, had 60.4%. (*Id.*)

esses, eight grill cooks, six retail shop employees, three back-up cooks, three prep cooks, and two night maintenance employees. (*Id.*) Variations exist in the relative mix of jobs among stores and in store size. (*Id.* at 10–11.) The average store has 115 employees, but the largest store has 235 employees and the smallest store has fifty-nine employees. (*Id.*) The retail space available in Defendant's stores also varies from 1,300 to 2,500 square feet. (*Id.* at 11.)

Defendant has a large workforce with high turnover. For example, in 1998, the average size of Defendant's workforce was 39,305 employees. (Haworth–Thornton Report at 22.) During that year, however, Defendant had over 74,000 terminations and approximately 80,000 hires and re-hires. (*Id.*) The average employee working in a PAR 0 position[5] worked eight weeks, while the average employee working in a PAR 4 position worked thirty-five weeks. (*Id.*) Dishwashers worked the fewest average number of weeks—eleven—while servers worked the most—nineteen. (*Id.*)[6] The average hourly employee worked only 28.7 hours per week. (*Id.* at 23.) Employees in PAR 0 positions worked an average of 24.1 hours per week, compared with 29.9 hours per week for employees in PAR IV positions. (*Id.*) Those employees in host/hostess positions worked the fewest number of hours per week, 18.2 hours, while employees in grill cook positions worked the most hours per week, 30.1 hours. (*Id.*)

### b. Defendant's Employment Policies

Plaintiffs allege that Defendant maintains actual or constructive control over the operations, including employment practices, of each of its stores. (Am.Compl.¶ 6.) In response to Plaintiffs' allegation, Defendant submitted five Appendices detailing aspects of Defendant's employment practices: (1) a Hiring, Initial Job Assignments, and Training Appendix; (2) a PAR Movement and Cross–Training Appendix; (3) a Compensation Appendix; (4) a Promotion to Management Appendix; and (5) an Equal Employment Opportunity Appendix.

### i. Hiring, Initial Job Assignments, and Training Appendix

#### aa. Hiring for New Store Openings

From January 1995 to December 2000, the New Unit Openings Department (the "NUO") supervised new store openings. (Decl. of Michael A. Maidl ¶ 5 (contained in Def.'s Hiring, Initial Job Assignments, and Training App.).) The NUO first contacted an advertising agency before the new store's opening date to obtain information about the local labor market and to purchase advertising to reach potential employees. (*Id.* ¶¶ 5–6.) The new store's District Manager also conducted a study of the relevant labor market. (*Id.* ¶¶ 7–8.) The NUO used the District Manager's labor study to determine the wages to use in the advertising for the new store. (*Id.*)

Before mass hiring for the new store began, the NUO's Operating Supervisors—restaurant and retail—spent two to four hours reviewing Defendant's policy with store management to ensure proper screening and questioning of applicants. (Maidl Decl. ¶ 9.) The NUO used a manual titled "Interviewing and Hiring Guidelines" to conduct this training. (*Id.* ¶ 9; Def.'s Hiring, Initial Job Assignments, and Training App. Ex. H–1.)

Three weeks before a new store's opening, the interviewing and hiring process began with scheduling appointments to take applications and conduct interviews. (Maidl Decl. ¶ 10.) When an applicant arrived, he or she filled out an application and underwent a brief pre-screening interview. (*Id.*) During the pre-screening interview, an Associate Manager asked preliminary questions

---

**5.** The Court describes the Personal Achievement Responsibility, or PAR, system *infra* Part II. B.1.b.ii.aa.

**6.** The dishwasher position had the highest turnover rate in 1998—266%. (Haworth–Thornton Report at 43.) The dishwasher position consequently has the most opportunities for placement of new hires.

The positions of server, prep cook, host, and grill cook had average turnover rates in 1998 ranging from 179% to 192%. (Haworth–Thornton Report at 43.) The lowest turnover rate occurred among retail shop employees—116%. (*Id.*)

to determine if an applicant would receive a second interview. (*Id.* ¶¶ 11, 13.) Those questions came from the segment of the "Interviewing and Hiring Guidelines" handbook titled "New Store Opening/Mass Hiring Recommended Job Interview Format." (*Id.* ¶¶ 11, 13; Def.'s Hiring, Initial Job Assignments, and Training App. Ex. H–1 at 1–2, 7–9, 11–13.) Associate Managers could ask their own questions with prior General Manager approval. (Maidl Decl. ¶ 13.)

Managers also reviewed the applications to see whether applicants sought specific positions. (Maidl Decl. ¶ 12.) During new store openings, Defendant's policy is to pre-qualify an applicant for the position indicated on the application. (*Id.*) Two exceptions, however, exist. (*Id.*) First, if an applicant seeks a position that already is filled, and a manager determines after an interview that the candidate is excellent, the manager is to explain that the position sought is filled, and is to ask the applicant if he or she is interested in any other position. (*Id.*) Second, if an applicant seeks a cook position, the manager is to determine whether he or she is qualified for any cook position, including a prep cook position, a back-up cook position, or a grill cook position. (*Id.*)

The managers used the information obtained during the pre-screening interview either to disqualify the applicant or to schedule him or her for a second interview with the General Manager or Retail Manager. (Maidl Decl. ¶ 15; Def.'s Hiring, Initial Job Assignments, and Training App. Ex. H–1 at 9.) During the second interview, the General Manager and the Retail Manager focused on behavior-based questions. (Maidl Decl. ¶ 17.) General Managers and Retail Managers were to use the "Interview and Hiring Guidelines" handbook as a guide concerning appropriate questions to ask. (*Id.*; Def.'s Hiring, Initial Job Assignments, and Training App. Ex. H–1 at 2–6, 8, 35–37.)

Beginning in January 2001 and continuing to the present, Defendant used the same advertising process for new store hiring as described above, except that Defendant shifted the responsibility for the process from the NUO to its Employment Department. (Maidl Decl. ¶ 19; Def.'s Hiring, Initial Job Assignments, and Training App. Ex. H–2 at 9–11.) Managers of new stores now come to Defendant's Home Office five weeks before a new store opening for New Store Meetings. (Maidl Decl. ¶ 21.) During the New Store Meetings, Defendant's Field Human Resources personnel give a one-day presentation on staffing and retention and instruct Managers concerning interviewing and hiring practices using the "Unit Opening–Managers Handbook." (*Id.*; Def.'s Hiring, Initial Job Assignments, and Training App. Ex. H–2 ("Unit Opening–Managers Handbook").) Field Human Resources personnel teach the "Unit Opening–Managers Handbook" in conjunction with the document titled "Best Practices–Hitting the Target Through Staffing and Retention." (Maidl Decl. ¶ 21; Def.'s Hiring, Initial Job Assignments, and Training App. Ex. H–3.)

Associate Managers now use the "Seven Steps to Effective Interviewing" when questioning the applicants, using the format outlined in the "Best Practices–Hitting the Target Through Staffing and Retention" document. (Maidl Decl. ¶ 24; Def.'s Hiring, Initial Job Assignments, and Training App. Exs. H–2 and H–3.) Associate Managers also review the applications, ask skill questions specific to the position sought, ask behavior-based questions, and explain pay rates. (Maidl Decl. ¶¶ 24–25; Def.'s Hiring, Initial Job Assignments, and Training App. Ex. H–3 at 29–31.) If an applicant is chosen for a second interview, the applicant then is asked to read Defendant's Equal Opportunity Statement. (Maidl Decl. ¶ 26.)

During the second interview, the General Manager and Retail Manager ask behavior-based questions. (Maidl Decl. ¶ 27.) General Managers and Retail Managers are to use the "Best Practices–Hitting the Target Through Staffing and Retention" document as a guide for appropriate pre-employment inquiries. (*Id.* ¶¶ 27–28; Def.'s Hiring, Initial Job Assignments, and Training App. Ex. H–3 at 30–31, 63, 69–70.) General Managers and Retail Managers at Defendant's local stores make the final hiring decision, which is to be made on the basis of the applicant's ability to perform the essential functions of the position, the applicant's experience, the

applicant's availability, the applicant's attitude, and the applicant's communication skills. (Maidl Decl. ¶¶ 18, 29.)

### bb. Hiring at Defendant's Existing Stores

In 1993, Defendant's Management and Development Department began a training program concerning interviewing and hiring practices titled "Bringing People In." (Decl. of Thomas Pate ¶ 5; Def.'s Hiring, Initial Job Assignments, and Training App. Ex. H–5.) This program provided managers with the "Interviewing and Hiring Guidelines," which contained interviewing guides, rules of the interview, sample interview questions, and information concerning appropriate pre-employment inquiries. (Pate Decl. ¶¶ 6–8; Def.'s Hiring, Initial Job Assignments, and Training App. Ex. H–1.)

Defendant first administered "Bringing People In" training to District Managers in Defendant's Home Office. (Pate Decl. ¶ 9.) District Managers then presented the material to their store General Managers, who in turn trained their Associate Managers. (Id.) From 1994 to 1999, Managers in Training ("MITs") also received a day of instruction concerning the "Bringing People In" and "Interviewing and Hiring Guidelines" materials during their training at Defendant's Home Office. (Id. ¶ 11.)

From 1999 through 2000, Defendant's Management and Development Department used a new guidebook titled "Staffing and Retention–Resource Guide." (Pate Decl. ¶ 13.) The "Staffing and Retention–Resource Guide" contained information concerning creating a staffing plan, advertising, interviewing, hiring, and retaining employees. (Id.) The "Staffing and Retention–Resource Guide" contained sample interview questions, but encouraged managers to customize their interview questions to match their stores' specific needs. (Id. ¶ 15.) The "Staffing and Retention–Resource Guide" also instructed managers concerning how to conduct interviews, how to make good hiring decisions, and on Defendant's corporate values of diversity and compliance with the law. (Id. ¶ 16.) Defendant forwarded the "Staffing and Retention–Resource Guide" to all General Managers and Associate Managers. (Id. ¶ 17.) From 1999 through 2001, MITs also received a day of training concerning the "Staffing and Retention–Resource Guide" at Defendant's Home Office. (Id. ¶ 18.)

Beginning in 2001, Defendant started training managers using the "Best Practices–Hitting the Target Through Staffing and Retention" handbook. (Pate Decl. ¶ 19; Def.'s Hiring, Initial Job Assignments, and Training App. Ex. H–3.) The "Best Practices–Hitting the Target Through Staffing and Retention" handbook contains information about creating a staffing plan, handling applicant flow, advertising, interviewing, retention, and training. (Pate Decl. ¶ 19.) Defendant first presented the "Best Practices–Hitting the Target Through Staffing and Retention" materials to the Regional Vice Presidents, and then administered further training down the chain of command. (Id. ¶ 24.) From 2001 to the present, MITs have received a day of training concerning the "Best Practices–Hitting the Target Through Staffing and Retention" materials at Defendant's Home Office. (Id. ¶¶ 25–26.) Among other things, the "Best Practices–Hitting the Target Through Staffing and Retention" materials teach that it is unlawful to discriminate on the basis of race. (Id. ¶ 28.)

During the time period at issue in this case, Defendant's policy concerning hiring has been that hiring decisions are based on objective and subjective factors concerning an applicant: (1) the applicant's responses to questions concerning his or her availability; (2) the applicant's ability to perform the essential functions of the position; (3) the applicant's prior work experience; and (4) the applicant's overall "presentation." (Pate Decl. ¶ 29.) Store-level management, such as Associate Managers, General Managers, or Retail Managers, always have made the hiring decisions for hourly store positions. (Id. ¶ 30.)

### cc. Initial Job Assignments

When a store needs to fill hourly positions, managers typically advertise those employment opportunities. (Pate Decl. ¶ 36.) Applicants who complete applications are directed to indicate on the applications the position

or positions for which the applicants are applying. (*Id.*) A manager then interviews the applicant for one or more of the positions indicated. (*Id.*) If the applicant is qualified for the position sought, and if the job is available, the manager presumably offers the job to the applicant. (*Id.*)

If more than one position is available, Defendant instructs its managers to ask introductory questions, to gather information, to explain the positions that are available, and to ask the applicant to read the essential functions of each position to determine the position or positions in which the applicant is interested. (Pate Decl. ¶ 37.) Defendant also instructs its managers to determine whether the applicant is minimally qualified on the basis of his or her responses to questions about availability, the scheduling needs of the store, and the applicant's prior experience. (*Id.*) If the applicant is interested in the available position or positions and the availability needs of the particular store can be met, the manager will interview the applicant "on the spot" or will schedule a future interview. (*Id.*) If a store is not presently hiring to fill a particular position, but an applicant still wishes to complete an application, a manager is to explain the store's lack of staffing needs, but is to accept the application and keep it for possible future use. (*Id.*)

#### dd. Training Programs

From 1995 to 1996, Defendant's Employee Relations Department used the "Management Trainee Guidebook: Issues in Employment Law" to train MITs at Defendant's Home Office. (Pate Decl. ¶ 31; Def.'s Hiring, Initial Job Assignments, and Training App. Ex. H–7.) From 1997 to 1998, the Employee Relations Department trained managers using handouts from that Guidebook, including handouts discussing the importance of hiring the most qualified candidate for the position. (Pate Decl. ¶ 31.) Defendant's Employee Relations Specialists purportedly discussed anti-discrimination laws and Defen-

dant's anti-discrimination policies, and emphasized the importance of not considering race when making employment decisions. (*Id.*)

During 1999, the Employee Relations Department trained managers using the "Leader's Guide–Human Resources Policy Review" (the "Patchwork Quilt Guide"). (Pate Decl. ¶ 32; Def.'s Hiring, Initial Job Assignments, and Training App. Ex. H–8.) Defendant sent the "Patchwork Quilt Guide" to its stores. (Pate Decl. ¶ 32.) The "Patchwork Quilt Guide" included the same anti-discrimination policies mentioned above. (*Id.*)

From 2000 to the present, Defendant's Employee Relations Department has trained MITs using the "Management Reference Guide." (Pate Decl. ¶ 33; Def.'s Hiring, Initial Job Assignments, and Training App. Ex. H–9.) The "Management Reference Guide" includes Defendant's anti-discrimination policies, and emphasizes that managers should make employment decisions without regard to race. (Pate Decl. ¶ 33; Def.'s Hiring, Initial Job Assignments, and Training App. Ex. H–9.)

#### ii. PAR Movement and Cross–Training

#### aa. PAR Program

Five Personal Achievement Responsibility, or "PAR," levels exist for each of Defendant's nine hourly store positions. (Decl. of Stacy Stinson ¶ 7 (contained in Def.'s PAR Movement and Cross–Training App.).) The lowest PAR level is 0, and the highest PAR level is IV.[7]

An employee can progress from one PAR level to the next PAR level by working a specific time in his or her existing PAR level, receiving a passing score on his or her evaluation, and passing a written test.[8] (Stinson Decl. ¶ 7.) An employee receives a pay in-

---

7. The materials submitted by Plaintiffs and Defendant use both Arabic and Roman numerals interchangeably to designate the various rungs of the PAR ladder. The Court uses Roman numerals to designate PAR levels I through IV in this Order.

8. The passing score required for evaluations and written tests increases at each PAR level. (Stinson Decl. ¶ 7.)

crease and enhanced benefits when he or she advances in PAR level.[9] (*Id.*)

Each PAR level for each hourly position has a maximum pay rate. (Stinson Decl. ¶ 8.) To exceed the maximum pay rate for a given position, an employee either must advance to the next PAR level for that position or receive approval from Defendant's corporate management. (*Id.*)

Movement within PAR is not a promotion. (Stinson Decl. ¶ 9.) By advancing from one PAR level to the next, however, an employee acquires a level of achievement that evidences an increase in knowledge and skill within a position. (*Id.*)

Store management does *not* have discretion to refuse or prevent an employee's participation in PAR. (Stinson Decl. ¶ 10.) If store management prohibited an employee from participating in PAR, or refused an employee an opportunity to participate in PAR, those actions would violate Defendant's policy. (*Id.*)

Defendant's PAR Department has used the following documents to administer the PAR program: (1) Pleasing People Through PAR; (2) the PAR Program Manual; and (3) various PAR Manuals related to each hourly position. (Stinson Decl. ¶ 11.) The "Introduction to PAR" is part of the Pleasing People Through PAR manual. (*Id.*) The "Introduction to PAR" describes the PAR program and the requirements for each PAR level, and Defendant gives that information to new employees at new-hire orientations. (*Id.*)

The Pleasing People Through PAR manual includes training information and materials used by the PAR Department, by store management, by Employment Training Specialists ("ETSs"), and Employment Training Coordinators ("ETCs") in administering the PAR program. (Stinson Decl. ¶ 11(a); Def.'s PAR Movement and Cross–Training App. Ex. PAR–1.) The PAR Program manual includes information concerning testing schedules, testing procedures and logistics, and current versions of the actual PAR tests. (Stinson Decl. ¶ 11(b); Def.'s PAR Movement

and Cross–Training App. Ex. PAR–2.) The PAR manuals include information about the skills and knowledge required for each of the nine hourly store positions. (Stinson Decl. ¶ 11(c); Def.'s PAR Movement and Cross–Training App. Ex. PAR–3.) Each hourly store position has its own PAR manual. (Stinson Decl. ¶ 11(c).)

From 1994 to 1996, Defendant's PAR Department administered the PAR program at the store level by using corporate PAR representatives, or "PAR testers." (Stinson Decl. ¶ 12.) In 1996, Defendant phased out the use of PAR testers and began using ETSs. (*Id.* ¶¶ 13–14.) By assigning an ETS to work with each store, Defendant intended to ensure continued corporate involvement in PAR at the store level and to insure corporate supervision of PAR at the store level. (*Id.* ¶ 14.) Defendant also intended to improve PAR training. (*Id.*) Defendant's corporate involvement in PAR precluded local store management from exercising discretion concerning PAR testing and other administrative tasks. (*Id.*)

In late 1998 and early 1999, Defendant began implementing a system in which the ETC, who is an hourly employee of the local store, provides support for the administration of PAR. (Stinson Decl. ¶ 15.) The ETC receives training concerning the PAR program and store administration of PAR at Defendant's corporate headquarters. (*Id.*) Presently, Defendant has approximately 250 ETCs in the field. (*Id.*)

Employees study PAR training materials during study sessions held at the store while the employees are "on the clock." (Stinson Decl. ¶ 16.) Home study of PAR materials is prohibited. (*Id.*)

Throughout its existence, the PAR program has undergone continual improvement through updated materials and different methods of training. (Def.'s PAR Movement and Cross–Training App. Ex. PAR–5.) Most recently, Defendant has introduced comput-

---

**9.** Defendant's hourly employees may receive two types of raises: (1) PAR raises, which employees receive after passing a PAR test, and which PAR IV employees potentially receive every six

months with their evaluations; and (2) merit raises, which are based upon merit, job performance, and tenure. (Stinson Decl. ¶ 7 n. 2.)

er-assisted PAR instruction and training ("e Learning"). (Stinson Decl. ¶ 17.)

Through 1999, Defendant required all its employees to test for PAR level I.[10] (Stinson Decl. ¶ 17.) After an employee passed PAR level I, Defendant did not require the employee to participate any further in PAR. (*Id.*) Defendant considered the PAR I test as a minimum-knowledge-based test. (*Id.*) Defendant still required its employees who chose not to participate further in PAR to maintain a minimum level of knowledge and skill, as measured by evaluations that occurred every six months. (*Id.*)

After a set, continuous time period at a given PAR level, an employee then had options concerning PAR level movement or cross-training. (Stinson Decl. ¶¶ 20–24.) The following chart summarizes PAR requirements and rewards for advancing in PAR level:

| PAR LEVEL | REQUIRED TO REACH LEVEL | BENEFITS OF LEVEL | MINIMUM TIME REQUIRED IN LEVEL | OPTIONS |
|---|---|---|---|---|
| 0 (after 1999) | —— | —— | 30 days | Test for PAR I |
| I | (1) Minimum score of 80 percent on evaluation (2) Pass skill test | (1) Pay increase (2) Gold star (3) 20 percent discount card | Three months | (1) Test for PAR II in same position (2) Pre–1999 Cross-train in another position at PAR I. Post–1999, must reach PAR II to cross-train |
| II | (1) Minimum score of 85 percent on evaluation (2) Minimum score of 85 percent on skill test | (1) Pay increase (2) Gold star (3) Certificate. (4) Eligible for decrease in insurance premiums | Four months | (1) Test for PAR II in same position (2) Cross-train into another position at PAR I (pre–1999) or PAR 0 (post–1999) (3) Test for higher PAR level in other position already cross-trained to perform |
| III | (1) Minimum score of 90 percent on evaluation (2) Minimum score of 90 percent on skill test | (1) Pay increase (2) Gold star (3) Certificate (4) Eligible for decrease in insurance premiums | Seven months | (1) Test for PAR IV in same position (2) Cross-train into another position at PAR I (pre–1999) or PAR 0 (post–1999) (3) Test for higher PAR level in other position already cross-trained to perform |

10. Defendant still considers the PAR I test a minimum-knowledge-based test. (Stinson Decl. ¶ 24.) Defendant requires those employees who choose not to participate in PAR to demonstrate a minimum level of knowledge by completing courses in e Learning. (*Id.*)

| IV | (1) Minimum score of 95 percent on evaluation (2) Minimum score of 95 percent on skill test | (1) Pay increase (2) Gold star (3) Certificate. (4) Eligible for decrease in insurance premiums (5) Yearly stock options | None, but must score 95 percent on evaluation every six months to maintain PAR IV |

(Stinson Decl. ¶¶ 20–24; Def.'s PAR Movement and Cross–Training App. Exs. PAR 6–PAR 9.)

### bb. Cross–Training

Defendant views cross-training as an opportunity to help each store run more efficiently by employing a staff of versatile and flexible employees. (Stinson Decl. ¶ 26.) An employee may cross-train into any position as long as he or she meets the minimum time requirements in his or her current primary position. (*Id.*) In considering when to cross-train, the employee and local store management consider the objective business needs of the store, such as staffing needs and availability of staffing hours, in conjunction with the flexibility, skill level, and availability of the employee. (*Id.*)

Defendant does not require employees to have prior work experience or training in a front-of-the-house position to cross-train or to test for front-of-the-house PAR levels. (Stinson Decl. ¶ 27.) Defendant's policy always has provided that an employee may cross-train in any skill position. (*Id.* ¶ 28.) The only prerequisites for cross-training have been the attainment of PAR I in an employee's primary position (prior to 1999) or the attainment of PAR II in an employee's primary position (post–1999.) (*Id.* ¶ 28; Def.'s PAR Movement and Cross–Training App. Ex. PAR–4.) For example, after 1999, a dishwasher could cross-train to a hostess, server, grill, or other position in the store as soon as he or she became a PAR II dishwasher. (Stinson Decl. ¶ 28.)

Before testing in the cross-trained position of interest, however, an employee should work in the cross-trained position long enough to attain a working knowledge of the position that is sufficient to enable the employee to pass the evaluation. (Stinson Decl. ¶ 29.) The amount of time necessary to develop that level of knowledge varies, depending upon how often the staffing needs of the store permit the employee to work in the cross-training position, the employee's availability, and the employee's learning ability. (*Id.*) To be fully cross-trained in a position, an employee must pass the evaluation and skill test for that position. (*Id.*)

Historically, an employee received the highest of his or her current pay rate for his or her primary position or the minimum of the PAR 0 wage rate range for the position for which he or she was cross-training. (Stinson Decl. ¶ 30.) Once the employee passed the corresponding PAR test for the position for which he was cross-training, he earned wages for the corresponding position and PAR level. (*Id.*) It thus was possible for an employee to earn different wages, depending upon the position in which the employee was working. (*Id.;* Decl. of Larry Jones ¶ 33 (contained in Def.'s Compensation App.).) [11]

Effective November 2001, an employee cross-training into a new position earns the rate applicable for that position at PAR 0, as if newly hired into the position, as opposed to the higher of his primary job pay rate or the pay rate of the cross-trained position. (Stinson Decl. ¶ 32.) For example, if a PAR IV hostess cross-trains as a cashier, she will earn the pay rate for a PAR 0 cashier. (*Id.*) Upon reaching PAR I status in the cross-trained position, the employee then would receive the pay rate for a PAR I cashier

---

**11.** For example, if a PAR III dishwasher making $5.75 per hour was cross-training to become a grill cook, he or she would be paid $5.75 per hour during training because the $5.75 PAR III dishwasher wage rate was higher than the $5.15 hourly rate earned by a PAR 0 grill cook. (Stinson Decl. ¶ 31; Jones Decl. ¶ 34.) Once the employee passed the corresponding PAR level—in this example, a PAR III grill cook—the employee earned wages in the PAR III grill cook range whenever he or she worked in that position. (Stinson Decl. ¶ 31; Jones Decl. ¶ 34.)

whenever she works in the cashier position. (*Id.*; Jones Decl. ¶ 35.)

### iii. Compensation of Hourly Employees

Each of Defendant's stores differs with respect to its own labor market, business needs, and available employment opportunities. (Jones Decl. ¶ 6.) Defendant examines local labor markets before a new store opens, and creates a labor market study to determine the wage levels that will be sufficiently competitive to allow the new store to hire the necessary employees. (*Id.*) [12]

Defendant uses its labor market studies to develop pay grids, which Defendant then uses to establish wage ranges for the following hourly positions: (1) night maintenance; (2) dishwasher; (3) back-up cook; (4) prep cook; (5) grill cook; (6) cashier; (7) host/hostess; (8) gift shop; and (9) server. (Jones Decl. ¶ 7.) A store's pay grid specifies the minimum and maximum wage rates allowed for employees in each position and PAR level. (*Id.* ¶ 12.) A store's pay grid may change as local market conditions change. (*Id.* ¶ 11.)

Since 1995, Defendant has used three different pay grid systems. (Jones Decl. ¶ 13.) Before fall 1995, Defendant assigned each of its stores to one of four general areas, or grids: Areas 1, 2, 3, and 4. (*Id.*; Def.'s Compensation App. Ex. C–2.) Additionally, Defendant developed supplemental variations in response to local market conditions.

(Jones Decl. ¶ 13; Def.'s Compensation App. Ex. C–2.)

Under the pay grid system established in fall 1995, Defendant developed new pay grids based on state and local wage laws for tipped positions, such as server positions, and the competitive wages for Defendant's highest-paying position—grill cook. (Jones Decl. ¶ 14.) Defendant created nine pay scales for servers and twelve pay grids for grill cooks. (*Id.*) Defendant created a total of thirty-one different basic pay grids. (*Id.*) Defendant created more grids when Defendant added stores in new states or when laws changed in states where Defendant had existing stores. (*Id.*) [13]

In August 1998, Defendant again changed its pay grid system to the current system. (Jones Decl. ¶ 17.) Initially, Defendant used five general grids, lettered A through E. (*Id.*) Those grids listed wage ranges for all hourly positions except server positions. (*Id.*) As under the fall 1995 system, server wages reflected state minimum wage laws for tipped employees, as well as local labor market conditions. (*Id.*) When Defendant combined the server wage ranges with the five basic pay grids for other hourly jobs, Defendant had twenty different pay grids. (*Id.*; Def.'s Compensation App. Ex. C–4.) Defendant subsequently added a sixth pay grid for Connecticut, Grid F, which Defendant also applied to stores it opened in Rhode Island. (Jones Decl. ¶ 17; Def.'s Compensation App. Ex. C–4.)

---

**12.** Defendant has attached an example of a local labor market study as Exhibit C–1 to its Compensation Appendix. (Def.'s Compensation App. Ex. C–1.) The information in a labor market study falls into four categories: (1) a description of the store's location; (2) a discussion of competition in the local labor market; (3) a description of sources of labor; and (4) a discussion of local wage rates. (Jones Decl. ¶¶ 8–9; Haworth/Thornton Report at 11–13; Def.'s Compensation App. Ex. C–1.) A local store's District Manager reviews the local labor market study, recommends a pay grid, and forwards a copy of the study and his or her recommendation to. the Regional Vice President for approval. (Jones Decl. ¶ 10.)

**13.** Under the fall 1995 system, all stores assigned to a given pay grid had identical wages for the server and grill cook positions. (Jones Decl.

¶ 15; Def.'s Compensation App. Ex. C–3.) The wage ranges for the other hourly positions, however, varied from store to store—even for stores within the same general pay grid—so that individual stores could remain competitive in their local labor markets for other positions. (Jones Decl. ¶ 15; Def.'s Compensation App. Ex. C–3.)

For example, Defendant assigned both Store Number 42, in Columbia, South Carolina, and Store Number 70, in Pelham, Alabama, to the general wage grid "GE." (Def.'s Compensation App. Ex. C–3.) Both stores had identical wage ranges for the server and grill cook positions. (*Id.*) However, their wage ranges for dishwashers varied. (*Id.*) Store Number 42 had a wage range for PAR 0 dishwashers of $4.30 to $5.25 per hour, while Store Number 70 had a wage range for PAR 0 dishwashers of $4.30 to $5.50 per hour. (*Id.*)

Once Defendant assigns a store to a pay grid, the store's General Manager determines the actual wage paid to an individual store employee, provided that the wage falls within the range set by the pay grid for the employee's position and PAR level. (Jones Decl. ¶ 18.) However, highly experienced or skilled individuals may earn above the maximum for a given PAR level with the approval of the District Manager and Regional Vice President. (*Id.*) [14] The wage rate for a particular hourly employee depends upon a number of factors, including: (1) local labor conditions; (2) the store's pay grid; (3) the employee's experience level; (4) the employee's position; (5) the employee's PAR level; (6) whether the store's General Manager requested a variance for the employee's position and PAR level; and (7) whether the District Manager and Regional Vice President approved or denied the requested variance. (*Id.* ¶ 21.)

Back-of-the-house positions generally have a higher hourly rate range than front-of-the-house positions. (Jones Decl. ¶ 22.) For example, the grill cook position has the highest hourly wage rate of any job. (*Id.; Def.'s Compensation App. Exs. C–3 and C–4.) Indeed, dishwashers generally have a higher hourly wage rate range than cashiers and hostesses. (Jones Decl. ¶ 22; Def.'s Compensation App. Exs. C–3 and C–4.) Defendant's experts performed analyses supporting this testimony. (Haworth/Thornton Report at 27–28 & Fig. 2.)

To achieve the objectives of Defendant's salary administration policy, Defendant established salary administration guidelines for all hourly positions.[15] (Jones Decl. ¶ 25.) Local store management must adhere to those guidelines or face disciplinary action. (*Id.*) The salary administration guidelines establish, among other things: (1) the minimum length of employment required for an employee to be eligible to take a PAR test; (2) the required passing score for each PAR test; (3) the percentage wage increase for passing a PAR test; and (4) the percentage wage increase for merit raises. (*Id.* ¶¶ 25–26; Def.'s Compensation App. Exs. C–5 and C–6.)

Defendant completes PAR testing on a bi-monthly basis for all units in a region. (Jones Decl. ¶ 27.) Stores give PAR tests one week of every other month. (*Id.*)

Before March 1999, the standard hourly rate increase for employees passing a PAR test was up to three percent, approved by the store General Manager. (Jones Decl. ¶¶ 28–33.) After March 1999, the standard hourly rate increase for employees passing a PAR test was up to four percent. (*Id.*) With approval of the District Manager, a deserving employee could receive a five percent increase. (*Id.* ¶ 28.) Any increase that would result in the employee receiving a pay rate that exceeded the maximum pay rate for his or her PAR level required advance approval from the Regional Vice President. (*Id.*)

Employees are eligible for merit raises based on performance every six months from the date of their last increases, including PAR increases. (Jones Decl. ¶¶ 29–31.) Effective August 1, 1998, a store General Manager could give a merit increase of up to

14. In response to changing labor market conditions, a General Manager can request a change in his store's pay grid or can adjust the wage range within a pay grid. (Haworth–Thornton Report at 30.) When market pressure is particularly intense for a specific job, General Managers may use "ad hoc market adjustments" for paying employees outside the maximum allowable range for a particular job and PAR level for their store's pay grid. (*Id.*) Defendant's experts examined, by PAR level and position, the wage rates of employees working in November 2000, as compared to the maximum allowable wages of the March 1999 wage grid assigned to the employees' stores. (*Id.*) Approximately 27% of the employees were paid at rates off the March 1999 wage grid. (*Id.*) In 10% of the stores, over 50%

of the employees were paid at rates off the March 1999 wage grid, and, in 36.5% of the stores, over 30% of the employees were paid at rates off the grid. (*Id.*)

15. The salary administration policy's objectives are: (1) to pay salaries that fairly reflect the value of each job relative to other jobs with Defendant; (2) to recognize individual contributions and learned skills through participation in the PAR program; (3) to pay salaries that are competitive with others in the local marketplace; (4) to provide the capability to adapt to changing market conditions; and (5) to ensure that the policy conforms to the law. (Jones Decl. ¶¶ 23–24.)

three percent. (*Id.* ¶ 32.) [16] Increases between 3.1% and 5.0% required the advance approval of the District Manager. (*Id.*) Advance approval of both the District Manager and the Regional Vice President was required for: (1) increases that exceeded 5.0%; (2) increases that occurred less than six months from the last increase; and (3) increases that resulted in the employee receiving an hourly rate that exceeded the maximum rate for his or her PAR level. (*Id.*)

Defendant has separate salary administration guidelines for the server position. (Jones Decl. ¶¶ 36–37.) Servers receive compensation at a set wage per PAR level, and receive a fixed dollar increase as they attain the next PAR level. (*Id.*) Exceptions to those rules require prior written approval from the District Manager and the Regional Vice President. (*Id.*) Servers become eligible for merit increases six months after attaining PAR IV. (*Id.* ¶ 38.)

Before March 1999, Defendant limited merit increases for servers to a maximum of three percent with General Manager approval and five percent with District Manager approval. (Jones Decl. ¶ 38.) Increases that exceeded five percent required approval from the Regional Vice President. (*Id.*) Merit raises given more frequently than every six months or given before a server attained PAR IV also required advance approval from the Regional Vice President. (*Id.*)

Effective March 1999, Defendant limited merit increases for servers to a maximum of four percent with General Manager approval and five percent with District Manager approval. (Jones Decl. ¶.38.) Increases that exceed five percent require approval from the Regional Vice President. (*Id.*)

### iv. Promotion to Management

In 1994, Defendant created its "Management Internship Program." (Decl. of Thomas Pate ¶ 5 (filed as part of Def.'s Promotion to Management App.).) Defendant's Management Internship Program seeks to identify hourly store employees who have the potential to move into restaurant and retail management, and to provide those employees with extensive training for such a promotion. (*Id.*) Since its inception, Defendant's Management Internship Program has consisted of four phases: (1) selection; (2) in-store training; (3) management training; and (4) reassignment to a store. (*Id.*) [17]

Several prerequisites exist for Defendant's Management Internship Program. (Pate Decl. ¶ 6a–c.) First, a candidate must have a high school diploma or its equivalent. (*Id.*) Second, a candidate must have a certain level of work experience with Defendant. (*Id.*) Initially, Defendant required a candidate to satisfy each of the following work experience requirements: (1) the candidate must have been a PAR IV employee in any area; (2) the candidate must have held the Lead Trainer, New Store Opener, or Merchandise Assistant position with Defendant for a minimum of six months; (3) the candidate must have been a Cashier PAR II or higher; (4) the candidate must have been a PAR II or higher back-up cook or grill cook; and (5) the candidate must have been a PAR II or higher server or host. (*Id.* ¶ 6c.) [18] Third, a candidate must

---

**16.** Effective March 1999, a store General Manager could give a merit increase of up to four percent. (Jones Decl. ¶ 32.)

**17.** Defendant has two entry points for new managers: (1) Defendant's Management Internship Program, for internal candidates; and (2) Defendant's Management–in–Training ("MIT") Program, for external candidates. (Haworth–Thornton Report at 76–78.) The entry-level management positions at Defendant's stores are: (1) Assistant Restaurant Manager, for internal candidates who enter the restaurant side of the business through the Management Internship Program; (2) Associate Restaurant Manager, for external candidates who enter the restaurant side of the business through the MIT Program; and (3) Merchandise Assistant, for candidates

who enter the retail/gift shop side of Defendant's business to become Retail Managers. (*Id.*)

Internal and external management candidates face different criteria and means of attaining management positions. (Haworth–Thornton Report at 76–78.) Internal candidates may apply either through the Management Internship Program or the MIT Program. (*Id.*) External candidates may apply only through the MIT Program. (*Id.*) Successful internal candidates in the Management Internship Program graduate from Assistant to Associate Managers after eighteen to twenty-four months. (Def.'s Promotion to Management App. Ex. M–5.)

**18.** Over the years, Defendant changed the positions that satisfy the experience prerequisite. The positions of POS Technical Trainer, Employ-

complete an application.[19] (Def.'s Promotion to Management App. Ex. M–3.) Fourth, several Plaintiffs testified that a candidate for Defendant's Management Internship Program must be willing to relocate.

If a candidate for Defendant's Management Internship Program met the minimum requirements, his or her name would be forwarded to the Regional Management Recruiter ("RMR") for the region in which the candidate was employed. (Pate Decl. ¶ 7.) The RMR then contacted the candidate and scheduled an assessment. (Id. ¶ 8.) The assessments used varied over time, but each assessment was developed by an outside professional consultant who determined that the assessment was a valid, job-related selection device. (Id.) If a candidate successfully completed the assessment, the RMR interviewed the candidate. (Id. ¶ 9.)

Defendant provided RMRs with a structured interview guide that identified the questions for the RMRs to ask candidates for the Management Internship Program during interviews. (Pate Decl. ¶ 9.) The RMRs decided whether to accept the candidates into the Management Internship Program. (Id. ¶ 10.)

In 1998, District Managers assumed the responsibility for interviewing candidates for the Management Internship Program. (Pate Decl. ¶ 11.) The District Managers followed an "action checklist" and adhered to structured interview questions. (Id.) Before finalizing a decision concerning a candidate, the District Manager consulted with his or her Regional Vice President. (Id.)

On March 15, 1999, Defendant returned the responsibility for interviewing candidates for the Management Internship Program to the Recruiting Department. (Pate Decl. ¶ 12.) The Regional Vice President, however, assumed responsibility for deciding whether to accept a candidate into the Management Internship Program. (Id.)

In 1999, the structured interview format for the Management Internship Program changed somewhat. (Pate Decl. ¶ 13.) Specifically, Defendant changed the interview format to include questions in additional areas. (Id.; Def.'s Promotion to Management App. Ex. M–5.)

In the vast majority of cases, Defendant has selected candidates for the Management Internship Program if the candidates satisfied the minimum requirements, passed the assessment, and passed a mandatory drug screen. (Pate Decl. ¶ 14.) Defendant has rejected candidates because of poor interviews on only a few occasions. (Id.)

Defendant also publishes the "Internship Program Handbook" to provide information for candidates selected for the Management Internship Program, as well as for those employees who are interested in the Program. (Pate Decl. ¶ 15; Def.'s Promotion to Management App. Ex. M–2.) Since September 1998, Defendant also has used posters in store break areas to inform employees of the Management Internship Program. (Def.'s Promotion to Management App. Ex. M–4.)

### v. Equal Employment Opportunity Policies

Since 1995, Defendant has promulgated the following written policies: (1) Equal Opportunity Statement (Def.'s Equal Employment Opportunity App. Ex. E–1); (2) Harassment and Discrimination Policy (id. Ex. E–2); (3) Rules of Conduct (id. Ex. E–3); (4) Open Door Policy (id. Ex. E–4); (5) Pleasing People Mission Statement (id. Ex. E–5); and (6) Patchwork Quilt Policy (id. Ex. E–6). (Decl. of Kim Tramel ¶¶ 4–9 (contained in Def.'s Equal Employment Opportunity App.).) During the relevant time period,

---

ee Training Coordinator ("ETC"), Skill Trainer, and Shift Leader were added to the list of non-PAR job requirements, all of which an employee must have held for six months to qualify for Defendant's Management Internship Program. (Pate Decl. ¶ 6c.)

19. Initially, Defendant required the candidate to obtain the signature of the General Manager of the candidate's store before submitting the appli-

cation to Defendant's headquarters. (Pate Decl. ¶ 6c.) In September 1998, Defendant modified this requirement to require local management's approval after Defendant receives the candidate's application at Defendant's headquarters. (Id.) If the General Manager of the candidate's store does not recommend the candidate, Defendant documents the reason for the General Manager's refusal to recommend the candidate. (Id.)

Defendant's Equal Opportunity Statement has governed all hiring decisions. (Pate Decl. ¶ 12; Maidl Decl. ¶ 28.) Defendant's Equal Opportunity Statement requires Defendant's managers to make all decisions without regard to race. (Def.'s Equal Employment Opp.App. Ex. E–1.)

Defendant has made its employees aware of its policies by publishing the policies in its Employee Handbook and by conducting new-hire orientation sessions. (Tramel Decl. ¶¶ 10–11.) Defendant provides its Pleasing People Mission Statement to employees at hiring and in PAR manuals, and Defendant also distributed this statement to all employees in September 2001. (*Id.* ¶ 12.)

Defendant posts Equal Employment Opportunity posters in store break areas. (Tramel Decl. ¶ 13.) Those posters include a toll-free number for complaints, and telephone calls to that toll-free number are ultimately directed to Defendant's Employee Relations Department. (*Id.*) [20]

Defendant displays the Patchwork Quilt Policy poster in all store break areas. (Tramel Decl. ¶ 14.) All employees received a pamphlet concerning the Patchwork Quilt Policy with their paychecks. (*Id.*) All new hires also watch a video concerning the Patchwork Quilt Policy during new-hire orientation. (*Id.*)

In November 1999, Defendant began using payroll scrolls on paychecks to distribute the toll-free number for complaints to Employee Relations and to distribute the Open Door Policy. (Tramel Decl. ¶ 15.) Beginning in January 2000, Defendant also printed the toll-free number for complaints to Employee Relations on all Employee Discount Cards. (*Id.*)

Defendant's newsletter also addresses Defendant's Equal Employment Opportunity, non-discrimination, and non-harassment policies. (Tramel Decl. ¶ 15.) Defendant distributes its newsletter to all stores, and the stores place the newsletters in break areas. (*Id.*)

Defendant also posts its Equal Employment Opportunity policy on its website. (Tramel Decl. ¶ 16.) Further, Defendant's employment application describes Defendant's Equal Employment Opportunity policy. (*Id.*)

In February 2001, Defendant added a paragraph to its application form that directs applicants and employees to report concerns about discrimination or harassment to Defendant's Employee Relations Department. (Tramel Decl. ¶ 16.) Lead Trainers or ETCs also provide training to store employees concerning Equal Employment Opportunity policies after orientation. (*Id.* ¶ 17.)

In October 2000, Defendant added equal employment opportunity to management performance reviews. (Tramel Decl. ¶ 18.) Specifically, Defendant requires verification of each manager's understanding of, and compliance with, Defendant's Equal Employment Opportunity policies. (*Id.*) In November 2001, Defendant added equal employment opportunity initiatives to its Managers' Staffing and Retention Guide. (*Id.*)

Since at least 1999, Defendant's management trainees have received information concerning equal employment and anti-harassment policies. (Tramel Decl. ¶ 18.) Defendant's management trainees have received this information through the Employee Relations Handbook, the Orientation Manual, the Internship Handbook, and the Interview Guide. (*Id.*) [21]

---

**20.** Defendant's employees can report discrimination or harassment by complaining personally to any level of management or by complaining to an Employee Relations representative via the toll-free telephone number or e-mail. (Tramel Decl. ¶ 30.) Employees may complain anonymously. (*Id.*)

Although Defendant's management training includes information concerning investigating complaints of discrimination and harassment, Defendant asks its managers to report those complaints to its Employee Relations Department. (Tramel Decl. ¶ 32.) The Employee Rela-

tions Department can receive the complaint, assist with the investigation, maintain records, and ensure that Defendant takes responsive action when necessary. (*Id.*) The Employee Relations Department uses standard forms for reporting incidents and for obtaining witness statements, and also uses a checklist for conducting a proper investigation. (*Id.*)

**21.** Since at least 1995, Defendant has required all its management trainees to attend a seminar concerning Equal Employment Opportunity and Title VII issues during the trainees' initial train-

In May 2000, Defendant created a toll-free number to its Employee Relations Department for the exclusive use of managers. (Tramel Decl. ¶ 19.) Periodically, Defendant has modified its policies and procedures to improve those policies and to reflect changes in the law. (*Id.* ¶ 20.)

As Defendant promotes Associate Managers, those Associate Managers receive additional Patchwork Quilt training through the Senior Associate Manager Program. (Tramel Decl. ¶ 24.) Since at least 1995, Defendant's Senior Associate Managers have attended a one-week training course at Defendant's corporate headquarters before receiving their promotions to store General Manager positions. (*Id.*) During this week of training, Senior Associate Managers receive 1.5 hours of training concerning Equal Employment Opportunity issues. (*Id.*)

All General Managers who receive promotions to District Manager positions also receive a corporate orientation. (Tramel Decl. ¶ 25.) That orientation includes another hour of training with Defendant's Employee Relations Department personnel to review Patchwork Quilt materials. (*Id.*)

Since 1999, Defendant has presented Patchwork Quilt materials at its annual General Managers meeting. (Tramel Decl. ¶ 26.) All of Defendant's General Managers, District Managers, and Regional Vice Presidents attend that meeting. (*Id.*)

In fall 2001, Defendant continued employee relations training for NUO employees, using a format similar to the training program for management personnel. (Tramel Decl. ¶ 24.)

ing at Defendant's corporate headquarters. (Tramel Decl. ¶ 21.) Beginning in 1997 or 1998, Defendant required management trainees to participate in an interactive CD ROM training program that included Equal Employment Opportunity issues. (*Id.*)

In early 2000, Defendant's Employee Relations Department began using the Patchwork Quilt training program for management trainees. (Tramel Decl. ¶ 22.) In September 2000, Defendant created the Managers' Reference Guide, which incorporates the Patchwork Quilt Policy, and began using that Guide for training on Equal Employment Opportunity issues with management trainees. (*Id.*)

Beginning in fall 2001, Defendant's ETCs also attended Employee Relations training, which included information concerning Equal Employment Opportunity issues. (*Id.* ¶ 29.)

Each of Defendant's management employees provides training on Equal Employment Opportunity issues to his subordinates. (Tramel Decl. ¶ 29.) Defendant's Employee Relations Department also is available at any time to assist with Equal Employment Opportunity issues. (*Id.*)

### 2. The Putative Class Representatives

#### a. Plaintiff Kelvis Rhodes: Current Employee

Plaintiff Rhodes alleges that from July 1994 through September 1998, he worked as a reserve grill cook at Defendant's League City, Texas, store. (Am.Compl.¶¶ 11, 38.) Since October 1998, Plaintiff Rhodes has worked as a grill cook at Defendant's Dalton, Georgia, store. (*Id.*)

In his January 3, 2002, Declaration, Plaintiff Rhodes stated that when he applied for work at Defendant's League City store in 1994, he sought a position as either a grill cook, a back-up cook, or a dishwasher.[22] (Decl. of Kelvis Rhodes at 1; Dep. of Kelvis Rhodes at 23–24.) Plaintiff Rhodes was informed that the only position available was a dishwasher position, and Plaintiff Rhodes accepted this position. (Rhodes Decl. at 1; Rhodes Dep. at 27.) When Plaintiff Rhodes moved to Dalton, Georgia, in 1998, Plaintiff Rhodes sought either a grill cook or a back-up cook position. (Rhodes Dep. at 55–57.) Plaintiff Rhodes thus sought only back-of-the-house positions.[23]

Defendant also has provided Patchwork Quilt training to District Managers. (Tramel Decl. ¶ 23.) In turn, Defendant required its District Managers to train all management employees in their Districts concerning the Patchwork Quilt Policy. (*Id.*) In August 2001, Defendant assigned the CD ROM training program to its District Managers. (*Id.* ¶ 27.)

22. All of those positions are back-of-the-house jobs.

23. Plaintiff Rhodes rated Defendant's best jobs in descending order as: (1) grill cook; (2) back-up cook; (3) prep cook; (4) server; and (5) dishwasher. (Rhodes Dep. at 53–54.) Only one of

Plaintiff Rhodes claims that he informed his supervisors of his interest in being promoted to positions with better opportunities for advancement, but Plaintiff Rhodes never received instruction or encouragement concerning applying for the Management Training Program or cross-training for front-of-the-house positions. (Am.Compl.¶ 39.) In his deposition, Plaintiff Rhodes testified that he talked to a manager named "Micah" about a management position. (Rhodes Dep. at 59; Rhodes Decl. at 3.) Plaintiff Rhodes claims that Micah informed Plaintiff Rhodes that it would be best if Plaintiff Rhodes went back to school. (Rhodes Dep. at 59.) Plaintiff Rhodes claims that this statement was discriminatory because some White managers have only high school diplomas. (Rhodes Decl. at 3.)

During his deposition, however, Plaintiff Rhodes admitted that he was not interested in relocating—a requirement for consideration for management—and that, although Micah told Plaintiff Rhodes to go back to school, Plaintiff Rhodes could not remember whether Micah's comment had anything to do with promotion into management. (Rhodes Dep. at 59–61.)[24] Plaintiff Rhodes thus never sought a management position. (*Id.*)

Plaintiff Rhodes also alleges that he did not receive the standard PAR pay increase when he bypassed the PAR II and III tests and passed the PAR IV test for back-of-the-house jobs. (Am.Compl.¶ 39.) Plaintiff Rhodes further complains that his managers denied him an opportunity to take a PAR test for a back-up cook position. (Rhodes Dep. at 89–90.)[25] Plaintiff Rhodes testified that when the names of employees eligible to take this PAR test was posted on the door, Plaintiff Rhodes' name was not included. (*Id.* at 90.) Plaintiff Rhodes added that on one occasion some time ago, Plaintiff Rhodes

mentioned to an unidentified manager that Plaintiff Rhodes' name was not on the list of those eligible to take the PAR test. (*Id.*) Plaintiff Rhodes, however, did not recall the manager's response. (*Id.*) In the year preceding his deposition, Plaintiff Rhodes had not expressed his desire to take the PAR III or PAR IV test for the back-up cook position to anyone in management. (*Id.* at 91.) Plaintiff Rhodes feels that he should not have to express this desire, because everyone else who is eligible for a PAR test is listed. (*Id.*)

Plaintiff Rhodes asserts that Defendant routinely has promoted White employees to vacant positions, over African–American employees of comparable or more extensive experience. (Rhodes Dep. at 91.) Plaintiff Rhodes claims that putative class member Plaintiff McDermott, an African–American, has requested a promotion to a cashier position, but that her store's management always has responded that no cashier positions were available. (Am.Compl.¶ 39.)

Plaintiff Rhodes' PAR testing history is as follows:

| Date of Test | Skill | PAR Level Test | Results |
|---|---|---|---|
| 10/12/94 | Dishwasher | I | Pass |
| 01/17/95 | Dishwasher | II | Pass |
| 06/06/95 | Dishwasher | III | Pass |
| 01/25/96 | Dishwasher | IV | Fail |
| 03/29/96 | Back-up Cook | I | Pass |
| 05/23/96 | Dishwasher | IV | Pass |
| 09/13/96 | Back-up Cook | II | Pass |
| 01/15/97 | Grill Cook | I | Pass |
| 11/12/98 | Grill Cook | IV | Pass |
| 08/01/99 | Back-up Cook | IV | Pass |

those positions—the server position—is a front-of-the-house position.

**24.** In his Declaration, Plaintiff Rhodes asserts that an unidentified manager told Plaintiff Rhodes to go back to school after Plaintiff Rhodes asked about getting a more highly paying job. (Rhodes Decl. at 3.) Plaintiff Rhodes does not mention promotion to management in connection with that comment. (*Id.*)

**25.** In his deposition, Plaintiff Rhodes claims that his managers denied him an opportunity to take the PAR III test. (Rhodes Dep. at 89–90.) In his Declaration, Plaintiff Rhodes claimed that his managers denied him an opportunity to take the PAR IV test. (Rhodes Decl. at 4.) Plaintiff Rhodes' PAR testing history, however, shows that Plaintiff Rhodes took three PAR tests for the back-up cook position and that Plaintiff Rhodes is at PAR IV in that position. (Haworth–Thornton Report at 75.)

(Haworth–Thornton Report at 75.) Plaintiff Rhodes thus had the opportunity to cross-train in other jobs and to take PAR tests. (*Id.*)

Plaintiff Rhodes' hourly pay rate increased from $6.04 in 1995 to $12.53 in 2001, an increase of 108 percent. (Haworth–Thornton Report at 101.) In 1995, Plaintiff Rhodes' hourly pay rate was one cent less than that of the other PAR III dishwasher, who was non-African-American, and was higher than that of any other employee who worked the majority of his or her hours as a dishwasher. (*Id.*)

In 1996, Plaintiff Rhodes spent the majority of his work hours in the grill cook position, for which Plaintiff Rhodes had yet to pass a PAR test. (Haworth–Thornton Report at 101.) Plaintiff Rhodes' pay rate was lower than that of six of the other employees who spent their majority of their hours as grill cooks. (*Id.*) Five of those employees were PAR III or IV grill cooks, and one of those employees was African–American. (*Id.*) Plaintiff Rhodes' pay rate was higher than the pay rates for the remaining seventeen other employees who worked primarily as grill cooks. (*Id.*)

After moving to Defendant's Dalton store in 1997, Plaintiff Rhodes' pay rate was less than the pay rate of one non-African American PAR I grill cook. (Haworth–Thornton Report at 101.) Plaintiff Rhodes' pay rate, however, was higher than the pay rates of the remaining four PAR 0 and PAR I grill cooks, three of whom were non-African-American. (*Id.*)

In 1998, Plaintiff Rhodes bypassed the PAR II and III grill cook tests and passed the PAR IV grill cook test. (Haworth–Thornton Report at 102.) At the end of 1998, Plaintiff Rhodes' pay rate was lower than the pay rates of the seven other PAR III and IV grill cooks who worked primarily in that job. (*Id.*) One of those grill cooks was putative class representative Plaintiff Regan, and the other six grill cooks were non-African-Americans. (*Id.*) Plaintiff Rhodes had a higher pay rate than the pay rates for all grill cooks at PAR levels below III, with the exception of one African–American grill cook. (*Id.*)

At the end of 1999, Plaintiff Rhodes' hourly rate was less than the other PAR III and IV grill cooks who worked primarily in that job. (Haworth–Thornton Report at 102.) One of those PAR III or IV grill cooks was Plaintiff Regan, and the other PAR III or IV grill cooks were non-African-Americans. (*Id.*) In 2000 and 2001, Plaintiff Rhodes was the most highly-paid hourly employee in Defendant's Dalton store. (*Id.*)

### b. Plaintiff Stephen Wilson: Former Employee

Plaintiff Wilson alleges that he worked as a grill cook at Defendant's Dalton store from September 1997 through December 1998. (Am.Compl.¶ 12.) In his Declaration, however, Plaintiff Wilson asserts that he began his employment with Defendant in 1994 as a dishwasher, that he became a grill cook in August 1994, and that he quit in January 1999. (Decl. of Stephen Wilson at 1.) In his deposition, Plaintiff Wilson testified that he began working with Defendant in April 1994, that he left in January 1997, that he returned in January 1998, and that he quit again in December 1998. (Dep. of Stephen Wilson at 45–46, 129.) Plaintiff Wilson alleges that Defendant constructively discharged him. (Am.Compl.¶ 41.)[26]

Plaintiff Wilson alleges that the only job available when Defendant initially hired him was a dishwasher position. (Wilson Dep. at 36–37, 41.) Plaintiff Wilson accepted the dishwasher position, and quickly received a

---

**26.** Defendant's experts' review of Plaintiff Wilson's employment records shows the following employment history for Plaintiff Wilson. (Haworth–Thornton Report at 102.) Plaintiff Wilson applied for, and received, a dishwasher position at Defendant's Dalton store, and began working on June 8, 1994. (*Id.*) On June 5, 1995, Plaintiff Wilson voluntarily terminated his employment with Defendant. (*Id.*) On August 14, 1995, Plaintiff Wilson returned to Defendant as a PAR I grill cook. (*Id.*) On June 26, 1997, Plaintiff Wilson again voluntarily terminated his employment with Defendant. (*Id.*) On January 14, 1998, Defendant re-hired Plaintiff Wilson as a grill cook. (*Id.*) On January 12, 1999, Plaintiff Wilson left his employment with Defendant for the final time. (*Id.*)

promotion to a grill cook position. (Wilson Decl. at 1.) Plaintiff Wilson points to no evidence suggesting that front-of-the-house positions actually were available when Defendant's Dalton store hired him.[27]

Plaintiff Wilson asserts that he requested cross-training as a server so that he could position himself for a move into management, but that his managers either ignored his request or told him to remain in a grill cook position. (Am. Compl. ¶ 42; Wilson Dep. at 149–50; Wilson Decl. at 3.) At the same time, his managers allowed a White grill cook, Devante Delinco, to cross-train as a server. (Wilson Dep. at 150–51; Wilson Decl. at 3.)

Plaintiff Wilson also claims that his managers discouraged him from seeking a management position because: (1) Defendant failed to post vacancies for the Management Internship Program;[28] (2) his managers did not cross-train him as a server; and (3) his managers did not make him aware of the opportunity to take the PAR IV grill cook examination. (Am. Compl. ¶ 42; Wilson Decl. at 3; Wilson Dep. at 149–51.) Plaintiff Wilson also asserts that his managers denied him the opportunity to take PAR tests for back-of-the-house positions on three occasions, and that, after Plaintiff Wilson believed that he had passed a PAR II test in 1996, Plaintiff Wilson did not receive the automatic PAR pay increase. (Wilson Dep. at 77–78, 91–92, 120.)

Plaintiff Wilson alleges that he was underpaid in comparison to similarly-situated White employees. (Wilson Decl. at 4–5.) Plaintiff Wilson asserts that Mr. Delinco held the same PAR level as Plaintiff Wilson held, but that Mr. Delinco received $2.00 more per hour. (Am. Compl. ¶ 43; Wilson Dep. at 124–26.) Plaintiff Wilson alleges that his store routinely denies African–American employees merit pay increases. (Am. Compl. ¶ 43.) Plaintiff Wilson asserts that in

1998, he acquired seniority over some White cooks, but that he often was directed to work the back grill, which is more difficult and is typically assigned to persons with less seniority. (*Id.*) According to Plaintiff Wilson, White grill cooks more often were assigned to the easier front grill station. (*Id.*)

Plaintiff Wilson further claims that Defendant promoted White employees to vacant positions over African–American employees with comparable or superior experience. (Am.Compl. ¶ 43.) For example, Plaintiff Wilson points out that although he had three years of experience with a janitorial maintenance company, his managers did not permit him to train into the night maintenance position. (*Id.*) When a night maintenance position became available, Plaintiff Wilson sought the position, but a White employee received the position. (*Id.*) Plaintiff Wilson alleges that the Dalton store's General Manager did not want African–Americans on night maintenance duty because he believed that those individuals could not be trusted inside the store after hours. (*Id.*)

Plaintiff Wilson also complains that White employees received preferential treatment in scheduling, while African–American employees almost always were required to work on holidays. (Am.Compl. ¶ 44.) When Plaintiff and a White employee were scheduled to work on July 4, both employees elected not to report for work. (*Id.*) Plaintiff claims that he was suspended and reprimanded, but that the White employee received no discipline.[29] (*Id.*)

Plaintiff Wilson also contends that in the Dalton store, certain White managers frequently referred to African–Americans as "boy" or "you people" or made other disparaging remarks. (Am. Compl. ¶ 43; Wilson Decl. at 5–6.) Plaintiff Wilson claims that those managers never received discipline for

---

**27.** Plaintiff Wilson testified that Defendant's best non-management job was the back-up cook position. (Wilson Dep. at 121–22.) This position is a back-of-the-house position.

**28.** In his deposition, Plaintiff Wilson testified that he was unwilling to relocate—a prerequisite for promotion to management—and that he never sought entry into any formal management training program. (Wilson Dep. at 193, 204.)

**29.** Plaintiff Wilson claims that he knew the White employee was scheduled to work, but that he saw the White employee on the street. (Wilson Dep. at 108–09, 111.) The White employee later bragged that he had not reported for work, but that he had not received discipline. (*Id.*) Plaintiff Wilson does not know if the White employee ever received discipline. (*Id.*)

those remarks. (Am. Compl. ¶ 43; Wilson Decl. at 5–6.)

Plaintiff Wilson has the following PAR testing history:

| Date of Test | Skill | PAR Level | Result |
| --- | --- | --- | --- |
| 08/16/94 | Grill Cook | I | Pass |
| 03/06/95 | Grill Cook | II | Fail |
| 05/22/95 | Grill Cook | II | Fail |
| 04/23/96 | Grill Cook | II | Pass |
| 09/25/96 | Grill Cook | III | Pass |
| 02/25/97 | Prep Cook | I | Fail |
| 02/10/98 | Prep Cook | I | Pass |

(Haworth/Thornton Report at 55–56.)

In 1995, one PAR I grill cook, who was an African–American, had a higher hourly pay rate than Plaintiff Wilson. (Haworth/Thornton Report at 103.) Four PAR I grill cooks, all of whom were non-African-American, had lower hourly rates than Plaintiff Wilson. (*Id.*)

At the end of 1995, Plaintiff Wilson was one of four PAR III grill cooks, three of whom were non-African-American. (Haworth/Thornton Report at 103.) Plaintiff Wilson had a lower hourly pay rate than two of the grill cooks and the same rate as one of the grill cooks. (*Id.* at 104.)

In 1997, Plaintiff Wilson began working as a prep cook. (Haworth/Thornton Report at 103.) Plaintiff Wilson earned the highest hourly rate of any employee who worked primarily in that position during 1997. (*Id.*) In 1998, Plaintiff Wilson's hourly rate exceeded the hourly rates for all PAR I prep cooks and for all PAR 0 through PAR II grill cooks. (*Id.*)

### c. Plaintiff Connie Regan: Current Employee

In 1987, Plaintiff Regan began working as a grill cook at Defendant's Williamsburg, Vir-

ginia, store. (Am.Compl.¶ 13.) In 1991, Plaintiff Regan transferred to Defendant's Lumberton, North Carolina, store, where he worked as a grill cook. (*Id.*) In 1995, Plaintiff Regan transferred to Defendant's Dalton store as a grill cook. (*Id.*) Plaintiff Regan currently remains at Defendant's Dalton store as a PAR IV grill cook. (*Id.;* Dep. of Connie Regan at 42.) [30]

Plaintiff Regan testified that he only applied for back-of-the-house positions that involved cooking at Defendant's Williamsburg store, and that those were the only positions he wanted. (Regan Dep. at 29.) When Plaintiff Regan moved to Defendant's Lumberton and Dalton stores, he sought to remain a grill cook because he liked cooking. (*Id.*) He never pursued a front-of-the-house position. (*Id.* at 88, 175.)

Plaintiff Regan testified that the Lumberton store never denied him the opportunity to cross-train. (Regan Dep. at 140.) He knew of no other African–American employees who were denied cross-training opportunities at the Lumberton or Dalton stores. (*Id.* at 140–41, 176, 233.)

Plaintiff Regan contends that Defendant's discriminatory selection procedures adversely affected him. (Am.Compl.¶ 47.) For example, Plaintiff Regan claims that he expressed interest in the Lead Store Opening Trainer position to his Lumberton store supervisors. (Am. Compl. ¶ 47; Regan Dep. at 75–76, 136–37; Decl. of Connie Regan at 2.) Plaintiff Regan contends that Defendant did not afford him the opportunity to apply for that position because Defendant failed to announce, post notices of, or accept applications for, vacancies in that position. (Am. Compl. ¶ 47; Regan Dep. at 75–76, 136–37; Regan Decl. at 2.)

Plaintiff Regan claims that Defendant's compensation procedures adversely affected him. (Am.Compl.¶ 47.) At Defendant's Lumberton store, Plaintiff claims that White employees received higher salaries and re-

---

**30.** The evidence in the record indicates that Plaintiff Regan actually began working at Defendant's Williamsburg store in 1990. (Regan Dep. at 28, Ex. 1; Decl. of Connie Regan at 1; Haworth–Thornton Report at 98.) In Plaintiff Regan's Declaration, he stated that he worked at

Defendant's Dalton store and then at Defendant's Calhoun, Georgia, store. (Regan Decl. at 1.) It appears that Plaintiff Regan transferred to the Dalton store in July 1994, and that he transferred to the Calhoun store in January 2000. (Haworth–Thornton Report at 98–99.)

ceived regular pay increases, while similarly-situated African–American employees were underpaid. (*Id.*) Plaintiff Regan claims that he had to accept a reduction in pay when he arrived at the Lumberton store. (*Id.*) Plaintiff Regan asserts that neither he nor any other African–American employee at the Lumberton store ever received an annual raise in excess of twenty cents per hour. (*Id.*)

Plaintiff Regan contends that White employees receive more frequent raises and promotional opportunities. (Am.Compl.¶ 47.) Plaintiff Regan claims that David Fridele, a White kitchen employee at the Dalton store, received a substantial pay increase despite withdrawing from a scheduled PAR examination. (*Id.*) Plaintiff Regan believes that Plaintiff Rhodes, who passed three PAR examinations, received a smaller pay increase. (*Id.*) [31] Plaintiff Regan could not identify any similarly-situated White employee at the Dalton store who received a higher pay rate than he received. (Regan Dep. at 199.)

Plaintiff Regan did not seek a promotion to management at the Williamsburg store. (Regan Dep. at 75.) When Plaintiff Regan moved to the Dalton store, he worked under African–American managers and considered that path for himself—even talking to a manager about the Management Internship Program—but he became discouraged about moving into management when those managers were removed for what Plaintiff Regan believed were discriminatory reasons. (*Id.* at 166–68, 175–78, 217; Regan Decl. at 2–3.) Plaintiff Regan never knew of anyone who was excluded from Defendant's Management Internship Program, but Plaintiff Regan himself never pursued it. (Regan Dep. at 232.)

Plaintiff Regan also contends that Defendant promoted White employees into vacant positions over African–American employees of comparable or superior experience. (Am. Compl.¶ 48.) At the Lumberton store, White kitchen employees filled all management vacancies, and, to Plaintiff Regan's knowledge, no African–Americans were informed of vacancies or considered for vacancies. (*Id.*)

Plaintiff Regan also complains that the Lumberton store had no African–American managers, and that the Williamsburg store had only one African–American in management—as a trainee. (*Id.*)

Plaintiff Regan asserts that White kitchen employees generally are assigned to choice positions, regardless of tenure or experience. (Am.Compl.¶ 48.) Plaintiff Regan claims that African–American cooks are relegated to the back grill while White cooks occupy the front grill. (*Id.*) When an African–American cook, Plaintiff Wilson, complained about this practice, management reacted with hostility, which led Plaintiff Wilson to quit. (*Id.*)

Plaintiff Regan claims that of the 150 people employed at the Lumberton store, only six or seven African–Americans worked at that store at any given time, and those employees normally worked in the kitchen. (Am.Compl.¶ 49.) Over a four-year period, the Lumberton store had only one African–American hostess. (*Id.*) Of the sixty to seventy servers at the Lumberton store, only three servers at any one time were African–American. (*Id.*)

Plaintiff Regan claims that similar disparities existed at Defendant's Dalton store. (Am.Comp.¶ 49.) Plaintiff Regan claims that only seven of 180 employees in the Dalton store were African–American. (*Id.*) Five of those seven employees worked in the kitchen, even though the Dalton store received a number of applications for front-of-the-house positions. (*Id.*) Plaintiff Regan claims that two African–Americans applied for transfers to cashier positions but were rejected. (*Id.*)

Plaintiff Regan contends that at the Lumberton and Dalton stores, he observed that management disproportionately assigned African–Americans to work holidays and weekends. (Am.Compl.¶ 50.) He alleges that managers and co-workers continually referred to African–American employees at the Lumberton and Dalton stores as "boy." (*Id.*) He asserts that a White co-worker used the "N" word to refer to an African–American cook, but that a manager with knowledge of the incident refused to discipline the White

---

**31.** At his deposition, Plaintiff Regan admitted that he did not know what any other employee at Defendant's Dalton store earned. (Regan Dep. at 199.)

co-worker. (*Id.*) Plaintiff Regan was unable to rank the hourly positions with Defendant according to their desirability.

Plaintiff Regan has the following PAR testing history:

| Date of Test | Skill | PAR Level | Result |
|---|---|---|---|
| 07/10/90 | Grill Cook | I | Pass |
| 11/14/90 | Grill Cook | II | Pass |
| 08/20/91 | Grill Cook | III | Fail |
| 11/05/91 | Grill Cook | III | Pass |
| 06/09/92 | Grill Cook | IV | Fail |
| 11/10/92 | Grill Cook | IV | Fail |
| 01/12/93 | Grill Cook | IV | Pass |

(Haworth–Thornton Report at 75.) Plaintiff Regan thus had an opportunity to take PAR tests. (*Id.*) Plaintiff Regan, however, testified that at the Lumberton and Williamsburg stores, management failed to give him advance notice of PAR tests for back-of-the-house jobs, thus delaying him in taking some tests. (Regan Dep. at 120–22, 126–27.)

From 1995 to 1999, Plaintiff Regan worked exclusively as a grill cook. (Haworth–Thornton Report at 99.) In 2000, Plaintiff Regan also worked as a back-up cook. (*Id.*) By the end of 2001, Plaintiff Regan spent most of his hours in the back-up cook position. (*Id.*)

In 1995, Plaintiff Regan's hourly rate was $9.55, and by the end of 2001, his hourly rate had risen to $14.39—an increase of almost fifty-one percent. (Haworth–Thornton Report at 99.) In 1995, among PAR IV grill cooks who worked primarily in that job, Plaintiff Regan's hourly rate was less than that of two non-African-American employees and greater than that of two non-African-American employees and one African–American employee. (*Id.*) In 1996 and 1997, Plaintiff Regan's hourly rate fell between the hourly rates for two other PAR IV grill cooks, both of whom were non-African-American. (*Id.*) In 1998 and 1999, Plaintiff Regan was the highest-paid employee at the Dalton

store. (*Id.* at 100.) In 2000 and 2001, Plaintiff Regan was the highest-paid hourly employee at the Calhoun store. (*Id.*)

**d. Plaintiff Jerry Barbee: Current Employee**

In 1991, Plaintiff Barbee began working as a dishwasher at Defendant's Athens, Alabama, store. (Am.Compl.¶¶ 41, 52.) In January 1994, Plaintiff Barbee left Defendant's employment. (*Id.*) In May 1994, Plaintiff Barbee returned to work for Defendant as a dishwasher. (*Id.*) Plaintiff Barbee currently works as a back-up cook. (*Id.*) [32]

Plaintiff Barbee alleges that Defendant has never encouraged him to apply for cross-training in a front-of-the-house position, even though Plaintiff Barbee has expressed interest in those positions. (Am.Compl.¶ 53.) In his deposition, however, Plaintiff Barbee testified that he asked to be hired as a dishwasher, and that he has never sought a server, cashier, or gift shop position. (Dep. of Jerry Wayne Barbee at 47–49, 224–25.)

Plaintiff Barbee asserts that Defendant denied him the opportunity to participate in the Management Internship Program. (Am. Compl.¶ 53.) In his deposition, however, Plaintiff Barbee testified that he never applied for Defendant's Management Internship Program and that he never expressed interest in the program to any manager because he did not think "it was cut out for me." (Barbee Dep. at 337–38.)

Although Plaintiff Barbee complained that Defendant never offered him a lead trainer position, there is no evidence that he ever applied for such a position. (Barbee Dep. at 264–65.) Similarly, Plaintiff Barbee complained that Defendant denied him training as a shift leader, but admitted in his deposition that he never applied for that program. (*Id.*)

Plaintiff Barbee alleges that very few of the employees at Defendant's Athens store were African–American, and that most of the Athens store's African–American employees

---

**32.** The Haworth–Thornton Report states that Defendant hired Plaintiff Barbee in July 1991, and that he quit in October 1994. (Haworth–Thornton Report at 92.) In February 1994, Defendant re-hired and terminated Plaintiff Barbee. (*Id.*) In June 1994, Defendant re-hired Plaintiff Barbee. (*Id.*)

worked in back-of-the-house jobs as dishwashers. (Am.Compl.¶ 53.) The Athens store had no African–American managers. (*Id.*) Since 1991, no African–American dishwasher or prep cook ever became a server or hostess at the Athens store. (*Id.*) No African–American dishwasher has ever received a promotion to a grill cook position, but five White dishwashers have received such a promotion. (*Id.;* Barbee Dep. at 122–23; Decl. of Jerry Wayne Barbee at 4.) Although Athens store management promised Plaintiff Barbee that he would receive cross-training for a grill cook position, this cross-training did not occur even though the Athens store hired six Whites for grill cook positions. (Am. Compl. ¶ 53; Barbee Dep. at 122–23; Decl. of Jerry Wayne Barbee at 4.)

Plaintiff Barbee complains that Defendant promoted White employees to vacant positions over African–Americans with comparable or superior experience. (Am. Compl.¶ 54.) After four years, Plaintiff Barbee received a promotion to a back-up cook position. (*Id.*) A White dishwasher, Jeremy Beauchamp, who worked about six months as a dishwasher and had three fewer years of experience with Defendant, received a promotion to a grill cook position over Plaintiff Barbee. (*Id.*)

Plaintiff Barbee also alleges that Defendant routinely denies African–American employees information concerning the availability and timing of PAR examinations. (Am. Compl.¶ 54.) For example, Plaintiff Barbee was informed that he would receive a PAR examination after thirty days of working for Defendant. (*Id.*) Plaintiff Barbee, however, did not receive a PAR examination until after ninety days had passed. (*Id.*) Plaintiff Barbee also was told that he would receive subsequent PAR examinations every couple of months. (*Id.*) However, it took eighteen months for Plaintiff Barbee to receive and to pass all four PAR examinations for his position. (*Id.*) Plaintiff Barbee also claims that he has received only one merit pay increase during his eight years with Defendant. (*Id.;* Barbee Dep. at 275–76; Barbee Decl. at 4.)

Plaintiff Barbee also alleges that he has witnessed disparate treatment toward African–Americans, and that he has received such treatment. (Am.Compl.¶ 55.) Plaintiff Barbee complains that African–American employees do not receive set schedules and have to work different times each week. (*Id.*) One of the White back-up cooks, Judy Barrian, asked for and received time off every Thursday. (*Id.*) When Plaintiff Barbee mentioned this schedule to his store's Assistant Manager and sought to have a set "off" day, the Assistant Manager denied his request. (*Id.*) Although Plaintiff Barbee alleged that Defendant engages in pay discrimination, he testified at his deposition that he has no facts to support such a claim, and that he bases his claim on his "feeling" that Defendant pays White employees more than African–American employees. (Barbee Dep. at 115, 135, 218–19.)

Plaintiff Barbee has the following PAR testing history:

| Date of Test | Skill | PAR Level | Result |
|---|---|---|---|
| 08/27/91 | Dishwasher | I | Pass |
| 01/28/92 | Dishwasher | II | Fail |
| 06/17/92 | Dishwasher | II | Pass |
| 03/18/93 | Dishwasher | III | Fail |
| 05/06/93 | Dishwasher | III | Pass |
| 12/20/94 | Dishwasher | IV | Pass |
| 06/19/95 | Back-up Cook | I | Pass |
| 09/07/95 | Back-up Cook | III | Fail |
| 11/20/95 | Back-up Cook | II | Pass |
| 05/14/96 | Back-up Cook | III | Pass |
| 10/30/96 | Back-up Cook | IV | Fail |
| 11/21/96 | Back-up Cook | IV | Pass |

(Haworth–Thornton Report at 74.) Plaintiff Barbee thus had the opportunity to cross-train in other jobs and to take PAR tests. (*Id.*)

From 1995 to 2001, Plaintiff Barbee spent the majority of his hours in the back-up cook position. (Haworth–Thornton Report at 93.) From 1995, Plaintiff Barbee was the most highly paid PAR II back-up cook at the Athens store. (*Id.*) From 1996 to 1999, Plaintiff Barbee was the most lowly paid PAR IV back-up cook in the Athens store,

but the other two PAR IV back-up cooks at that store had worked for Defendant longer. (*Id.*) For 2000 and 2001, Plaintiff Barbee was the most highly paid back-up cook at the Athens store. (*Id.* at 93–94.) In 2000, Plaintiff Barbee was the most highly paid hourly employee in the Athens store. (*Id.* at 94.) In 2001, Plaintiff Barbee was the second most highly paid hourly employee at the Athens store, and the most highly paid hourly employee at that store was an African–American grill cook. (*Id.*)

### e. Plaintiff Sandra Keel: Current Employee

Plaintiff Keel resides in Lake City, Florida, and has worked for Defendant's Lake City store since 1989. (Am.Compl.¶¶ 15, 17.) Plaintiff Keel alleges that she began working for Defendant as a dishwasher and received a promotion to a prep cook position after seven months. (*Id.* ¶ 15.) In 1998, Defendant demoted Plaintiff Keel to a dishwasher position. (*Id.*) After Plaintiff Keel had surgery in October 2000, she returned to work with a restriction on heavy lifting. (Decl. of Sandra Keel at 1.) Defendant then assigned Plaintiff Keel to a front-of-the-house hostess position. (*Id.*)

Plaintiff Keel testified that when she applied with Defendant in 1989, she sought a dishwasher position. (Dep. of Sandra Keel at 54–55, Ex. 1.) Although Plaintiff Keel claimed in her Declaration that Defendant channels African–Americans who apply for front-of-the-house jobs into back-of-the-house jobs as dishwashers, Plaintiff Keel testified at her deposition that she has no information about the positions that applicants seek. (Keel Dep. at 114; Keel Decl. at 4.)

Plaintiff Keel stated, however, that she has witnessed unidentified African–Americans apply for cashier, hostess, or gift shop positions on numerous occasions. (Keel Dep. at 114.) Those persons were informed that the Lake City store was not hiring, but a few days later, Whites were hired for those positions. (*Id.* at 114–15.) Plaintiff Keel knew nothing about the relative qualifications of

the people hired and rejected for those positions. (*Id.* at 118–19.)

Plaintiff Keel alleges that she sought a front-of-the-house position as a cashier or hostess in 1999. (Am. Compl. ¶ 58; Keel Dep. at 263–64; Keel Decl. at 4.) The Lake City store's general manager informed Plaintiff Keel that no openings were available. (Am. Compl. ¶ 58; Keel Dep. at 263–64; Keel Decl. at 4.) Approximately three days later, the Lake City store hired two Whites as hostesses. (Am. Compl. ¶ 58; Keel Dep. at 263–64; Keel Decl. at 4.) Plaintiff Keel claims that Defendant only allowed her to work in a hostess position after she suffered an injury and could no longer work in a back-of-the-house position. (Am. Compl. ¶ 58; Keel Dep. at 263–64; Keel Decl. at 4.) [33] Plaintiff Keel never sought a management position with Defendant, and was not willing to relocate—a prerequisite for promotion to management. (Keel Dep. at 58, 260.)

Plaintiff Keel alleges that she has received only one salary increase in ten years of working for Defendant. (Am.Compl.¶ 58.) In contrast, a White grill cook with less tenure received three salary increases over one year and earns more than Plaintiff Keel earns. (*Id.*) Plaintiff Keel adds that the Lake City store often permits White dishwashers to work as back-up cooks, but has never permitted Plaintiff Keel to do so, even though she has passed all four PAR levels as a prep cook. (*Id.*) Plaintiff Keel, however, could not identify a single similarly-situated White employee who was paid more than Plaintiff Keel. (Keel Dep. at 277.) Plaintiff Keel also asserts that the Lake City store's General Manager discriminated against her in applying the PAR requirements for her back-of-the-house positions. (Keel Decl. at 2–4.)

Plaintiff Keel alleges that she has observed disparate treatment and that she has suffered disparate treatment. (Am.Compl.¶ 59.) During Plaintiff Keel's ten years of employment with Defendant, she has worked with only one African–American manager, and she has had few African–American co-workers and servers. (*Id.*) Most of the African–Americans employed at the Lake City store

---

**33.** Plaintiff Keel testified that she asked the Lake City store's manager about moving to a server job in 1996, but that the manager never responded to her. (Keel Dep. at 269.)

worked in the back-of-the-house as dishwashers. (*Id.*) At her deposition, however, Plaintiff Keel testified that the Lake City store has had an African–American cashier and "plenty" of African–American hosts. (Keel Dep. at 268.)

Plaintiff Keel also alleges that the Lake City store allows White employees to use the telephone in the store manager's office, but requires African–American employees to use the pay phone in the store break room. (Am.Compl.¶ 59.) According to Plaintiff Keel, the Lake City store routinely schedules African–American employees to work weekends, holidays, and closing shifts, while White employees routinely receive time off on weekends and holidays. (*Id.*) Plaintiff Keel alleges that the Lake City store management often tell African–American employees to end their breaks early to assist in the break room, while allowing White employees to finish their breaks. (*Id.*) Finally, Plaintiff Keel asserts that as an African–American, she receives "write-ups" for minor infractions, while White employees do not receive similar "write-ups." (Am. Compl. ¶ 59; Keel Decl. at 4; Keel Dep. at 303–04.)

Plaintiff Keel has the following PAR testing history:

| DATE OF TEST | SKILL | PAR LEVEL | RESULT |
| --- | --- | --- | --- |
| 08/01/89 | Dishwasher | I | Pass |
| 04/25/90 | Dishwasher | II | Pass |
| 07/20/90 | Prep Cook | I | Pass |
| 09/24/90 | Prep Cook | II | Fail |
| 11/28/90 | Prep Cook | II | Pass |
| 11/29/90 | Dishwasher | III | Fail |
| 02/01/91 | Dishwasher | III | Fail |
| 04/09/91 | Prep Cook | III | Fail |
| 04/09/91 | Dishwasher | III | Pass |
| 06/13/91 | Prep Cook | III | Pass |
| 12/18/91 | Prep Cook | IV | Fail |
| 04/20/92 | Prep Cook | IV | Pass |
| 08/01/99 | Dishwasher | IV | Pass |

(Haworth–Thornton Report at 74–75.) Plaintiff Keel thus has received an opportunity to cross-train in other positions and to take PAR tests. (*Id.*)

From 1995 to 1998, the Lake City store had no other PAR IV prep cooks, but Plaintiff Keel received an hourly rate that exceeded the rates of the other employees who worked most of their hours as prep cooks. (Haworth–Thornton Report at 97.) In 1999, Plaintiff Keel's hourly rate was higher than that of the other PAR IV prep cook, who was an African–American, but Plaintiff Keel worked most of her hours as a dishwasher. (*Id.*) When compared to other PAR IV dishwashers, Plaintiff Keel's hourly rate was lower than that of her two co-workers, one of whom was African–American and one of whom was non-African-American. (*Id.*) In 2000, Plaintiff Keel spent the majority of her hours as a dishwasher, but also worked as a hostess, shop attendant, and prep cook. (*Id.*)

In 2001, Plaintiff Keel worked the majority of her hours as a hostess. (Haworth–Thornton–Report at 97.) Plaintiff Keel's pay rate fell between the pay rates of the other two PAR IV hostesses, both of whom were African–American. (*Id.*)

**f. Plaintiff Kebere Workue: Unsuccessful Applicant**

Plaintiff Workue resides in Washington, D.C. (Am.Compl.¶ 16.) During 1995, Plaintiff Workue applied unsuccessfully for employment at several of Defendant's stores in Virginia. (*Id.*) Plaintiff Workue argues that Defendant engaged in a pattern and practice of discrimination, and did not consider her for traditionally White job classifications when she applied for employment. (*Id.* ¶ 61.)

In July or August 1995, Plaintiff Workue telephoned Defendant's Manassas, Virginia, store. (Am.Compl.¶ 62.) Someone informed Plaintiff Workue that the store had just opened and was hiring employees for every position. (*Id.*) Plaintiff Workue went to the Manassas store either on that same day or on the following day to complete an application for a server position. (*Id.*) A White manager told Plaintiff Workue either that the Manassas store was hiring servers or that the store had no server positions avail-

able, but she had good experience as a server, and he would call her when a server position became available. (*Id.*) The manager, however, never called Plaintiff Workue. (*Id.;* Decl. of Kebere Workue ¶ 2.)

From August through November 1995, Plaintiff Workue subsequently applied for server positions at other stores operated by Defendant in Virginia. (Am. Compl. ¶ 63; Workue Decl. at 1.) None of the stores offered Plaintiff Workue a job, even though the stores were hiring servers. (Am. Compl. ¶ 63; Workue Decl. at 1.)[34]

Plaintiff Workue alleges that when she applied for jobs with Defendant, she had worked as a server from 1976 to 1986 at the Marriott Cafeteria in the Art and Space Museum, in Washington, D.C., and that she had worked from 1986 to 1995 as a server at a restaurant in the Museum of American History in Washington, D.C., called "Daka." (Am.Compl.¶ 64.) Plaintiff Workue asserts that she had nineteen years of experience working as a server when she applied unsuccessfully with Defendant's stores. (*Id.* ¶ 64.)

In her Declaration, however, Plaintiff Workue only lists ten years of experience as a server at the Marriott Cafeteria located in the Air and Space Museum. (Workue Decl. at 1–2.) At her deposition, Plaintiff Workue testified that she worked as a cashier at Daka, rather than as a server. (Dep. of Kebere Workue at 44–49.) On her application for Defendant's Manassas store, however, Plaintiff Workue incorrectly stated that she worked at Data Food Services at 12th Street and Constitution Avenue as a waitress from 1986 to 1995, but that her employer had laid her off. (*Id.* at 157–58 & Ex. 4.)

In Plaintiff Workue's deposition, she testified that she contacted Attorney Grant Morris on the same day that she applied at the Manassas store. (Workue Dep. at 248–49.)

Attorney Morris drove Plaintiff Workue to other stores operated by Defendant, where Plaintiff Workue submitted applications. (*Id.* at 251.)

Defendant questions whether Plaintiff Workue was a serious application for the positions at its Virginia stores. Plaintiff Workue applied at Defendant's stores that are located near Interstate highway exits in the northern Virginia suburbs of Washington, D.C., or further outlying areas. Plaintiff Workue, however, had no car and no driver's license. (Workue Dep. at 139.) Plaintiff Workue claims that she wanted to find a job, move her family out of Washington, D.C., and then find an apartment near her new job. (*Id.*) Plaintiff Workue, however, had no idea whether affordable housing existed close to Defendant's stores, or whether public transportation was available to any of those stores. (*Id.* at 138–40.)

Plaintiff Workue also omitted information on her applications for employment with Defendant, or submitted false information on those applications. For example, on her Manassas application, Plaintiff Workue provided no information about her education. (Workue Dep. at 135, 147 & Ex. 4.) Plaintiff Workue listed as prior employment a position at Howard Johnson's that she held from 1976 to 1978. (*Id.* Ex. 4.) In her deposition, however, Plaintiff Workue testified that she worked at Howard Johnson's for only two weeks. (*Id.* at 147–48.)[35] Plaintiff Workue listed the Howard Johnson's as being located at the Air and Space Museum, but the actual location of the Howard Johnson's was near the Watergate complex. (*Id.* at 148.) For the Howard Johnson's position, Plaintiff Workue failed to list her job title, her supervisor's name, her reason for leaving, her job responsibilities, and a contact number for

---

**34.** In her Declaration, Plaintiff Workue states that she applied at Defendant's Manassas, Williamsburg, Newport News, Mechanicsville, and Fredericksburg, Virginia, stores. (Workue Decl. at 1.) Plaintiff Workue states that she completed applications at all those stores except for the Fredericksburg store, where someone stated that the store was out of applications. (*Id.* at 2.) Plaintiff Workue claims that at one of those stores, an unidentified White employee asked,

"Why Cracker Barrel? Why don't you go somewhere else and apply?" (*Id.*)

**35.** Later in her deposition, Plaintiff Workue stated that she had worked at Howard Johnson's for two years. (Workue Dep. at 188–89.) Plaintiff Workue, however, was uncertain as to the dates of her employment with Howard Johnson's. (*Id.*)

that former employer. (*Id.* at 150–51, 153–54.)

Plaintiff Workue also listed Marriott Hot Shoppes as a former employer, but later testified in her deposition that she had only applied for a job there. (Workue Dep. at 188–89 & Ex. 4.) Plaintiff Workue also failed to disclose any of the requested information about another prior employer, Gallaudet College. (*Id.* Ex. 4.) [36] Although the application asked applicants to list three references other than relatives and employers, Plaintiff Workue listed only two references: her sister and a former employer. (*Id.* at 167–69 & Ex. 4.)

Plaintiff Workue's Newport News store application also has similar defects. (Workue Dep. at 202 & Ex. 5.) Plaintiff Workue listed the Washington Hilton & Towers as a former employer on that application, and provided beginning and ending dates of employment, 1969 to 1970, beginning and ending salary, a supervisor's name, and a job title. (*Id.* at 171–72 & Ex. 5.) Plaintiff Workue testified at her deposition, however, that she only applied at the Washington Hilton & Towers, and that she did not even move to Washington, D.C., until 1976. (*Id.* at 172–73, 195.)

On the Newport News store application, Plaintiff Workue also listed Data Food Services as a former employer, and gave her dates of employment with Daka as 1970 through 1980. (Workue Dep. at 182–83, Ex. 5.) Those dates are different from the dates that Plaintiff Workue provided for her employment with Daka on her Manassas store application, and predate her move to Washington, D.C. (*Id.* at 182–83.) Plaintiff Workue also failed to list Howard Johnson and Gallaudet College as employers. (*Id.* at 198 & Ex. 5.)

With respect to each of Defendant's stores at which Plaintiff Workue applied, Plaintiff Workue has no knowledge concerning whether the stores hired anyone instead of her.

(Workue Dep. at 103–04, 114, 250.) Plaintiff Workue also does not know the qualifications of anyone who may have been hired instead of her. (*Id.*)

### g. Plaintiff Willie Alexander: Current Employee

Since May 1991, Plaintiff Alexander has worked as a dishwasher for Defendant's Savannah, Georgia, store. (Am.Compl. ¶¶ 17, 67.) Plaintiff Alexander alleges that during his interview in May 1991, he asked what positions were available, and that management told him that only dishwasher positions were available. (*Id.* ¶ 68.) In his Declaration, Plaintiff Alexander asserts that when he applied for employment, he asked for a grill cook position as his first choice and a back-up cook position or dishwasher position as his second choice, but that management told him that only a dishwasher position was available. (Decl. of Willie Alexander at 1.) Plaintiff Alexander thus did not seek a front-of-the-house position at hire. In fact, Plaintiff Alexander testified in his deposition that Defendant did not discriminate against him at the time Defendant hired him. (Dep. of Willie Alexander at 64.) [37]

Plaintiff Alexander alleges that in 1992, he informed his store's General Manager, John Freeland, that Plaintiff Alexander wished to cross-train into grill cook and back-up cook positions, and that he sought promotions to those positions. (Am. Compl. ¶ 68; Alexander Decl. at 1–2.) Mr. Freeland responded that Plaintiff Alexander was more valuable in the dish room. (Alexander Decl. at 3–4.) When Plaintiff Alexander persisted in his request, Mr. Freeland responded that Plaintiff Alexander would start as a PAR I if Plaintiff Alexander moved into a grill cook or back-up cook position. (Alexander Dep. at 38–39.) Plaintiff Alexander was a PAR IV dishwasher at the time, and he told Mr. Freeland that he was not willing to cross-train and take a pay cut. (*Id.*) [38]

---

**36.** Defendant's application states, with respect to the Experience section: "THIS SECTION MUST BE COMPLETED." (Workue Dep. Ex. 4.)

**37.** Plaintiff Alexander also testified that he reached the PAR IV level, and that his store's

management never denied him the opportunity to take a PAR test. (Alexander Dep. at 141–44.)

**38.** Plaintiff Alexander claims that his store's management did not allow him to cross-train to grill cook, prep cook, or host positions. (Alexan-

In 1999, Plaintiff Alexander spoke with a White Associate Manager named Mary Ellen about participating in the shift leader training program.[39] (Am. Compl. ¶ 69; Alexander Decl. at 2–3; Alexander Dep. at 158–62.) Ms. Ellen replied that before Plaintiff Alexander would be considered for the program, Plaintiff Alexander must have attained PAR IV and passed a written test. (Am. Compl. ¶ 69; Alexander Decl. at 2–3; Alexander Dep. at 158–62.) Plaintiff Alexander had reached PAR IV, and requested to take the test. (Am. Compl. ¶ 69; Alexander Decl. at 2–3; Alexander Dep. at 158–62.) Ms. Ellen never responded to Plaintiff Alexander's request. (Am. Compl. ¶ 69; Alexander Decl. at 2–3; Alexander Dep. at 158–62.) The Savannah store's General Manager later selected four employees, three of whom were White and one of whom was African–American, and three of whom may have been junior to Plaintiff Alexander, to participate in that program. (Am. Compl. ¶ 69; Alexander Decl. at 2–3; Alexander Dep. at 158–62.)

In 1999, Plaintiff Alexander informed the General Manager of the Savannah store that Plaintiff Alexander had an interest in becoming an Associate Manager. (Am. Compl. ¶ 69; Alexander Decl. at 3; Alexander Dep. at 162–64.) The General Manager stated that he could not afford to lose Plaintiff Alexander as a dish room employee. (Am. Compl. ¶ 69; Alexander Decl. at 3; Alexander Dep. at 162–64.) Plaintiff Alexander was aware of Defendant's Management Internship Program because an unnamed male Associate Manager told Plaintiff Alexander about the program and because the Savannah store had postings for the program. (Alexander Dep. at 117–21, 129, Exs. 9–10.) Plaintiff Alexander, however, never applied for that program. (*Id.*)

In his Declaration, Plaintiff Alexander stated that Defendant channeled African–Americans to back-of-the-house positions, even when the front-of-the-house positions sought by the African–Americans were available. (Alexander Decl. at 3.) Plaintiff Alexander, however, stated in his deposition that he could not identify anyone who sought an available front-of-the-house position but who was instead placed in a back-of-the-house position. (Alexander Dep. at 165–66.) Plaintiff Alexander further testified that he had no personal knowledge concerning which jobs were available or which jobs applicants sought. (*Id.* at 166.)

Plaintiff Alexander testified that the Savannah store has had African–American hosts, servers, and cashiers. (Alexander Dep. at 104–05.) In fact, Plaintiff Alexander testified that he knew of no African–Americans who were denied employment at the Savannah store. (*Id.* at 106.) Plaintiff Alexander also stated that African–Americans obtained front-of-the-house positions at the Savannah store. (*Id.* at 107.)

Plaintiff Alexander alleges that Defendant's discriminatory compensation procedures have adversely affected him. According to Plaintiff Alexander, he and other African–American employees requested their evaluations in December 2001 so that they could receive annual pay increases. (Am. Compl. ¶ 71; Alexander Decl. at 4.) Several White employees had received their pay increases six months earlier. (Am. Compl. ¶ 71; Alexander Decl. at 4.) Plaintiff Alexander, however, testified in his deposition that he knew of no White dishwasher who made more money than he made. (Alexander Dep. at 115.)

Plaintiff Alexander has the following PAR testing history:

---

der Decl. at 4; Alexander Dep. at 103–04; Am. Compl. ¶ 70.) Plaintiff Alexander testified at his deposition that he would be willing to cross-train only if he received the same hourly pay rate as he received as a PAR IV dishwasher. (Alexander Dep. at 45–46.) Plaintiff Alexander was not willing to work as a PAR I in any other position when he was a PAR IV in the dish room. (*Id.* at 109.)

**39.** In his Amended Complaint and Declaration, Plaintiff Alexander used the term "associate manager training program"; however, in his deposition, Plaintiff Alexander testified that he meant to use the term "shift leader training program." (Alexander Dep. at 125, 158.)

| DATE OF TEST | SKILL | PAR LEVEL | RESULT |
|---|---|---|---|
| 08/19/91 | Dishwasher | I | Pass |
| 01/15/92 | Dishwasher | II | Pass |
| 05/19/92 | Dishwasher | III | Pass |
| 12/14/92 | Dishwasher | IV | Pass |

(Haworth–Thornton Report at 74.) Plaintiff Alexander thus has had an opportunity to take PAR tests. (*Id.*)

In 1995 and 1996, Plaintiff Alexander was the third most highly paid PAR IV dishwasher in the Savannah store. (Haworth–Thornton Report at 91.) Plaintiff Alexander earned less than one African–American employee and less than one White employee. (*Id.*)

From 1997 through 2001, Plaintiff Alexander earned the second highest year-end hourly rate among the PAR IV dishwashers at the Savannah store. (Haworth–Thornton Report at 91.) The most highly paid dishwasher at the Savannah store was a non-African-American, who had worked for Defendant for two weeks longer than Plaintiff. (*Id.* at 92.)

### 3. Plaintiffs' Witnesses Hawk and Ullom

Plaintiffs rely upon testimony from two White former employees for Defendant, Marilyn Hawk and Warren Ullom. (Pls.' Br. Supp. Class Certification at 14–19.) When the Court considers those witnesses' depositions and their Declarations, disregards statements from the Declarations that directly contradict prior sworn testimony without explanation, and disregards conclusions, hearsay, and statements not based on personal knowledge, the remaining, admissible testimony described below does not support the inference that Defendant had a company-wide policy of discrimination against African–Americans.

### a. Marilyn Hawk

Defendant hired Ms. Hawk as a server at its Melbourne, Florida, store. (Dep. of Marilyn Hawk at 61.) Ms. Hawk had seen and

understood Defendant's Equal Employment Opportunity policy, and she knew that it applied to hiring and promotion. (*Id.* at 175–76.)

In early 1994, Ms. Hawk applied to work as a trainer in Defendant's New Store Opening Department, and Defendant selected Ms. Hawk for that position. (Hawk Dep. at 289–90.) In that position, Ms. Hawk traveled to new stores to train new employees. (*Id.* at 398.)

When Ms. Hawk first began working as a trainer, she returned to the Melbourne store between new store openings. (Hawk Dep. at 60.) Later, Ms. Hawk performed the trainer task on a full-time basis. (*Id.*) In her position as a trainer, Ms. Hawk worked at, or visited, sixteen of Defendant's stores, scattered throughout the continental United States. (*Id.* at 60–61, 161–66, 173, 176, 274, 332, 357, 361, 363–65, 373, 377, 380, 382.)

In the first quarter of 1997, Ms. Hawk left Defendant's New Store Opening Department and resumed work as a server in Defendant's Johnson City, Tennessee, store. (Hawk Dep. at 411–12.) In April 1999, Ms. Hawk's employment at that store terminated. (*Id.* at 342.)

Ms. Hawk asserts that she witnessed managers using a racially-biased numbering system on applications to exclude African–American applicants. (Hawk Dep. at 160–62.) She also alleges that she witnesses White managers channeling African–American applicants to back-of-the-house positions, denying cross-training to African–Americans, and making biased remarks. (Hawk Decl. at 2–6.)

At her deposition, however, Ms. Hawk testified that only three Managers—two of whom were in the same store—explained to Ms. Hawk that they had a racial basis for the numbers that they had placed on applications.[40] (Hawk Dep. at 162, 275–76.) Ms. Hawk also testified at her deposition that only four Managers, including the three Managers previously mentioned, ever said

---

**40.** The Court agrees with Judge Johnson that "one manager engaging in that type of conduct is too many." (Report and Recommendation at 75 n. 36.) The Court, however, emphasizes that Ms. Hawk witnessed racial numbering of applications in two of the sixteen stores in which she worked, as opposed to all sixteen stores.

anything to Ms. Hawk about hiring, promoting, cross-training, firing, or employment opportunities for African–Americans. (*Id.*) Even though Ms. Hawk knew that the conduct of those Managers violated Defendant's policy, Ms. Hawk never reported that conduct. (*Id.* at 276, 337, 339, 348, 468–69.)

### b. Warren Ullom

In November 1989, Defendant hired Warren Ullom. (Dep. of Warren Ullom at 40.) After attending a three-month training program that included classroom sessions and on-the-job training at stores, Mr. Ullom worked as an Associate Manager for Defendant's Cedar Bluff, Iowa, and Knoxville, Tennessee, stores over a two-year period before Defendant named him General Manager of Defendant's Cartersville, Georgia, store in 1992. (*Id.* at 52–54.) In 1998, Defendant terminated Mr. Ullom's employment. (*Id.* at 54, 237.)

Mr. Ullom knew about Defendant's Equal Employment Opportunity policy, and understood that, as a Manager, Mr. Ullom bore the responsibility for enforcing that policy. (Ullom Dep. at 54–55, 59.) No one ever told Mr. Ullom not to follow Defendant's Equal Employment Opportunity policy. (*Id.* at 63–64.) Mr. Ullom testified that he did not consider race when making employment decisions. (*Id.* at 65–66.)

In his Declaration, Mr. Ullom alleges that: (1) he heard comments from store Manager colleagues and Managers to whom he reported concerning channeling African–American employees to back-of-the-house positions; (2) he heard racist jokes; and (3) Defendant closed a store because of the area's racial mix. (Decl. of Warren Ullom.) Most of Mr. Ullom's allegations, however, are contradicted by his deposition testimony, are embellished, are taken out of context, or lack probative value.[41]

In any event, even if the Court considers all of Mr. Ullom's Declaration, the Declaration hardly shows that Defendant had a company-wide bias against African–American employees. During his career with Defendant, Mr. Ullom worked primarily at one store, and was not in a position to know whether the bias that he purportedly witnesses was rampant throughout Defendant's nationwide operations.

### C. Statistical Evidence

Judge Johnson also set forth a summary and analysis of the statistical evidence presented in this case in his Report and Recommendation. (Report and Recommendation at 77–123.) The Court has reviewed the statistical evidence presented in this case, and concludes that Judge Johnson's summary and analysis of the statistical evidence presented in this case is exceedingly thorough, extremely detailed, and, ultimately, correct. (*Id.*)[42] The Court summarizes the statistical evidence in this section.

The parties have presented voluminous statistical evidence through their expert witnesses. The Court has reviewed the experts' depositions and deposition excerpts presented by the parties. The Court also has reviewed the following statistical reports: (1) Plaintiffs' Expert Statistical Report Regarding Class Certification, prepared by Drs. Edwin L. Bradley and Liesl M. Fox, dated January 11, 2002 ("Bradley–Fox Report"); (2) Supplemental Expert Statistical Report Regarding Class Certification, prepared by Drs. Edwin L. Bradley and Liesl L. Fox, dated February 8, 2002 ("Supplemental Bradley–Fox Report"); (3) Analysis of Employment Decisions Relevant to Putative Class in the Matter of *Rhodes et al. v. Cracker Barrel Old Country Store, Inc.*, prepared by Drs. Joan G. Haworth and Janet R.

---

41. Mr. Ullom's Declaration states that Regional Manager John Davoli told him that Defendant "is a 'white company.'" (Ullom Decl. at 3.) In his deposition, however, Mr. Ullom admitted that Mr. Davoli never made such a comment. (Ullom Dep. at 169.) Defendant has listed the numerous unexplained discrepancies between Mr. Ullom's allegations contained in his Declaration and his deposition testimony. (Def.'s App. of Pls.' Witnesses, Vol. I, Warren Ullom.) The Court has

reviewed that listing, and concludes that it is accurate.

42. As discussed *infra* Part III.B., the Court overrules Plaintiffs' Objection based on Plaintiffs' belief that Judge Johnson made credibility determinations and weighed evidence in summarizing and analyzing the statistical evidence.

Thornton, dated March 22, 2002 (previously identified as "Haworth–Thornton Report"); (4) Plaintiffs' Rebuttal Expert Report, prepared by Drs. Edwin L. Bradley and Liesl M. Fox, dated April 24, 2002 ("Rebuttal Bradley–Fox Report"); and (5) Response to Plaintiffs' Experts' Rebuttal Report in the Matter of *Rhodes et al. v. Cracker Barrel Old Country Store, Inc.*, prepared by Drs. Joan G. Haworth and Janet R. Thornton ("Rebuttal Haworth–Thornton Report"). In their expert reports, the parties' experts studied and reported upon: (1) racial distribution in various positions at Defendant; (2) a Job Interest Survey of current employees of Defendant; (3) a sample of employment applications of Defendant; (4) hourly position assignments at hire; (5) hourly employee progress through PAR levels; (6) salaries of hourly PAR employees; (7) data concerning promotion to management; (8) hiring data; and (9) termination data and management performance evaluations.

### 1. Explanation of Statistical Terms

Before addressing the experts' studies, the Court provides a brief explanation of statistical terms. Statisticians use a criterion of 5% or less or 0.1% or less probability of occurring by chance ("greater than two or three standard deviations") to categorize a result as "statistically significant." [43] The Supreme Court adopted this standard in voting rights cases. *Castaneda v. Partida,* 430 U.S. 482, 496–97 n. 17, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). The Supreme Court has carried this standard over to civil rights cases. *Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 308–09 n. 14, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *Kilgo,* 789 F.2d at 871 n. 18; Haworth/Thornton Report at 18–19 & n. 27; Bradley/Fox Report at 5–6.

In *Maddox v. Claytor,* 764 F.2d 1539 (11th Cir.1985), the United States Court of Appeals for the Eleventh Circuit warned against drawing inferences of discrimination from standard deviations in the range of one to three, and cautioned that courts should evaluate the significance of statistical evidence in light of all the surrounding facts and circumstances. 764 F.2d at 1552. The Eleventh Circuit stated:

> It is important to note that no bright line of two, three, or more standard deviations can be drawn to distinguish automatically between fair and discriminatory employment practices. Just as a standard deviation of two or three does not necessarily exclude legitimate causes other than change, so a [standard deviation] below that range does not necessarily exclude discrimination as the cause. The Supreme Court has repeatedly warned, "We caution only that statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, may be rebutted. In short, their usefulness depends on all the surrounding facts and circumstances."

*Id.* at 1552 (citation omitted).

Additionally, courts also use the four-fifths, or eighty percent, rule, taken from the Uniform Guidelines on Employee Selection. The four-fifths rule provides:

> A selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will be generally regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact.

**43.** The Eleventh Circuit has stated:

Standard deviation analysis tests the hypothesis that underrepresentation of a protected minority group in any sample made up of a protected and a nonprotected group (binomial distribution) might be attributable to normal fluctuations of chance rather than to discriminatory design. The standard deviation is the measure of the predictable fluctuation in a random selection process. The difference between actual ("observed") numbers of the protected group in such a sample, and the number that would be "expected" in a perfectly proportional process of selection from the appropriate pool can then be expressed in numbers of standard deviation. In turn, standard deviations can be expressed in terms of the mathematical probability that chance is the cause of the disparities (differences between "observed" numbers and "expected" numbers) measured. *Kilgo v. Bowman Transp., Inc.,* 789 F.2d 859, 871 n. 16 (11th Cir.1986) (citing B. Schlei & P. Grossman, *Employment Discrimination Law* 1372 n. 331 (2d ed.1983)).

29 C.F.R. § 1607.4(D) (2002). When the ratio is greater than 125 percent, it is outside the acceptable four-fifths range, but is favorable to the protected group. (Haworth/Thornton Report at 17–18; Bradley/Fox Report at 6–7; Rebuttal Bradley/Fox Report ¶ 14.)

## 2. Employee Racial Distribution

Plaintiffs' experts analyzed the racial distribution of Defendant's workforce on three "snapshot" dates: March 1996, March 1998, and March 2000. (Bradley–Fox Report at 7.) Plaintiffs' experts concluded that African–American employees were more heavily concentrated in the lower PAR levels. (*Id.* at 7 & Exs. 1–2.) The percentage of African–American employees in back-of-the-house positions exceeded their workforce percentage, while the percentage of African–American employees in front-of-the-house positions was below their workforce percentage. (*Id.* at 7–8 & Exs. 3A–3C.) Finally, Plaintiffs' experts compared the percentage of African–American employees in each position on those same snapshot dates to the percentage of African–Americans in Defendant's workforce, and concluded that African–Americans were "overrepresented" in back-of-the-house positions and "underrepresented" in front-of-the-house positions. (*Id.* at 8 & Ex. 4.)

Unfortunately, several problems exist with Plaintiffs' experts' analyses. Plaintiffs' experts fail to account for the many variables that properly may affect job assignments, such as the job preference or experience of the employee or applicant, available job openings, and labor-market availability. For example, African–Americans may seek back-of-the-house positions because those positions pay average wages that exceed the average wages that Defendant pays for front-of-the-house positions. Plaintiffs' experts' analyses show only that a racial distribution exists, but do not explain why that distribution exists. The factors discussed below, however, help explain why the distribution exists.

In May 1999, Defendant conducted a Job Interest Survey. (Bradley–Fox Report at 8; Haworth–Thornton Report at 53–54.) A total of 11,159 employees returned survey forms. (Bradley–Fox Report at 8; Ha-worth–Thornton Report at 54–55.) 1,073, or 9.7 percent, of those employees were African–American. (Bradley–Fox Report at 8; Haworth–Thornton Report at 54–55.) 11,127, or 99.7 percent, of the employees worked in one of Defendant's nine primary hourly positions. (Bradley–Fox Report at 8; Haworth–Thornton Report at 55.)

The Job Interest Survey elicited employee interest in different positions with a series of questions, such as: "Are you satisfied with your current job?" and "Would you like another position?" (Haworth–Thornton Report at 53–54.) The Job Interest Survey then listed each job so that employees could identify which jobs they desired. (*Id.*)

A majority of the employees who responded indicated interest in another job or satisfaction in employment. (Haworth–Thornton Report at 2–3, 57–58, & Table 18.) Racial differences, however, were apparent. (*Id.*) African–American employees were most interested in back-of-the-house jobs. (*Id.*) Non–African–American employees were most interested in front-of-the-house jobs. (*Id.*)

An employee's interest in a specific job also differed depending on what type of job that employee held. (Haworth–Thornton Report at 3, 58–61 & Table 19.) For example, employees who held back-of-the-house jobs were more interested in other back-of-the-house jobs, and employees who held front-of-the-house jobs were more interested in other front-of-the-house jobs. (*Id.*)

Using that data to develop a benchmark for determining whether the presence of African–American employees in dining or retail jobs was statistically significantly less than predicted by their interest, Defendant's experts found that: (1) in 1996 there were statistically significantly fewer African–American employees in the server jobs than one would have expected by their interest; (2) in 2000, there were statistically significantly more African–American employees in the server jobs than one would have predicted by their interest; and (3) in 1998, the outcome was neutral. (Haworth–Thornton Report at 3, 61–63 & Table 20.) Defendant's experts found that in no year were there statistically significantly fewer African–

American employees in the cashier, host/hostess, and night maintenance jobs as predicted by their interest. (*Id.*) Defendant's experts concluded that there were fewer African–American employees in the retail non-management, or gift shop, and restaurant management jobs than predicted by their interest for all three years. (*Id.*) Finally, Defendant's experts concluded that there were fewer African–American employees in the dishwasher position than predicted by their interest for all three years. (*Id.*)

When Plaintiffs' experts examined the same data, their conclusions were not markedly different. (Bradley–Fox Report at 8–10 & Exs. 5–7.) For example, Plaintiffs' experts' analyses of the job interest data also showed that the percentage of African–Americans expressing interest in back-of-the-house jobs was greater than the percentage of non-African-Americans expressing interest in those jobs. (Bradley–Fox Report at Ex. 5.) Conversely, the percentage of non-African-Americans expressing interest in front-of-the-house jobs was greater than the percentage of African–Americans expressing interest in those jobs. (*Id.*)[44]

Defendant's experts point out that their analysis of the Job Interest Survey data differs from the analysis conducted by Plaintiffs' experts only because Plaintiffs' experts did not include employees in their benchmark who already were working in a particular position and who did not express interest in another job. (Haworth–Thornton Report at 3, 61–62.) Defendant's experts contend, and the Court finds, that all employees who expressed interest in a job should have been counted, including those employees who indicated that they were satisfied with their current job and who did not indicate another job of interest. If the Court counts those employees who expressed satisfaction with their current jobs, then Defendant's Table 20 contains the accurate analysis. (*Id.* at 62.)

Plaintiffs' experts assert that the Job Interest Survey is flawed and that the Court should disregard it. (Bradley–Fox Report at 9.) According to Plaintiffs' experts: (1) the response rate for African–American employees was less than the response rate for non-African-American employees; (2) Defendant did not follow up with those employees who failed to return a survey to test for non-response bias, which occurs if non-respondents hold different opinions than respondents; and (3) Defendant only conducted the survey on current employees. (*Id.*)

Defendant's experts respond that Plaintiffs' experts failed to offer any evidence to suggest that the group of African–American employees who responded to the Job Interest Survey was likely to provide different preferences than those who did not respond to the survey. (Haworth–Thornton Report at 54.) Defendant's experts also note that Plaintiffs' experts produced no evidence to suggest that the employees who responded to the Job Interest Survey were not a representative sample. (*Id.*) In fact, one of Plaintiffs' experts, Dr. Bradley, testified in his deposition that he had no evidence indicating that non-respondents held different opinions than respondents. (Dep. of Edwin Bradley at 131–32.) Given the lack of any reason to reject the Job Interest Survey, the Court finds that the Survey is helpful in understanding Defendant's racial distribution statistics.

### 3. Sample of Employee Applications

Defendant's experts examined a random sample of applications of employees hired between 1995 and 2001 to determine whether Defendant hired those employees into the jobs that they requested. (Haworth–Thorn-

---

44. Even when Plaintiffs' experts modified the percentage of African–Americans in Defendant's overall workforce for the three snapshot dates to incorporate the results of the May 1999 Job Interest Survey using Bayes' theorem, they found that African–Americans were over-represented in the dishwasher position only in 1996, but that African–Americans were under-represented in that position in 1998 and 2000. (Bradley–Fox Report at 9–10 & Ex. 6.) For all three years, African–Americans were over-represented in the night maintenance, back-up cook, prep cook, and grill cook positions. (*Id.* at 9–10 & Ex. 7.) There were just as may African–Americans in the host/hostess and cashier positions as one would expect for all three years on the basis of their interest. (*Id.*) African–Americans, however, were under-represented in the server, gift shop, and management positions for all three years on the basis of their interest. (*Id.*)

ton Report at 46.) [45] This review indicated that the proportion of employees interested in each job varied, and that job interest varied by race. (*Id.* at 47–48 & Table 11.) For example, seventy percent of non-African-American hires applied for server jobs, but only forty-four percent of African–American hires applied for server jobs. (*Id.* at 48.) In contrast, only thirty-four percent of non-African-American hires applied for dishwasher jobs, but fifty-three percent of African–American hires applied for dishwasher jobs. (*Id.*) In those situations where the number of standard deviations exceeded the two– or three–standard–deviations threshold, the adverse impact ratios under the four-fifths rule were almost all favorable to the protected group, African–American employees. (*Id.*)

Defendant's experts grouped the same data by jobs in the dining/retail areas, or front-of-the-house jobs, and cook/dishwasher areas, or back-of-the-house jobs to determine if there were differences by race in applications for jobs. (Haworth–Thornton Report at 49.) Defendant's experts' Table 12 shows that African–Americans were statistically significantly more likely than non-African-Americans to apply for cook/dishwasher area positions, while non-African-Americans were statistically significantly more likely to apply for dining/retail area positions. (*Id.* at 49 & Table 12.)

Defendant's experts also concluded that ninety-five percent of the applicants were hired into the job that they requested, with little variation by race. (Haworth–Thornton Report at 49.) Defendant's experts' Table 13 shows the percentage of hires who received the job for which they applied, or who applied for "any job." (*Id.* Table 13.) Ninety-four percent of the individuals hired as dishwashers had requested that job or "any" available job. (*Id* at 49 & Table 13.) African-

American hires were statistically significantly more likely to be placed in a server job when they did not request such a job on their applications. (*Id.* at 49–50 & Table 13.)

Plaintiffs' experts contend that Defendant's experts' Table 13 provides no useful information. (Rebuttal Bradley–Fox Report ¶ 35.) According to Plaintiffs' expert, Defendant's experts' Table 13 is not useful because it includes applications where the applicants wrote that they would take "any" job. (*Id.*)

In response, Defendant's experts prepared a new analysis excluding those applications marked "any" job. (Rebuttal Haworth–Thornton Report at 22–23 & Table 4.) Defendant's experts concluded that this exclusion made no difference. (*Id.*) According to Defendant's experts, Defendant placed the vast majority of African–American hires—ninety-two percent—and non-African-American hires—ninety-four percent—into a position for which the hires showed interest. (*Id.* at 22.) Defendant's experts concluded that Defendant still was more likely to place African–Americans in server jobs when those individuals did not request those jobs. (*Id.*)

Plaintiffs' experts also examined the 1,483 applications on which applicants indicated that they would take "any" hourly job. (Rebuttal Bradley–Fox Report ¶ 36.) Plaintiffs' experts computed the distribution of job assignments for both African–Americans and non-African-Americans and compared those distributions, creating their Exhibit 22. (*Id.* ¶ 36 & Ex. 22.) According to that Exhibit 22, African–American applicants expressing interest in "any" job were assigned more often than their non-African-American counterparts to back-of-the-house positions, and were assigned less often than their non-African-American counterparts to front-of-the-house positions. (*Id.* ¶¶ 37–38.) [46]

**45.** Defendant's experts selected a sufficient number of applications in each geographic region to permit the experts to make estimates with a sampling error of no more than two percent. (Haworth–Thornton Report at 46–47 & Table 10.) Defendant's experts recorded jobs applied for, jobs hired into, and each candidate's prior job experience. (*Id.* at 47.) Defendant's experts counted every job for which a new hire applied. (*Id.*) If an employee did not specify a job sought or indicated that he would take "any" job, then

Defendant's experts counted that employee as if he had applied for all jobs. (*Id.*)

**46.** Defendant's experts criticize Plaintiffs' experts' Exhibit 22 because that Exhibit does not take into account the applicants' prior experience, does not properly use the sample data, and does not adjust for openings available in the given store for each placement. (Rebuttal Haworth–Thornton Report at 29.)

Plaintiffs' experts also examined a subset of 498 hires who had expressed interest in "any" job, but who had no prior experience listed on their applications. (Rebuttal Bradley–Fox Report ¶ 39.) According to Plaintiffs' experts, Defendant more often assigned African–Americans to back-of-the-house positions and less frequently assigned African–Americans to front-of-the-house positions. (*Id.*) According to Plaintiffs' experts, of the seventy African–Americans from this group assigned to back-of-the-house position, eighty-nine percent became dishwashers. (*Id.*) Of the 189 non-African-Americans assigned to front-of-the-house positions, fifty-two percent became servers. (*Id.*)

Defendant's experts respond that Plaintiffs' experts neglect to mention that eighty-two percent of the inexperienced, non-African-Americans assigned to back-of-the-house positions became dishwashers, and that seventy-three percent of the inexperienced, African–American hires placed in front-of-the-house positions became servers. (Rebuttal Haworth–Thornton Report at 30.) Defendant's experts concluded that the percentage of inexperienced African–American and non-African-American applicants who were placed in dishwasher and server jobs was not statistically significant by race. (*Id.*)

When Defendant's experts examined the jobs into which applicants were hired and the jobs that the applicants requested by area of the store, Defendant's experts concluded that the data showed that Defendant hired employees into the job category requested, regardless of race. (Haworth–Thornton Report at 50 & Table 14.) Defendant placed over ninety-seven percent of applicants who requested only cook/dishwasher area jobs into those jobs, while Defendant placed over ninety-nine percent of applicants who requested only dining/retail area jobs into those jobs. (*Id.*)

Defendant's experts also examined whether racial differences in the prior experience of hires were evident with respect to the jobs for which the hires were selected. (Ha-

worth–Thornton Report at 51.) Defendant's experts' Table 15 compares the percentage of hired applicants with previous experience in each job, for all jobs and by race. (*Id.* Table 15.) Regardless of race, dishwashers and hosts/hostesses were less likely to have had relevant experience before hire. (*Id.*) In four of the jobs—cashier, host/hostess, dishwasher, and cook—a greater percentage of the African–American hires had prior experience in the job for which they were hired, but those differences were not statistically significant. (*Id.*) African–Americans hired as servers were significantly less likely to have had prior experience in that job. (*Id.* at 52.)

When Defendant's experts compared experience to job placement, they concluded that Defendant placed over ninety-seven percent of those who applied for positions in only one area of the store—either the dining/retail area or the cook/dishwasher area—in the area that the applicant specified. (Haworth–Thornton Report at 52.) When Defendant's experts considered experience, no pattern adverse to African–Americans existed when applicants sought positions in both areas. (*Id.* at 52 & Table 16.) For example, thirty-six percent of the non-African-American employees and thirty-four percent of the African–American employees whom Defendant hired into the dining/retail area of its stores had prior experience in those types of positions. (*Id.* at 52.) Similarly, Defendant hired thirty-five percent of non-African-American employees and thirty-four percent of African–American employees into positions in the dining/retail area when those employees had experience in both the dining/retail and cook/dishwasher areas. (*Id.* at 52–53.)

Plaintiffs' experts then took the application rate benchmarks from Table 10–12 of the Haworth/Thornton Report to determine whether differences in the selection rates of African–American employees for front-of-the-house positions were significantly correlated to race. (Rebuttal Bradley–Fox Report ¶¶ 28–31.) [47] Plaintiffs' experts presented

---

**47.** Plaintiffs' experts assert that using application data to determine whether African–American applicants received the positions they sought is flawed. (Rebuttal Bradley–Fox Report ¶ 34.)

Plaintiffs' experts contend that unless it is known whether the applicants completed their applications before or after they interacted with management, it is impossible to draw any conclusion

their analysis in Exhibit 21 to their Rebuttal Report, which shows that from January 1995 to November 2000, using Defendant's experts' job interest benchmarks and applying Bayes' theorem,[48] there was statistical significance both in the shortfall of African–Americans selected for server positions and in the over-selection of African–Americans for dishwasher positions. (*Id.* ¶¶ 28–31 & Ex. 21.)

Defendant's experts have pointed out deficiencies in the analysis conducted by Plaintiffs' experts in Exhibit 21.[49] Because of those deficiencies, the Court cannot use Plaintiffs' experts' Exhibit 21 to assist the Court in making a class certification determination.

Overall, the data discussed above support a conclusion that Defendant placed employees into positions for which the employees had expressed interest. Thus, it appears that applicant preference, rather than discrimination, accounts for the racial distribution that exists within Defendant's stores.

### 4. Position Assignments at Hire

Plaintiffs' experts examined the distribution of position assignments at the time of hire into PAR level 0 between 1995 and 2000. (Bradley–Fox Report at 10–11 & Ex. 8.) Plaintiffs' experts' Exhibit 8 shows that for each year from 1995 through 2000, the proportion of African–American hires assigned to back-of-the-house positions was higher than the proportion of non-African-American hires assigned to back-of-the-house positions. (*Id.* at 11 & Ex. 8.) The proportion of African–American hires assigned to front-of-the-house positions was lower than the proportion of non-African-American hires assigned to front-of-the-house positions. (*Id.*) The differences were statistically significant for each year. (*Id.*)

Plaintiffs' experts also analyzed employees hired into PAR level 0 positions as servers and dishwashers, compared to their representation in the county where their hiring store was located, using 1990 Census data. (Bradley–Fox Report at 11.) For 1995

---

whether the applications were voluntary or were themselves the product of efforts to steer African–Americans into back-of-the-house positions. (*Id.*) For example, according to Plaintiffs' experts, if management told an African–American applicant before he completed his application that the only position available was a dishwasher position, that applicant might have listed dishwasher as the position sought. (*Id.*) Plaintiffs' experts therefore contend that one cannot assume that applicants sought positions voluntarily. (*Id.*) Plaintiffs' experts also assert that this analysis does not take into account the fact that African–Americans may have sought back-of-the-house positions because of Defendant's reputation, or that they may have been discouraged from applying for front-of-the-house positions in subtle ways. (*Id.*) At his deposition, however, Plaintiffs' expert, Dr. Fox, stated that he could not identify a single situation where: (1) an African–American was "chilled" from applying for a particular position; (2) an African–American was "steered" into a position he did not want; or (3) an African–American was falsely told that the only position available was a dishwasher position. (Bradley Dep. Vol. I at 113, 312–32; Bradley Dep. Vol. II at 572.) Those speculative assertions therefore do not undermine the usefulness of reviewing actual application data.

**48.** Bayes' theorem is a conditional probabilities theorem, and states that the probability that an event A occurs given that another event B already has occurred is equal to the probability that the event B occurs given that A already has

occurred, multiplied by the probability of occurrence of event A and divided by the probability of event B. *Merriam–Webster's Collegiate Dictionary* 98 (10th ed.2001).

**49.** First, Defendant's experts point out that Plaintiffs' experts constructed the proportion requesting each job from a sample of hires between 1995 and 2001, but applied that proportion to a smaller time range that excluded hires after November 2000. (Rebuttal Haworth–Thornton Report at 24.) Defendant created two new regions in 2001 that were included in the application sample examined by Defendant's experts, but those regions were not in the hires analyzed by Plaintiffs' experts. (*Id.*)

Second, Defendant's experts note that Plaintiffs' experts did not correctly weight the regional representation of applicants. (Rebuttal Haworth–Thornton Report at 24 & n. 29.) Consequently, Defendants' experts believe that the comparisons made by Plaintiffs' experts are inaccurate. (*Id.*)

Third, Defendant's experts note that they did not draw their sample to be able to determine, within a two percent error rate, whether or not differences existed in job interest and placement at the store level. (Rebuttal Haworth–Thornton Report at 24–25.) Defendant's experts contend that any comparison of racial composition using their sample should have incorporated the expected error rate for each region in the significance tests, but Plaintiffs' experts failed to do so. (*Id.*)

through 2000, Plaintiffs' experts compared the number of African–Americans hired into the dishwasher positions to their representation in Census category 439, which includes kitchen workers and food preparation. (*Id.* at 11–12.) Plaintiffs' experts also compared the number of African–Americans hired into the server positions to their representation in Census category 435, which pertains to waiters and waitresses, and Census category 433, which pertains to waiter and waitress assistants. (*Id.*) Plaintiffs' experts used a multiple-pools analysis and found that from 1995 through 2000, Defendant· hired 9,221 more African–Americans into dishwasher positions than one would have expected based on their representation in the counties where their stores were located. (*Id.* at 12.) Plaintiffs' experts concluded that from 1995 through 2000, Defendant hired 5,810 fewer African–Americans into the server positions than one would have expected on the basis of their representation in the counties where their stores were located. (*Id.*) Both numbers are statistically significant. (*Id.*)

Defendant's experts point out that Plaintiffs' experts' analyses do not account for the fact that initial placement generally is determined by the applicants' expressed interests in specific jobs and the applicants' schedule preferences, as well as the positions available at the time of application. (Haworth–Thornton Report at 14–15, 43.) According to Defendant's experts, the Job Interest Survey and application sample discussed *supra* Parts II.C.2. and 3. support this assertion.

Defendant's experts also contest Plaintiffs' experts' use of Census code 433, pertaining to waiter and waitress assistants, when the waiter and waitress assistant job is not part of a server's duties. (Haworth–Thornton Report at 44.) [50] Defendant's experts also criticize Plaintiffs' experts for using the wrong Census code for the dishwasher position.

(*Id.*) Plaintiffs' experts acknowledge that they should have used Census code 444 for the dishwasher position comparison, but argue that using that code still results in statistical significance. (Rebuttal Bradley–Fox Report ¶ 19; Bradley Dep. Vol. II at 527, 542.)

Defendant's experts, however, validly criticize Plaintiffs' experts for using the county in which the relevant store was located to perform their comparisons. (Haworth–Thornton Report at 45.) [51] In some counties, the number of observations from the Census data is very small, and the estimated racial composition of the selected occupation code is likely to be unreliable. (*Id.*) For example, in Gordon County, Georgia, the location of Defendant's Calhoun store, the Census data reported two waiters and waitresses, both of whom were African–American. (*Id.*) Plaintiffs' experts consequently would have assumed an inaccurate 100 percent African–American benchmark for Gordon County. (*Id.*; Rebuttal Haworth–Thornton Report at 3–10.)

The deposition testimony of Plaintiffs' expert, Dr. Bradley, also indicates other errors in Plaintiffs' experts' use of Census data. For example, Plaintiffs' experts reported that: (1) the availability of African–American servers in Autauga County, Alabama, where Defendant's Store Number 273 is located, was 52.3%; (2) the availability of African–American servers in Van Zandt County, Texas, where Defendant's Store Number 266 is located, was 10.1%; (3) the availability of African–American servers in the county containing Defendant's Store Number 366 was 12.3%; (4) the availability of African–American servers in Hunterdon County, New Jersey, where Defendant's Store Number 386 is located, was 3.9%; and (5) the availability of African–American servers in Harrisonburg

**50.** Plaintiffs' experts respond that servers perform work listed in Census code 433, pertaining to waiter and waitress assistants. (Rebuttal Bradley–Fox Report ¶ 22.) Plaintiffs' experts assert that even if they do not use that Census code, statistical significance exists using only Census code 435, which pertains to waiters and waitresses. (*Id.* ¶ 18.)

Defendant's experts respond that servers spend very little time—less than two percent of their weekly hours—performing work as server assistants, a position which is comparable to a waiter and waitress assistant positions. (Rebuttal Haworth–Thornton Report at 10–13 & Figs. 4–5.) The Court does not resolve this dispute, because Plaintiffs' experts' analysis has more serious flaws.

**51.** Plaintiffs' experts do not refute this criticism.

City County, Virginia, was 6.2%. The Census data, however, actually indicate that no African-American servers were present in those counties. (Bradley Dep. Vol. II at 517–20 & Ex. 12.) Those errors could create the appearance of statistical significance where no statistical significance exist, and undermine the reliability of Plaintiffs' experts' analysis.

Defendant's experts used the Census data for the larger Metropolitan Statistical Areas where available and the correct Census categories to conduct an analysis. (Haworth-Thornton Report at 45; Rebuttal Haworth-Thornton Report at 15 n. 19.) Using this data, Defendant's expert concluded that Defendant hired fewer African-American servers than one would predict based on the Census data, but that Defendant hired the same number of African-American dishwashers that one would predict based on the Census data. (Haworth-Thornton Report at 45; Rebuttal Haworth-Thornton Report at 15 n. 19.)

### 5. Progress Through PAR Levels

Plaintiffs' experts conducted analyses of the progress of African-American employees through PAR levels. (Bradley-Fox Report at 13.) Plaintiffs' experts first examined the length of time that employees remain in each PAR level. (*Id.*) In Exhibit 9, Plaintiffs' experts compared the average length of time that African-American and non-African-American employees remained in each PAR level during the period from 1995 through 2000, adjusting for position held using multiple regression analysis. (*Id.* at 13 & Ex. 9.) Except for 2000, Plaintiffs' experts found no

statistically significant differences between African-American and non-African-American employees' average length of time in PAR level 0. (*Id.*) Plaintiffs' experts, however, found that the differences between African-American and non-African-American employees' average length of time in PAR levels I–IV were statistically significant, with the exception of time spent in PAR level III in 1999. (*Id.*)

Plaintiffs' experts next compared the percentage of African-American employees who moved to higher PAR levels during the period from January 1995 through November 2000 to those employees' representation in lower PAR levels, controlling for year of promotion, position, and store. (Bradley-Fox Report at 14 & Ex. 10.)[52] In Plaintiffs' experts' Exhibit 10, Plaintiffs' experts reflect their conclusion that from January 1995 to November 2000, 225,254 movements from PAR levels I through IV occurred, and 24,802 of those movements were by African-American employees. (*Id.* Ex. 10.) Plaintiffs' experts concluded that there were 3,532 fewer African-American PAR level movements than one would have expected for each PAR level. (*Id.* at 14 & Ex. 10.) The differences were statistically significant at each PAR level, although the adverse impact ratios were greater than eighty percent for each level and were not outside the acceptable range. (*Id.*) For this analysis, Plaintiffs' experts created a comparison benchmark by combining lower PAR levels. (*Id.*) From their results, Plaintiffs' experts concluded that the movement of hourly employees from lower to higher PAR levels is related to race

---

**52.** Plaintiffs' experts compared the percentage of African-Americans who moved to PAR level II to the representation of those employees in PAR levels 0 and I combined, and compared the percentage of African-Americans who moved to PAR level IV to the representation of those employees in PAR levels 0, I, II, and III combined. (Bradley-Fox Report at 13.) Plaintiffs' experts assert that because the distribution of African-Americans employees is concentrated in lower PAR levels, it is reasonable to assume that African-Americans are not advancing through the PAR system. (*Id.* at 13–14.) Plaintiffs' experts therefore contend that each PAR level would be a tainted pool if used as a comparison benchmark. (*Id.;* Rebuttal Bradley-Fox Report ¶ 48.) Plaintiffs' experts consequently argue that combining

lower PAR levels for comparison removes the racial taint. (Bradley-Fox Report at 13–14; Rebuttal Bradley-Fox Report ¶ 48.)

Defendant's experts, however, correctly point out that Plaintiffs' experts' combination of lower PAR levels does not reflect how employees move from lower to higher PAR levels. (Haworth-Thornton Report at 67–68.) For example, employees move only one PAR level at a time. (*Id.*) Consequently, employees in PAR level I cannot move to PAR level IV. (*Id.*) Because the percentage of African-American employees in lower PAR levels is higher, combining the PAR levels for comparison inflates the percentage of African-American employees in the pool and increases the likelihood of finding statistical significance. (*Id.* at 68.)

because African–Americans spend more time in each PAR level than non-African-American employees, and African–Americans do not advance as one would expect. (*Id.* at 14–15.)

Defendant's experts assert that Plaintiffs' experts' analysis misunderstands how employees move through PAR levels. (Haworth–Thornton Report at 15–16.) To move to a higher PAR level, an employee must have: (1) remained in his or her current position and PAR level for a specified period of time; (2) had a successful performance evaluation; and (3) demonstrated his or her knowledge of the PAR level sought by passing the relevant PAR test. (*Id.*) The employees decide whether to take PAR tests. (*Id.* at 64.)[53] If an employee does not pass a PAR test, he or she can re-take that test at another testing time without penalty, and without limits on the number of re-tests permitted. (*Id.* at 64–65.) Each of Defendant's stores has a defined testing schedule. (*Id.* at 65.) Defendant's employees may use written PAR Manuals to study for PAR tests. (*Id.*) Some of Defendant's stores use study groups, while other stores leave studying to individual employees. (*Id.*) Defendant's experts also contend that Plaintiffs' experts' analysis ignores whether an employee expressed an interest in moving to the next higher PAR level by choosing to take the PAR test and by studying sufficiently to pass the test. (*Id.* at 68.)[54]

Defendant's experts also point out that Plaintiffs' experts prepared an analysis of movements that controlled for year of move, position, current PAR level, and store, but that Plaintiffs' experts report only aggregat-

ed results, which combined all 225,254 PAR level moves across almost six years by PAR level. (Haworth–Thornton Report at 65.)[55] With this number of events, even a shortfall of one percent would be statistically significant. (*Id.* at 65–66.) The statistically significant shortfall reported by Plaintiffs' experts is 1.6% of all PAR level moves. (*Id.* at 66.)

Defendant's experts contend that statistics aggregated to a large number, such as Plaintiffs' experts' statistics, do not properly reflect the wide variation among Defendant's 440–plus stores in movement to higher PAR levels by African–American employees. (Haworth–Thornton Report at 67.) Defendant's experts show that many stores have no differences between the actual number of African–American PAR moves and the number of PAR moves predicted. (*Id.*) Other stores, such as the stores in which three of the putative class representatives worked, have more than predicted PAR moves by African–Americans, and other stores have fewer than predicted PAR moves by African–Americans. (*Id.*) The largest shortfall in any store where a Plaintiff worked was 4.1 PAR moves per year. (*Id.*) According to Defendant's experts, the variation in advancement to higher PAR levels from one store to another shows that no consistent pattern exists across Defendant's company of denying PAR moves to African–American employees. (*Id.*)

Additionally, Defendant's experts contend that PAR level increases reflect self-selection and test results. (Haworth–Thornton Report at 68.) According to Defendant's experts, an employee's move to a higher PAR level depends on the employee's initiative, the employee's job, the employee's PAR level, the

---

**53.** Defendant's employee handbook states: " 'The Personal Achievement Responsibility, or PAR, program has been developed by [Defendant] to open up opportunity for you, but you choose whether to participate.' " (Haworth–Thornton Report at 68 (quoting Defendant's Employee Handbook 21 (1997)).) Plaintiffs' experts contend that employees must have approval from Defendant to take a PAR test, but Plaintiffs' experts cite no evidence supporting that contention, and the evidence in the record is to the contrary. (Bradley–Fox Rebuttal Report ¶ 46.)

**54.** For example, putative class representative Plaintiff Barbee testified in his deposition that he did much better on a PAR test the second time he

took it because: "I studied harder. I just tried to do the first test too fast." (Barbee Dep. at 158.)

**55.** At least one court has cautioned against the danger of using aggregated data:

> If Microsoft-founder Bill Gates and nine monks are together in a room, it is accurate to say that on average the people in the room are *extremely* well-to-do, but this kind of aggregate analysis obscures the fact that ninety percent of the people in the room have taken a vow of poverty.

*Abram v. United Parcel Serv. of Am., Inc.,* 200 F.R.D. 424, 431 (E.D.Wis.2001).

employee's tenure, and the employee's evaluation scores. (*Id.*) Defendant's experts thus believe that differences in the composition of those employees who chose to take PAR tests could explain the differences that Plaintiffs' experts found to exist between the actual and expected number of African–American PAR level moves. (*Id.*)

Defendant's experts therefore propose that analyzing PAR testing results, rather than PAR level moves, would be more relevant. (Haworth–Thornton Report at 69.) First, Defendant's experts compared the percentage of African–American employees taking PAR tests in each store to those employees' presence in the store's workforce. (*Id.*) Defendant's experts found that fifty-seven stores have a higher percentage of African–Americans in their workforces than the percentage of African–American employees who took PAR tests. (*Id.* at 69 & Fig. 3.) Defendant's experts then examined their data to determine whether a statistically significant racial difference existed in the number of PAR tests taken, after controlling for each year and month, store, position, and PAR level. (*Id.*) Defendant's experts used the percentage of African–Americans in each of those pools of employees to estimate the number of African–American employees who could have taken a PAR test. (*Id.* at 69–70.) Defendant's experts then compared the predicted number to the number of African–American employees who actually took a PAR test. (*Id.* at 70.)

Defendant's experts' analysis produced an estimated average shortfall in the number of PAR tests taken over the period from 1995 to 2001 of 9.1 African–American employee tests per store, or slightly over one test per store per year. (Haworth–Thornton Report at 70.) This shortfall, as a percentage of the total 338,000 PAR tests taken, is 1.2% over the entire period. (*Id.*) This shortfall is statistically significant, but the adverse impact ratio exceeds eighty percent and does not fall outside the acceptable range for the four-fifths rule. (*Id.*) Defendant's experts therefore contend that their results suggest that

the shortfall in the number of African–American PAR level moves is related to the difference in interest in taking the test. (*Id.*) [56]

Plaintiffs' experts, however, disagree that the lack of interest in taking the test explains the shortfall. (Rebuttal Bradley–Fox Report ¶ 46.) Plaintiffs' experts cite the requirement that African–American employees satisfy eligibility criteria and the supposed effect of discouragement in taking or re-taking tests. (*Id.*) All employees, however, regardless of race, must satisfy eligibility criteria. Plaintiffs' experts also do not quantify their "discouragement" factor. Indeed, the evidence in the record indicating the rapid rise of almost all of the putative class representatives through the PAR system to PAR IV and their frequent testing and re-testing tends to refute this "discouragement" factor.

In their Supplemental Report, Plaintiffs' experts reviewed individual PAR testing results. (Supplemental Bradley–Fox Report at 1.) In Plaintiffs' experts' Exhibit 19, Plaintiffs' experts compared the percentage of African–American employees who took each level of the PAR test to their representation in the PAR level immediately below the level of the test taken, controlling for PAR level, year, store, and position, using a multiple-pools analysis. (*Id.* at 2 & Ex. 19.) For each year, the percentage of African–Americans who took a PAR test was less than their representation in the pool of eligible individuals. (*Id.*) The differences were statistically significant. (*Id.*)

In Plaintiffs' experts' Exhibit 20, Plaintiffs' experts analyzed PAR test failure rates by race, controlling for year, position, and PAR level, but not controlling for store. (Supplemental Bradley–Fox Report at 3 & Ex. 20.) For each PAR level for each year from 1995 to 2001, the percentage of African–American hourly PAR employees who failed PAR tests was greater than the percentage of non-African-American hourly PAR employees who failed PAR tests. (*Id.*) The differences were statistically significant. (*Id.*)

---

**56.** Plaintiffs' expert, Dr. Bradley, testified at his deposition that two testing components existed: (1) taking the test; and (2) passing or failing the test. (Bradley Dep. Vol. II at 609.) Dr. Bradley

admitted that failing to take the PAR tests is one reason that employees do not advance in PAR level. (*Id.* at 608.)

Defendant's experts criticize Plaintiffs' experts' Exhibit 20. (Haworth–Thornton Report at 71.) Defendant's experts assert that the analysis used by Plaintiffs' experts to create their Exhibit 20 did not control for store. (*Id.*) According to Defendant's experts, the failure to control for store ignores the different PAR test pass rates among stores. (*Id.*) Further, Defendant's experts argue that the results portrayed in Plaintiffs' experts' Exhibit 20 are aggregated nationally by PAR levels across all years from 1995 to 2000. (*Id.*)

Defendant's experts prepared a different analysis, examining the passing rates for employees taking PAR tests to determine if differences exist among the test-takers, regardless of race, by PAR levels, years, positions, and stores. (Haworth–Thornton Report at 71–72.) Defendant's experts found that passing rates are statistically significantly different for each of those factors. (*Id.* at 72.) For example, as PAR level increases, the percentage of employees failing the PAR test also increases. (*Id.*) While over 99.2% of the test-takers passed the PAR level I test, only 86.5% of test-takers passed the PAR level IV test. (*Id.*) The highest pass rates for position type are among cashiers: ninety-six percent, and the lowest pass rates for position types are among grill and back-up cooks: eighty-nine percent. (*Id.*) Pass rates are statistically significant by year, ranging from 91.7% to almost 96%. (*Id.*) Pass rates also are statistically significant by store, ranging from 85 to 100 percent. (*Id.*) Defendant's experts report similar patterns both for African–American test-takers and for non-African-American test-takers. (*Id.*)

Defendant's experts then repeated the analysis conducted by Plaintiffs' experts in their Exhibit 20, but controlled for the test-taker's store. (Haworth–Thornton Report at 72.) Defendant's experts found that for most years, positions, PAR levels, and stores, the pass rates of African–American test-takers and non-African-American test-takers were identical. (*Id.*) [57]

Defendant's experts also measured the difference in the number of African–American test-takers who passed tests, compared to the number predicted from their presence among test-takers in the same year, store, PAR level, and position. (Haworth–Thornton Report at 73.) This analysis had more comparisons because Defendant's experts only required that at least one test-taker of each race exist in each pool. (*Id.*) Overall, Defendant's experts concluded that the actual and predicted number of passes amounted to 0.08% of the 334,783 tests taken, with an adverse impact ratio of close to 100%. (*Id.* at 73 & Table 22.)

In Appendix C, Table C2 of the Haworth/Thornton Report, Defendant's experts summarized the results of PAR tests by year and store. (Haworth–Thornton Report App. C, Table C2.) Defendant's experts concluded that in most stores and over most years, no difference in PAR test pass rates existed between African–Americans and non-African-Americans. (*Id.*) The difference between the actual and predicted pass rates of African–Americans and non-African-Americans was statistically significantly adverse to African–Americans in only eleven of Defendant's stores over a seven-year period. (*Id.*)

Plaintiffs' experts argue that even if they control for the test-taker's store, they still find statistical significance. (Rebuttal Bradley–Fox Report ¶ 54 & Ex. 23.) According to Plaintiffs' experts, for the years 1995 to 2000, the percentage of African–American PAR test failures exceeded the percentage of non-African-American PAR test failures.

57. During the seven year period, at least 878 combinations of years, stores, positions, and PAR levels with at least five African–American test-takers and with at least five non-African-American test-takers existed. (Haworth–Thornton Report at 72.) Defendant's experts concluded that five of each type of test-taker provided sufficient numbers to test the passing proportion with reasonable accuracy, using a test. (*Id.*) Defendant's experts concluded that in 718 instances, the pass rates for African–American and non-African-American test-takers were identical. (*Id.*) In sixty-one instances, two of which were statistically significant, African–American test-takers had higher passing rates. (*Id.* at 72–73.) In ninety-nine instances, one of which was statistically significant, non-African-American test-takers had higher passing rates. (*Id.*) Defendant's experts concluded that this data does not show a pattern of passing rates adverse to African–Americans who elected to take PAR tests. (*Id.*)

(*Id.* ¶ 55 & Ex. 23.) The difference was statistically significant. (*Id.* ¶ 55.) The adverse impact ratios are less than eighty percent for each PAR level. (*Id.*)

To focus on the failure rate of first-time PAR test-takers, Plaintiffs' experts created their Exhibit 24. (Rebuttal Bradley–Fox Report ¶¶ 56–57 & Ex. 24.) Plaintiffs' experts' Exhibit 24 shows that for each PAR level for the years 1995 to 2000, the percentage of African–American PAR test failures among first-time test-takers exceeded the percentage of non-African-American PAR test failures among first-time test-takers. (*Id.*) The difference was statistically significant, and the adverse impact ratios were less than eighty percent for each PAR level. (*Id.* ¶ 57.)

Defendant's experts point out that the analysis of PAR testing results described in the preceding two paragraphs focused on failures rather than passes. (Rebuttal Haworth–Thornton Report at 32.) Plaintiffs' experts' rebuttal report did not disclose the number of tests that make up the difference in pass rates between African–American and non-African-American test-takers. (*Id.*) During his deposition, however, Plaintiffs' expert, Dr. Bradley, calculated the adverse impact ratios of the passing rates of African–American and non-African-American test-takers on the basis of Exhibit 23 of the Rebuttal Bradley–Fox Report. (Bradley Dep. Vol. II at 619–22.) Those ratios show that pass rates for African–American test-takers are very close to the pass rates for non-African-American test-takers. (Rebuttal Haworth–Thornton Report at 32.) The ratios range between ninety-two and ninety-nine percent, and have an overall acceptable adverse impact ratio of ninety-eight percent. (*Id.*)

Defendant's experts determined, from Plaintiffs' experts' analyses, that the difference between the actual and predicted number of African–American passes and failures was 234 fewer tests passed by African–American employees, out of 292,000 tests taken over a six-year period. (Rebuttal Haworth–Thornton Report at 33.) Defendant's experts concluded that the difference in actual and predicted pass rates, based on that data,

was less than one-tenth of one percent, or less than 0.1%. (*Id.*) Even using an estimated shortfall number of 690, Dr. Bradley calculated that the shortfall in African–American passes per store per year was 0.29 of a person, or, if rounded to the nearest whole number, zero. (*Id.;* Bradley Dep. Vol. II at 635–36.) Alternatively, one could compare the difference between the percentage of African–American test-takers among those who took the PAR tests across all years and stores—11%—and the percentage of African–American test-takers among those who passed the PAR tests—10.8%. (Rebuttal Haworth–Thornton Report at 33.)

At his deposition, Dr. Bradley also calculated the adverse impact ratios for Plaintiffs' experts' Exhibit 24, which examined the first PAR test of an individual for each position. (Bradley Dep. Vol. II at 636–37.) Those ratios ranged from ninety-four to ninety-nine percent, with an overall adverse impact ratio of ninety-eight percent. (Rebuttal Haworth–Thornton Report at 33–34.) As with Exhibit 23, the difference in the number of PAR tests passed by African–American test-takers and the number predicted is small. (*Id.*) Even using the estimated shortfall of 690, Dr. Bradley calculated the average shortfall for each store and year combination to be so small as to round to zero. (*Id.*) Additionally, the percentage of African–Americans among first-time test-takers across all years and stores is 10.9%, while the percentage of African–Americans among those test-takers who passed the PAR tests is 10.6%. (*Id.* at 34.) The test analyses on which Plaintiffs' experts focused their attention in their Exhibits 23 and 24 had adverse impact ratios that were very close to one hundred percent, with differences in the number of tests per store per year of near zero, despite the large number of tests taken. (*Id.*)

Defendant's experts also point out that Plaintiffs' experts did not examine, and did not know, what percentage of Defendant's stores were statistically significantly the same for African–Americans and non-African-Americans or were favorable to African–Americans. (Rebuttal Haworth–Thornton Report at 34.) Defendant's experts assert, and the Court agrees, that this question is

relevant in a class certification proceeding. In particular, a store-level analysis helps to answer the question whether the difference found by Plaintiffs' experts when evaluating test failures was a common pattern across all stores or the result of aggregating statistics across a large number of tests over a long period of time. (*Id.*)

Defendant's experts report that Plaintiffs' experts' analyses reported in their Exhibits 23 and 24 do not present results by store. (Rebuttal Haworth–Thornton Report at 34.) According to Defendant's experts, if Plaintiffs' experts had presented results by store, the Court could see that in most years and in most stores, the difference between the actual and predicted number of African–American test passes is within the neutral range. (*Id.*)[58] According to Defendant's experts, over forty percent of the store and year combinations had a zero difference between the predicted and actual passes for African–Americans. (*Id.*) In seventy percent of the store and year combinations, the results were either perfectly neutral or more African–American test-takers passed than predicted. (*Id.* at 34–35.)

Defendant's experts graphically presented the above analysis in Figure 8 of their Rebuttal Report, which reflects the number of store and year combinations that show no difference, or that show zero standard deviations, as "perfect parity." (Rebuttal Haworth–Thornton Report at 35 & Fig. 8.) Defendant's experts concluded that an overwhelming number, 96%, of the store and year combinations had results that were neutral—between zero and plus or minus 1.96 standard deviations—or statistically significantly favorable—more than 1.96 standard deviations—to African–Americans. (*Id.*) The results were statistically significantly adverse to African–Americans in only four percent of the store and year combinations. (*Id.* at 36 & Fig. 8.) In 93.3% of the store and year combinations, the adverse impact ratios associated with the pass rates were greater than 80%. (*Id.*) Defendant's

experts concluded that those results are not consistent with a pattern of discrimination adverse to African–Americans that is common to all of Defendant's stores. (*Id.*)

Defendant's experts also examined the actual differences between the number of tests passed by African–American test-takers compared to the number predicted. (Rebuttal Haworth–Thornton Report at 36–37 & Fig. 9.) Defendant's experts concluded that in 891 store and year combinations, the difference between the actual and predicted number of tests passed or failed by African–American test-takers was zero. (*Id.* at 36 & Fig. 9.) Defendant's experts found that in 527 store and year combinations, there were between zero and one more tests passed by African–American test-takers than predicted. (*Id.*) For twenty-six store and year combinations, there were between one and three more tests passed by African–American test-takers than predicted. (*Id.*) In 492 store and year combinations, the number of tests passed by African–American test-takers was less than one fewer test than predicted. (*Id.*) In 103 store and year combinations, the shortfall in passes by African–American test-takers was between one and two tests. (*Id.*) Twenty-four store and year combinations had between two and five fewer tests passed by African–American test-takers. (*Id.*)

According to Defendant's experts, after controlling for store, position, and PAR level of test, African–American employees took an average of 1.05 PAR tests. (Rebuttal Haworth–Thornton Report at 38.) Non–African–American employees took an average of 1.04 PAR tests. (*Id.*) Defendant's experts concluded that in 67.6% of stores, jobs, and PAR levels, there was no difference in the average number of PAR tests taken by race. (*Id.*) In 15.7% of stores, jobs, and PAR levels, African–American employees took PAR tests fewer times than non-African-American employees. (*Id.*) In 98.9% of the comparisons, no statistically significant differences existed

---

**58.** On average, Defendant's stores administered 141 tests each year, ranging from an average of 128 tests in 2000 to 161 tests in 1997. (Rebuttal Haworth–Thornton Report at 37.) Across the six years analyzed by Plaintiffs' experts, Defendant's

stores administered an average of 658 tests. (*Id.*) Table 7 to Defendant's experts' Rebuttal Report shows the distribution of the number of tests administered by Defendant's stores each year. (*Id.* at 37–38 & Table 7.)

in the number of times employees took tests by race. (*Id.* at 38–39.)

Defendant's experts also examined whether employees "ever passed" a particular PAR test. (Rebuttal Haworth–Thornton Report at 39.) Over the six-year period examined by Plaintiffs' experts, the overall shortfall in the number of African–Americans ever passing a particular PAR test was 133. (*Id.*) In 52.5% of Defendant's stores, African–Americans passed a particular PAR test at the same rate as non-African-Americans, or passed at a higher rate. (*Id.* at 39–40 & Fig. 10.) Defendant's experts also compared the differences in employees who "ever passed" a particular PAR test in terms of standard deviations, and concluded: (1) in 91% of Defendant's stores, the results were neutral with respect to race (*id.* at 40–41 & Fig. 11); (2) in 52.5% of Defendant's stores, the number of standard deviations is either equal to zero or is positive, favoring African–American test-takers (*id.*); (3) in 8.3% of the stores, the results are statistically significantly adverse to African–American test-takers (*id.*); and (4) in 99% of Defendant's stores over the six-year period, the adverse impact ratios associated with "ever passed" rates fall within the acceptable range of 80% to 125% (*id.*).

Plaintiffs' experts assert that the failure to pass PAR tests among African–American employees prohibits African–American employees from advancing in PAR levels. (Bradley–Fox Report at 14–15; Rebuttal Bradley–Fox Report ¶ 55.) To test that assertion, Defendant's experts examined the upward PAR movement among those employees who took each PAR test. (Rebuttal Haworth–Thornton Report at 52.) Using Plaintiffs' experts' analysis, Defendant's experts identified test-takers, regardless of outcome, by store, year, position, and PAR level of test, and considered whether or not those test-takers had an upward movement in PAR

level around the time they took the PAR tests. (*Id.*) Defendant's experts concluded that overall and by year, 253 more African–American employees moved to a higher PAR level than predicted. (*Id.*) Defendant's experts found that adverse impact ratios overall and by year were close to one hundred percent. (*Id.* at 42 & Fig. 12.) In 59.9% of stores, African–American employees moved to a higher PAR level among test-takers at the same rate as non-African-American test-takers,[59] or moved to a higher PAR level at a greater rate than non-African-American test-takers.[60] (*Id.*) In 178 stores, fewer African–American test-takers moved to a higher PAR level than predicted. (*Id.*)

Defendant's experts also created Figure 13 to their Rebuttal report to reflect the results of their analysis in standard deviations. (Rebuttal Haworth–Thornton Report at 43–44 & Fig. 13.) Defendant's experts concluded that only 3.4%, or 15, of Defendant's stores had statistically significantly fewer African–American test-takers moving to higher PAR levels than predicted. (*Id.*) In 96.6% of stores, the results were neutral or favorable to African–American test-takers. (*Id.*) The majority of the adverse impact ratios were within the acceptable four-fifths range or above it. (*Id.*) Overall, Defendant's experts concluded that the data they examined did not suggest that PAR tests on a store-level analysis were a barrier to upward movement by African–Americans. (*Id.*)

### 6. Salaries of Hourly PAR Employees

Plaintiffs' experts next examined the pay of African–Americans as compared to the pay of non-African-Americans, excluding tips. (Bradley–Fox Report at 17–19 & Exs. 12–13.) Plaintiffs' experts contended that African–Americans were paid less in every year. (*Id.*)[61]

---

**59.** Defendant's experts found that African–American test-takers advanced at the same rate as non-African-American test-takers in 15 stores. (Rebuttal Haworth–Thornton Report at 42–43 & Fig. 12.)

**60.** Defendant's experts found that African–American test-takers advanced at a greater rate than non-African-American test-takers in 251 stores.

(Rebuttal Haworth–Thornton Report at 42–43 & Fig. 12.)

**61.** One of Plaintiffs' experts, Dr. Bradley, still found that in some years, African–American employees were paid more than non-African-American employees for certain jobs. (Bradley Dep. Vol. I at 204–05.)

Defendant's experts also performed pay analyses that excluded tips. (Haworth–Thornton Report at 16–17, 22–23, 30–31 & Tables 4–9.) Defendant's experts concluded that Defendant did not pay African–Americans less. (*Id.*) Defendant's experts leveled criticisms at the analyses performed by Plaintiffs' experts. (*Id.*)

In response to the criticisms from Defendant's experts, Plaintiffs' experts abandoned their first pay analyses and devised a new analysis. (Rebuttal Bradley–Fox Report ¶¶ 64–69.) In their new analysis, Plaintiffs' experts computed the total compensation of Defendant's employees as including regular income, overtime income, and "adjusted" tip income. (*Id.*) Plaintiffs' experts claimed that tipped employees regularly under reported tip income, and searched the Internet to learn that estimates of under reporting of tips vary between sixteen and eighty-four percent of reported tips. (*Id.* ¶ 67.) Plaintiffs' experts therefore assumed that Defendant's servers under reported tips, doubled each server's reported tip income, and ran their calculations performing a multiple regression analysis that modeled total compensation for one year, adjusting for years of service, total number of hours worked, and store. (*Id.* ¶¶ 66–68.)

Plaintiffs' experts assert that for the years 1997 through 2000, the average compensation of African–American employees was from $425 to $527 less per year than the average compensation of non-African-American employees. (Rebuttal Bradley–Fox Report ¶ 69 & Ex. 27.) [62] Plaintiffs' expert Dr. Bradley, however, testified at his deposition that he had no factual basis to assume that Defendant's servers under reported tips, and that he had never made this under reporting assumption in any other case, report, or con-

sulting project. (*Id.;* Bradley Dep. Vol. II at 679, 694.)

Defendant's experts recreated the new analysis conducted by Plaintiffs' experts, but included actually reported tips rather than doubling tips. (Rebuttal Haworth–Thornton Report at 47.) Defendant's experts also corrected Plaintiffs' experts' error of counting overtime hours twice. (*Id.*) Defendant's experts concluded that African–American employees had statistically significantly higher compensation every year. (*Id.*) Defendant's experts also found that in 1996, jobs in the cook/dishwasher area of Defendant's stores earned a higher rate of pay than those jobs in the dining/retail area of the stores. (*Id.* at 49 & Fig. 15.) Defendant's experts concluded that similar patterns existed for 1998 and 2000. (*Id.*) [63]

### 7. Promotion Into Management

Plaintiffs' experts analyzed the promotion of hourly PAR employees into management positions, using the percentage of African–American employees at PAR level IV as the comparison benchmark. (Bradley–Fox Report at 15.) Plaintiffs' experts' analysis controlled for year of promotion, management position, and store. (*Id.* at 16 & Ex. 11.) From January 1995 through November 2000, 593 promotions to management occurred. (*Id.*) Twenty-one of those promotions were for African–American employees. (*Id.*) One would have expected that 8.03%, or forty-eight, of the promotions, would have gone to African–American employees. (*Id.*) The discrepancy of twenty-seven fewer African–American employee promotions than expected represents a statistically significant difference of −4.39 standard deviations, with an adverse impact ratio of 42%, below the 80% threshold of the four-fifths rule. (*Id.*)

---

**62.** These results were statistically significant. Defendant's experts, however, concluded that the statistical significance was created by doubling servers' tip income. (Rebuttal Haworth–Thornton Report at 46–48 & Fig. 14.) Defendant's experts also concluded that Plaintiffs' experts made a significant error in their calculations by doubling overtime hours, which resulted in too many hours for those persons who had overtime work. (*Id.* at 47.) According to Defendant's experts, because Plaintiffs' experts adjusted individual employees' compensation for hours

worked, doubling overtime hours resulted in a bias against employees who worked overtime. (*Id.*)

**63.** For 1996, the average hourly rates of pay were: (1) $6.02 for all dining/retail area employees; (2) $6.13 for all dining/retail area employees, excluding servers; and (3) $6.64 for all cook/dishwasher area employees. (Rebuttal Haworth–Thornton Report at 49–50 & Fig. 16.)

Defendant's experts criticized the analysis performed by Plaintiffs' experts because the analysis combined management and trainee positions that had different criteria for entry. (Haworth–Thornton Report at 16, 76.) Plaintiffs' experts assumed that all PAR IV employees had an equal chance of entry into management, but ignored the fact that most of the MIT participants came from external labor markets. (*Id.* at 76.) [64] Defendant's experts argue that Plaintiffs' experts' analysis also ignored the differences in opportunities for moving to each of the different management positions analyzed, and did not incorporate available data concerning employee performance. (*Id.* at 80–81.) Defendant's experts asserted that an analysis of employees who expressed an interest in a management job and who met the basic qualifications necessary to enter the management program showed that African-American employees and non-African-American employees were equally likely to be a part of Defendant's Management Internship Program. (*Id.* at 81–82.)

Defendant's experts showed that Plaintiffs' experts examined 593 promotions of hourly employees into various management positions. (Haworth–Thornton Report at 79.) Three hundred and thirty-two of those promotions were of employees who met the entry requirements for Defendant's Management Internship Program from a variety of PAR levels, not just PAR IV. (*Id.* at 79 & Table 24.) Defendant's experts also showed that Plaintiffs' experts included in their analysis twelve Associate Manager entrants into the MIT program, as well as promotions into non-management positions such as Gift Shop Management Trainee, Employee Training Coordinator, and Restaurant Management Trainee. (*Id.* at 80 & Table 24.)

Defendant's experts concluded that all of the positions held by PAR IV employees do not have the same likelihood of entering the various "management" positions analyzed by Plaintiffs' experts. (Haworth–Thornton Report at 80.) Of the 332 moves into Defendant's Management Internship Program, 204 employees came from the server position and sixty-four employees came from the grill cook position. (*Id.*) Almost all of the 124 moves into the Gift Shop Management Trainee position came from gift shop [65] and cashier [66] positions. (*Id.*) Most of the fifty-five employees who entered the Employee Training Coordinator position came from the server position. [67] (*Id.*)

According to Defendant's experts, Plaintiffs' experts' assumption that all PAR IV employees have an equal chance of promotion into management is unfounded. (Rebuttal Haworth–Thornton Report at 51.) Defendant's experts point out that Defendant's Management Internship Program guidelines do not require cross-training in all of the store's hourly positions. (*Id.*) Defendant's experts also emphasize that given the nature of the Gift Shop Manager position, it is more likely that employees who have worked in the positions managed by the Gift Shop Manager will have the necessary background for the Gift Shop Manager position. (*Id.*) Defendant's experts consequently used employees in PAR IV positions from which the promotion occurred to adjust for the fact that employees with a PAR IV level in positions that are not required as part of the cross-training requirement are less likely to move into Defendant's Management Internship Training Program. (*Id.*)

Defendant's experts conducted an analysis that defined the candidate pool to include employees in the same position as the employee who moved to management. (Haworth–Thornton Report at 80.) Defendant's experts prepared Table 25 of their Report to summarize the results of their modification to the benchmark used by Plaintiffs' experts for the three positions that had statistically

---

64. Plaintiffs' experts complained that they received no data concerning entry into the MIT program. (Rebuttal Bradley–Fox Report ¶ 63.)

65. Seventy-three of the employees who moved into the Gift Shop Management Trainee position came from gift shop positions.

66. Thirty of the employees who moved into the Gift Shop Management Trainee position came from cashier positions.

67. Forty-two of the employees who moved into the Employee Training Coordinator position came from server positions.

significant adverse differences for African–American employees under the analysis performed by Plaintiffs' experts: Employee Training Coordinator, Gift Shop Management Trainee, and Intern. (*Id.* at 80–81 & Table 25.) None of the three positions, as modified, had statistical significance. (*Id.* at 81 & Table 25.) Defendant's experts concluded that the effect of Plaintiffs' experts' assumption that all PAR IV employees have an equal chance of moving into management, regardless of the positions in which they worked, was to inflate the percentage of African–Americans in the pool. (*Id.*)

Defendant's experts stated that an analysis of hourly employees' movements into management should consider only those employees who have applied for promotions to management and who meet the minimum qualifications for promotion to management. (Haworth–Thornton Report at 81.) Defendant's experts concluded that when they analyzed that data, no statistically significant difference existed between the number of African–American employees who moved into Defendant's Management Internship Program and the number of African–American movements predicted by the number of African–Americans among those employees who were qualified for such movements. (*Id.* at 81–82.) Defendant's experts indicated that they were unaware of any evidence that African–Americans were deterred from applying for Defendant's Management Internship Program.[68] (*Id.* at 81 n. 4.)

Plaintiffs' experts, however, asserted that they conducted the analyses conducted by Defendant's experts in all 593 promotions. (Rebuttal Bradley–Fox Report ¶¶ 58–60 & Ex. 25.) Plaintiffs' experts concluded a difference of –2.27 standard deviations existed, with an adverse impact ratio of 67.9%. (*Id.*) Plaintiffs' experts also expressed their dis-

agreement with Defendant's experts' belief that one should control for the job of the mover. (*Id.* ¶¶ 58, 61.) According to Plaintiffs' experts, restricting promotion opportunities to any one group is at odds with Defendant's actual selection progress, which does not give a preference to any hourly group. (*Id.* ¶ 61.)

Plaintiffs' experts also analyzed the movement of hourly employees into management positions who applied for such positions and who met the minimum qualifications for those positions. (Rebuttal Bradley–Fox Report ¶ 62 & Ex. 26.) In contrast to Defendant's experts, Plaintiffs' experts reported that the difference between the number of qualified African–American employees who moved into Defendant's Management Internship Program, compared to the number predicted, was –2.11 standard deviations, with an adverse impact ratio of sixty-eight percent. (*Id.*) The shortfall was 5.7 African–American selections for Defendant's Management Internship Program over a four-year period. (*Id.*)

Defendant's experts responded that they calculated the exact number of standard deviations as –1.915, which is not statistically significant. (Rebuttal Haworth–Thornton Report at 52.) According to Defendant's experts, Plaintiffs' experts used a hypergeometric approximation to calculate the number of standard deviations.[69] (*Id.*)[70]

### 8. Hiring Data

Plaintiffs' experts evaluated the racial composition of hourly hires by Defendant from 1995 to 2000, using the broad service workers' category, EEO–9, used in Government-mandated, annual EEO–1 filings. (Rebuttal Bradley–Fox Report ¶ 25.) Using the percentage of African–American service workers

---

**68.** Plaintiffs' experts also had no evidence that African–American employees were deterred from applying for Defendant's Management Internship Program. (Bradley Dep. Vol. I at 113.)

**69.** A hypergeometric distribution is a probability function that gives the probability of obtaining exactly $x$ elements of one kind and $n—x$ elements of another if $n$ elements are chosen at random without replacement from a finite population containing $N$ elements of which $M$ are of the first

kind and $N—M$ are of the second kind. *Merriam–Webster's Collegiate Dictionary* 569 (10th ed.2001).

**70.** Even if the Court accepts Plaintiffs' experts' calculation of the number of standard deviations, –2.11 barely falls within the statistically significant range of two to three standard deviations. *Maddox v. Claytor*, 764 F.2d 1539, 1552 (11th Cir.1985).

in the EEO–9 category in the county where each of Defendant's stores was located from the 1990 Census, Plaintiffs' experts concluded that Defendant hired over 18,000 fewer African–Americans than one would have expected. (*Id.*) [71] Dr. Bradley testified that he used the EEO–9 service worker category to make his comparisons because the positions Defendant fills are included among the long list of service occupations that make up the EEO–9 category, and because Defendant hires unskilled, entry-level employees. (Bradley Dep. Vol. II at 559–60.)

The Court concludes, however, that Plaintiffs' experts' use of EEO–9 data for their comparison was improper. The EEO–9 service worker category includes over fifty jobs, most of which involve no restaurant or gift shop work.[72] Defendant does not hire for those positions. Further, as Defendant's experts noted, the sample of Defendant's employment applications indicated that most of Defendant's hires had prior experience in the position sought. (Rebuttal Haworth–Thornton Report at 19.) Although Defendant may not require prior experience, its hiring Managers often chose employees with prior experience, possibly to reduce training costs. (*Id.* at 19–21 & Fig. 6.) Use of the broad EEO–9 category data thus was inappropriate.

### D. Procedural Background

On May 15, 2002, Plaintiffs filed their Motion for Class Certification. On December 31, 2002, Judge Johnson issued his thorough and well-reasoned Report and Recommendation concerning Plaintiffs' Motion for Class Certification. Judge Johnson has recommended that the Court deny Plaintiffs' Motion for Class Certification because Plaintiffs do not satisfy the adequacy and typicality requirements of Federal Rule of Civil Procedure 23(a), and because Plaintiffs have failed to satisfy the requirements of Federal Rule of Civil Procedure 23(b)(2). On January 27, 2003, the Court allowed Plaintiffs to file six-ty-five pages of Objections to the Report and Recommendation. (Order of Jan. 27, 2003.)

### III. Discussion

Plaintiffs object strenuously to the Report and Recommendation regarding class certification. For the following reasons, the Court concludes that class certification is not appropriate for this case and that Plaintiffs' Objections are without merit.

### A. Failure to Hold an Evidentiary Hearing

■ Plaintiffs complain that Judge Johnson failed to hold an evidentiary hearing with respect to Plaintiffs' Motion for Class Certification, and that Plaintiffs did not have an opportunity to present all of the evidence necessary to sustain their position on the merits or to protect against adverse credibility determinations. Plaintiffs' argument, however, ignores the fact that Plaintiffs failed to request an evidentiary hearing. (Report and Recommendation Class Certification at 5–6 n. 3.) In any event, as evidenced by the size of the record in this case and by the amount of time spent by the Court and its staff in reviewing the record in this case, the parties had ample opportunity to submit evidence in support of their positions concerning class certification. Judge Johnson thus properly concluded that an evidentiary hearing was not necessary for this case. (*Id.* at 6 n. 3.) The Court therefore overrules Plaintiffs' Objection based on Judge Johnson's decision not to hold an evidentiary hearing.

### B. Alleged Misunderstanding of the Nature of Plaintiffs' Claims

Plaintiffs contend that Judge Johnson somehow "misunderstood" the nature of Plaintiffs' claims. Plaintiffs argue that they challenge a centralized practice of discrimination by Defendant, which involves "channeling" African–American employees into

71. According to Plaintiffs' experts, the difference was –79.36 standard deviations. (Rebuttal Bradley–Fox Report ¶ 25.)

72. The EEO–9 category includes jobs such as elevator operator, hairdresser, child care worker, guard, nursing aide, barber, and bellhop. (Rebuttal Haworth–Thornton Report at 18–19 & Table 3.) Even Dr. Bradley testified that many of the EEO–9 jobs were ones for which Defendant did not hire employees. (Bradley Dep. Vol. II at 561.)

back-of-the-house positions and denying African–American employees promotions and opportunities. Plaintiffs consequently contend that their challenge will not involve individualized issues.

Plaintiffs' argument is unavailing. Regardless of how Plaintiffs attempt to style their claim, the claim will necessarily require the Court to examine many individual, fact-specific issues, including employment decisions made by different individual local store managers scattered over 450 stores in forty-one states, and any particular factual circumstances relevant to those decisions. Plaintiffs cannot disguise this fact simply by calling their claim a *"Teamsters-type"* pattern or practice action. The fact remains that Plaintiffs' claims necessarily involve many individual, fact-specific issues, and that class certification simply is inappropriate for this case. The Court therefore overrules Plaintiffs' Objection based on Judge Johnson's "misunderstanding" of the nature of Plaintiffs' claims.

### C. Alleged Determination on the Merits, Including Making Credibility Determinations and Weighing of Evidence

■ Plaintiffs also complain that Judge Johnson improperly addressed the merits of Plaintiffs' claims, including making credibility determinations and weighing evidence, in connection with his analysis of Plaintiffs' Motion for Class Certification. For the reasons discussed below, Plaintiffs' argument is without merit.

First, Judge Johnson was not required to accept the evidence presented by Plaintiffs and Plaintiffs' allegations at face value. Instead, the Rule 23 analysis requires a court to perform a "rigorous analysis" when determining whether a proposed class satisfies the requirements of Rule 23. *See infra* Part III.F. (discussing requirements for class certification). Judge Johnson performed such an analysis, and concluded that Plaintiffs' proposed class simply could not satisfy Rule 23's requirements. In reaching this conclusion, Judge Johnson did not, as Plaintiffs

argue, base his decision on the merits of Plaintiffs' claims. Judge Johnson did not purport to examine whether Plaintiffs' evidence did or did not prove discrimination under particular facts and circumstances. Instead, Judge Johnson simply examined the nature of the evidence sought to be presented by Plaintiffs, and examined how that evidence fit into the legal framework governing Plaintiffs' claims. This examination was proper.

Moreover, Judge Johnson did not base his recommendation concerning class certification on credibility determinations. Judge Johnson simply made completely appropriate evaluations of the relevance, persuasiveness, and probative value of the evidence in its appropriate context. Plaintiffs' Objection on this ground consequently is improper.

Similarly, Plaintiffs' Objection pertaining to Judge Johnson's evaluation of the statistical evidence presented by the parties also is without merit. Plaintiffs argued that their statistical evidence established Rule 23(a)'s commonality and typicality elements. Under those circumstances, Judge Johnson was obligated to conduct a careful review of the statistical evidence presented. In conducting this review, Judge Johnson did not, as Plaintiffs argue, believe the truthfulness of Defendants' experts over Plaintiffs' experts. Instead, Judge Johnson studied the statistical evidence and analyses presented by both sets of experts, and concluded that certain of the analyses performed by Plaintiffs' experts were not appropriately structured and were not relevant, reliable, or probative to class certification issues. Plaintiffs' argument that Judge Johnson simply should have accepted Plaintiffs' statistical evidence as true at this stage of the proceedings thus is without merit.[73]

### D. Alleged Failure to Construe the Evidence in the Light Most Favorable to Plaintiffs

Alternatively, Plaintiffs complain that Judge Johnson should have construed all the

---

73. In any event, the weakness of Plaintiffs' statistical evidence certainly was not the sole or even

a primary factor prohibiting class certification.

evidence in the light most favorable to Plaintiffs. For the reasons discussed *supra* Part III.C., this Objection is wholly without merit, and the Court overrules it.

### E. Whether Plaintiffs Possess Standing

■ "[A]nalysis of class certification must begin with the issue of standing." *Griffin v. Dugger,* 823 F.2d 1476, 1482 (11th Cir.1987). " '[S]tanding to sue is an essential threshold which must be crossed before any determination as to class representation under Rule 23 can be made.' " *Sandlin v. Shapiro & Fishman,* 168 F.R.D. 662, 668 (M.D.Fla.1996) (quoting *Angel Music, Inc. v. ABC Sports, Inc.,* 112 F.R.D. 70, 73 (S.D.N.Y.1986)). "[W]hether a plaintiff will be permitted to represent not only individual claims, but also those of parties not directly before the court who have common claims, depends on whether the plaintiff is able to meet additional criteria [of Rule 23 of the Federal Rules of Civil Procedure], apart from threshold standing tests." 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 2.05 (3d ed.1992).

■ "Prior to certification of a class, and before undertaking any formal typicality or commonality review, the district court must determine that at least one named class representative has Article III standing to raise each class subclaim." *Prado–Steiman v. Bush,* 221 F.3d 1266, 1279 (11th Cir.2000). "It is not enough that a named plaintiff can establish a case or controversy between himself and the defendant by virtue of having standing as to one of many claims he wishes to assert." *Id.* at 1280. "Rather, 'each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.' " *Id.* (quoting *Griffin,* 823 F.2d at 1483).

■ For each claim, to satisfy the standing requirements of Article III, at least one named Plaintiff:

> [first,] must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (quotation marks, ellipses, and citations omitted).

■ The Court agrees with Judge Johnson that the following Plaintiffs in this case possess standing to assert the following claims on behalf of the proposed class:

(1) Plaintiff Workue has standing to assert a claim for denial of front-of-the-house positions to African–American applicants at hire or channeling of African–American applicants to back-of-the-house jobs;

(2) Plaintiffs Wilson, Keel, and Alexander have standing to assert a claim for denial of cross-training or transfer opportunities that would allow African–American employees to move from back-of-the-house jobs to front-of-the-house jobs and to obtain the experience necessary to obtain management positions;

(3) Plaintiffs Rhodes, Wilson, Regan, Barbee, and Keel have standing to assert a claim for denial or delay in obtaining PAR levels or PAR tests that would allow African–Americans to move from back-of-the-house jobs to front-of-the-house jobs and to obtain the experience necessary to obtain management positions; and

(4) Plaintiffs Regan and Alexander have standing to assert a claim for denial or delay in obtaining management training or positions.

(Report and Recommendation at 123–128.) The Court also agrees that Plaintiffs have standing to seek injunctive relief against Defendant, because certain Plaintiffs presently are employed by Defendant. (*Id.* at 128–29.)

To the extent that Plaintiffs complain that Judge Johnson improperly addressed the merits of Plaintiff Workue's claim when discussing standing, this objection is without merit. Judge Johnson indeed expressed concern about the strength of Plaintiff Workue's claim; however, Judge Johnson explicitly recognized that "it is premature to judge the merits of a plaintiff's claim at the class certification stage." (Report and Recommendation at 130.) Judge Johnson did not purport to rule on the merits of Plaintiff Workue's claim in his Report and Recommendation; instead, Judge Johnson simply pointed out that serious concerns existed with respect to allowing Plaintiff Workue to represent the proposed class based on the unique factual circumstances associated with her claims and allegations. In any event, Plaintiffs' Motion for Class Certification fails for many more reasons than the potential weaknesses of Plaintiff Workue's claim. The Court therefore overrules this Objection.

## F. Whether Plaintiffs Failed to Satisfy Rule 23

■ A request to proceed as a class action is governed by Federal Rule of Civil Procedure 23. Plaintiffs have the burden of establishing that they have satisfied each of Rule 23's certification requirements. *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 683 (N.D.Ga.1991). When assessing a motion for class certification, the Court ordinarily does not inquire whether Plaintiffs have adduced sufficient evidence to prevail on the merits of their claims. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451, 456 (11th Cir.1996). Nonetheless, the Court performs a "rigorous analysis" of the arguments offered in support of certifying the class. *Gilchrist v. Bolger*, 733 F.2d 1551, 1556 (11th Cir.1984). When performing this analysis, the Court is not limited solely to the substance of the parties' pleadings; indeed, the Court should allow—and has allowed in this case—the parties to conduct discovery and adduce evidence relevant to the class certification issue. *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1570–71 (11th Cir.1992). As pointed out by the Supreme Court, the need for such discovery varies depending on the circumstances presented by each case:

> The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action. [*Coopers & Lybrand v. Livesay*, 437 U.S.] at 469 [, 98 S.Ct. 2454] (quoting *Mercantile Nat'l Bank v. Langdeau*, 371 U.S. 555[, 558, 83 S.Ct. 520, 9 L.Ed.2d 523 (1963)]). Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.

*Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *Hudson*, 90 F.3d at 457.

■ Consistent with Eleventh Circuit authority, the Court will "scrutinize the evidence plaintiffs propose to use in proving their claims without unnecessarily reaching the merits of the underlying claims." *Domestic Air*, 137 F.R.D. at 684; *Telecomm Technical Serv., Inc. v. Siemens Rolm Communications, Inc.*, 172 F.R.D. 532, 542–43 (N.D.Ga.1997) ("[Rule 23] analysis often mandates that the Court look to the law and facts which comprise the plaintiffs' class action claims"). "This means ensuring through information submitted outside of the pleadings that the requirements of Rule 23 are met, not whether plaintiffs' claims are viable." *Telecomm Technical*, 172 F.R.D. at 543. Stated differently, the Court will examine whether sufficient evidence exists to reasonably conclude that Plaintiffs may proceed in the manner proposed, not whether the evidence can withstand any and all factual challenges leveled by Defendants.

### 1. Class Action Certification Under Rule 23

Before certifying a class, the Court first determines whether Plaintiffs have satisfied the requirements of Rule 23(a), and then proceeds to verify that the proposed class

falls within one of the categories described in Rule 23(b). *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 315 (5th Cir.1978); [74] *Domestic Air*, 137 F.R.D. at 697. Rule 23(a) requires Plaintiffs to show:

> (1) the class is so numerous that joinder of all members is impracticable,
>
> (2) there are questions of law or fact common to the class,
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Plaintiffs contend they have satisfied these requirements, and further allege that the resulting class fits within Rule 23(b)(2), which requires that: "the party opposing the class ha[ve] acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). The Court first considers Plaintiffs' showing under Rule 23(a), and afterward addresses the requirements contained in Rule 23(b)(2).

### a. Rule 23(a) Analysis

#### i. Numerosity

■ The numerosity requirement is satisfied if the proposed class is so numerous that joinder of all members is impracticable. Fed.R.Civ.P. 23(a)(1). The requirement that joinder is impracticable does not mandate that joinder is impossible; rather, Plaintiffs "need only show that it would be extremely difficult or inconvenient to join all members of the class." *Domestic Air*, 137 F.R.D. at 698. Plaintiffs "generally must proffer some evidence or a reasonable estimate of the number of members comprising the purported class." *In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524, 529 (M.D.Fla.1996).

Plaintiffs seek to create a class consisting of:

> All African–Americans who applied for employment or were employed by Cracker Barrel Old Country Store, Inc., at any time since April 9, 1994, or who would have applied during such period in the absence of the employment practices challenged in this lawsuit.

(Pls.' Mot. Class Certification at 1.) The Court agrees with Judge Johnson that the proposed class is sufficiently numerous to satisfy Rule 23(a)(1). (Report and Recommendation at 144–145.)

■ A second element of the numerosity requirement is that the proposed class meet a minimal standard of identifiability. Although "[i]t is not necessary that the members of the class be so clearly identified that any member can be presently ascertained, ... [Plaintiffs] must establish that there exists a legally definable 'class' that can be ascertained through reasonable effort." *Earnest v. Gen. Motors Corp.*, 923 F.Supp. 1469, 1473 & n. 4 (N.D.Ala.1996) (quotations and citations omitted). The class simply must meet a "minimum standard of definiteness which will allow the trial court to determine membership in the proposed class." *Id.; see also Telecomm Technical*, 172 F.R.D. at 543–44 (all members of class need not be specifically identified and may be dispersed geographically). Plaintiffs' proposed class definition specifies a legally definable class. The Court thus concludes that Plaintiffs' proposed class meets the numerosity requirement of Rule 23(a).

#### ii. Commonality

■ To satisfy the commonality requirement, Plaintiffs must show the presence of questions of law or fact common to the entire class. Fed.R.Civ.P. 23(a)(2). "[W]hile it is not necessary that every question of law or fact is common to every class member, commonality will not exist as long as there is a predominance of individual issues." *Domestic Air*, 137 F.R.D. at 699 (citing 3 Herbert B. Newburg, Newburg on Class Actions § 18.09, at 464 (2d ed.1985)). For the following reasons, the Court concludes that Plain-

---

**74.** Opinions of the Fifth Circuit issued before October 1, 1981, the date marking the creation of the Eleventh Circuit, are binding precedent on this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209–11 (11th Cir.1981) (en banc).

tiffs cannot satisfy Rule 23(a)'s commonality requirement.

### aa. The Representative Plaintiffs

Judge Johnson correctly determined that the proposed class representatives' claims do not have the same essential elements of the claims of the class. (Report and Recommendation at 146–150.) Plaintiffs purport to represent African–Americans who experienced channeling into back-of-the-house positions, who were kept there involuntarily through the lack of opportunities to cross-train or to progress through PAR levels to management positions, and who were subjected to discriminatory pay.

Plaintiffs' evidence, however, reveals that none of the proposed class representatives experienced channeling to back-of-the-house positions at the time of hiring or in initial job assignments. In fact, all of the proposed class representatives who were hired applied for back-of-the-house jobs. Although Plaintiff Workue was never hired at all, Plaintiff Workue could not state whether Defendant hired anyone else instead of her, and did not know the qualifications of anyone else who Defendant might have hired.

Plaintiffs Wilson, Keel, and Alexander allege that Defendant denied them cross-training opportunities for front-of-the-house positions; however, Plaintiffs Rhodes, Regan, and Barbee never sought cross-training in front-of-the-house positions. Plaintiffs Rhodes, Wilson, Regan, Barbee, and Keel complain of problems with PAR testing; however, those complaints relate to PAR tests for back-of-the-house positions, rather than problems with obtaining PAR tests for front-of-the-house positions. In any event, each of the proposed class representatives who actually were employed by Defendant progressed rapidly through the PAR system. Plaintiffs Rhodes, Regan, Barbee, Keel, and Alexander are PAR IV employees, and their pay rates are the best or among the best in their stores. Those five employees have worked for Defendant, on average, for eleven years. Finally, although Plaintiffs Regan and Alexander complain that Defendant denied them management opportunities, most of the proposed class representatives, including Plaintiffs Barbee, Keel, and Rhodes, indicated that they were not interested in moving into management.

The proposed class representatives consequently do not appear to possess the same interests or to have suffered the same injuries as the putative class members. The proposed class representatives' claims thus do not appear to satisfy the commonality requirement.

Indeed, as Judge Johnson noted, the proposed class representatives assert primarily individualized claims, instead of common claims. For instance, Plaintiff Alexander asserts that Defendant channeled him from one back-of-the-house position to another. Plaintiff Barbee claims that Defendant denied him the opportunity to cross-train for other back-of-the-house positions, even though Defendant hired him as a dishwasher and moved him to a grill cook position. Plaintiff Keel claims that Defendant disciplined her and gave her an unequal work schedule on account of her race. Plaintiff Regan contends that Defendant denied him management training. Plaintiff Rhodes argues that Defendant channeled him from one back-of-the-house position to another. Plaintiff Wilson complains that Defendant denied him a transfer to a night management position. Finally, Plaintiff Workue contends that Defendant refused to hire her because of her race.

From the above review of the proposed class representatives' claims, it is clear that "the extent of commonality among the representatives lies solely in two plaintiffs who were both channeled between back-of-the-house positions." (Report and Recommendation at 149.) The Court agrees that "[t]his lone mutual claim" cannot support a finding of commonality. (*Id.*)

### bb. Decentralized Decision–Making

Defendant maintains guidelines and policies on equal employment opportunities, recruiting, and hiring, and uses individuals employed by Defendant's corporate office to assist with opening new stores and with training local store personnel concerning guidelines and policies. Defendant also es-

tablishes company-wide minimum standards for eligibility for PAR testing or promotion to management.

Defendant, however, has no central group of individuals or individuals at its corporate headquarters who apply Defendant's human resources guidelines and policies to every store by deciding whom to interview, whom to hire, or whom to promote or cross-train. Rather, Defendant's local store managers and assistant managers, who are scattered over 450 stores in forty-one states, apply Defendant's guidelines and policies. The local store managers and assistant managers decide whom to interview, whom to hire and in which job to hire those individuals, whom to cross-train, and whom to transfer. Local store and assistant managers set hourly rates, conduct evaluations, and award raises. Defendant thus has a decentralized system of personnel decision-making. *See* Report and Recommendation at 151 ("No more decentralized system of personnel decision-making could be imagined.").

Because each proposed class representative suffered injury based on alleged misconduct by his or her own managers, the proposed class representatives' claims have little in common. Similarly, the proposed class representatives' claims "could have little in common with class members spread over so many stores in so many states with so many different managers responsible for making the challenged employment decisions." (Report and Recommendation at 151.) Several other courts have found that the commonality requirement is not satisfied where geographic diversity or an absence of centralized decision-making exists, or where different decision-makers made the challenged decisions. *Stastny v. S. Bell Tel. & Tel. Co.,* 628 F.2d 267, 278–80 (4th Cir.1980); *Donaldson v. Microsoft Corp.,* 205 F.R.D. 558, 567 (W.D.Wash.2001); *Beck v. Boeing Co.,* 203 F.R.D. 459, 463–64 (W.D.Wash.2001); *Cooper v. Southern Co.,* 205 F.R.D. 596, 611 (N.D.Ga.2001); *Abram v. United Parcel Serv. of Am., Inc.,* 200 F.R.D. 424, 432–33 (E.D.Wis.2001); *Wright v. Circuit City Stores, Inc.,* 201 F.R.D. 526, 540–42 (N.D.Ala. 2001); *Bacon v. Honda of Am. Mfg., Inc.,* 205 F.R.D. 466, 478–79 (S.D.Ohio 2001); *Lott v. Westinghouse Savannah River Co.,* 200 F.R.D. 539, 555–56 (D.S.C.2000); *Troupe v. Randall's Food & Drugs, Inc.,* Civil Action No. 3:98–CV–2462–P, 1999 WL 552727, at *5 (N.D.Tex. July 28, 1999); *Betts v. Sundstrand Corp.,* No. 97 C 50188, 1999 WL 436579, at *6 (N.D.Ill. June 21, 1999); *Zachery v. Texaco Exploration & Prod., Inc.,* 185 F.R.D. 230, 238–40 (W.D.Tex.1999); *Bostron v. Apfel,* 182 F.R.D. 188, 195–96 (D.Md.1998); *Reyes v. Walt Disney World Co.,* 176 F.R.D. 654, 658 (M.D.Fla.1998); *Boykin v. Viacom, Inc.,* No. 96 CIV. 8559(DLC), 1997 WL 706323, at *4 (S.D.N.Y. Nov.12, 1997); *Abrams v. Kelsey–Seybold Med. Group, Inc.,* 178 F.R.D. 116, 130–31 (S.D.Tex.1997); *Appleton v. Deloitte & Touche LLP,* 168 F.R.D. 221, 231–32 (M.D.Tenn.1996); *Lumpkin v. E.I. Du Pont de Nemours & Co.,* 161 F.R.D. 480, 482 (M.D.Ga.1995).

Instead, the circumstances of each proposed class representative's case will depend on how a specific manager treated that proposed class representative at his or her store. Defendant can assert specific, non-discriminatory reasons for its manager's actions. Each purported class member's claim thus will depend on an individualized factual inquiry. Under these circumstances, Plaintiffs cannot satisfy Rule 23(a)'s commonality requirement.

### cc. Individualized Nature of the Claims—Disparate Treatment

■■■■ Plaintiffs assert disparate treatment claims. To establish a disparate treatment claim, a plaintiff must show that his employer intentionally treated him less favorably than a similarly situated non-minority employee on the basis of his race. *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). In a class action, Plaintiffs must show that "racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). This type of case commonly is known as a "pattern or practice case," and may be brought under Title VII and § 1981. *Rutstein v. Avis Rent–A–Car Sys., Inc.,* 211 F.3d 1228, 1237

(11th Cir.2000), *cert. denied,* 532 U.S. 919, 121 S.Ct. 1354, 149 L.Ed.2d 285 (2001).

■ In a pattern-or-practice case, the plaintiff first attempts to prove that discrimination was the employer's standard operating procedure. *Teamsters,* 431 U.S. at 338–39, 361, 97 S.Ct. 1843. The plaintiff may make this showing through a combination of historical, anecdotal, or statistical evidence. *Id.* This stage of the proceedings is known as the Stage I, or liability, stage of the case.

■ At Stage I of the case, the Court does not focus on individual decisions, but instead focuses on a pattern of discriminatory decision-making. *Teamsters,* 431 U.S. at 360 n. 46, 97 S.Ct. 1843. If the plaintiff succeeds at Stage I of the case, the "primary relief afforded to the plaintiff class in a pattern or practice case is declaratory or injunctive." *Rutstein,* 211 F.3d at 1238 n. 18 (citing *Teamsters,* 431 U.S. at 361, 97 S.Ct. 1843).

■ If individual class members desire individual relief, the individual class members must come forward during the Stage II, or remedial stage of the case. *Rutstein,* 211 F.3d at 1238. At this stage of the litigation, an inference exists that the Defendant's pattern or practice of discrimination negatively affected each individual. *Teamsters,* 431 U.S. at 360–61, 97 S.Ct. 1843. The defendant bears the burden of demonstrating that it denied an individual an employment opportunity for lawful reasons. *Id.* at 361, 97 S.Ct. 1843. If the employer fails to shoulder this burden, the court must fashion appropriate relief. *Id.* at 364–67, 97 S.Ct. 1843.

■ A plaintiff's task in establishing commonality is more difficult where the plaintiff alleges disparate treatment claims. *Nelson v. U.S. Steel Corp.,* 709 F.2d 675, 679 n. 9 (11th Cir.1983). Indeed, commonality often is absent in disparate treatment class actions because disparate treatment claims, by their very nature, are individual. *Washington v. Brown & Williamson Tobacco Corp.,* 959 F.2d 1566, 1570 n. 10 (11th Cir.1992).

As an initial matter, Stage I of a disparate treatment proceeding would require the Court to make individualized factual determinations. Although Plaintiffs claim that Defendant engaged in a pattern or practice of discriminatory decision-making, a determination whether Defendant maintained such a pattern or practice necessarily would require the Court to examine issues and facts pertaining to the individual proposed class representatives and class members. Indeed, Plaintiffs' "channeling" claim actually would require the Court to analyze several different individual hiring decisions—including who Defendant interviewed and hired for each position, as well as the races and relative qualifications of the applicants, whether Defendant had a position available, and what positions were available, who Defendant cross-trained, and who Defendant transferred, as well as the reasons for Defendant's decisions. Commonality simply is not present under these circumstances.[75]

Additionally, the Court agrees with Judge Johnson that Stage II of a disparate treatment proceeding will require individualized factual determinations. (Report and Recommendation at 160–64.) Even if an inference existed that an individual class member or proposed class representative had been denied an employment opportunity by Defendant based on Defendant's pattern or practice of discrimination, Defendant still could demonstrate that it denied that individual an opportunity for lawful reasons. As a result, the Court would have to make individualized factual determinations for each proposed class representative and class member. Plaintiffs consequently cannot satisfy the commonality requirement with respect to their disparate treatment claims.[76]

### dd. Individualized Nature of Claims—Disparate Impact Claims

■ Plaintiffs also assert disparate impact claims. A plaintiff asserting a dispa-

---

**75.** Plaintiffs' Objection to Judge Johnson's conclusion that Stage I of Plaintiffs' pattern and practice case would involve individualized factual determinations that would defeat commonality consequently is without merit.

**76.** The Court therefore overrules Plaintiffs' Objection to Judge Johnson's conclusion that Stage II of Plaintiffs' pattern and practice case would involve individualized factual determinations that would defeat commonality.

rate impact claim must demonstrate that a facially neutral requirement or policy of the defendant disproportionally and adversely affected members of a protected group. After a plaintiff makes this showing, the defendant then bears the burden of establishing that the requirement or policy was necessary and was job-related. *Griggs v. Duke Power Co.,* 401 U.S. 424, 436, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The plaintiff need not prove discriminatory intent. *EEOC v. Joe's Stone Crab, Inc.,* 220 F.3d 1263, 1273 (11th Cir. 2000). Disparate impact claims are not available under § 1981. *Reid v. Lockheed Martin Aeronautics Co.,* 205 F.R.D. 655, 667 n. 15 (N.D.Ga.2001).

In the first stage of a disparate impact case, the plaintiff must "demonstrate[ ] that the [employer] uses a particular employment practice that causes a disparate impact on the basis of race." 42 U.S.C.A. § 2000e-2(k)(1)(A)(i); *In re Employment Discrimination Litig. Against Ala.,* 198 F.3d 1305, 1311–16 (11th Cir.1999). The plaintiff primarily carries this burden of proof by using statistics.

If the plaintiff carries his burden of demonstrating that the employer's challenged employment practice causes a disparate impact, the burden shifts to the employer to "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C.A. § 2000e-2(k)(1)(A)(i). "Alternatively, the [plaintiff] can demonstrate 'that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in efficient and trustworthy workmanship.'" *In re: Employment Discrimination Litig.,* 198 F.3d at 1314–15 (quoting *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)) (internal quotation marks omitted).

█ If the court ultimately determines that the employer violated Title VII's dispa-

rate impact provisions, the court may order a wide range of equitable relief. 42 U.S.C.A. § 2000e-5(g)(1); *In re: Employment Discrimination Litig.,* 198 F.3d at 1315. With respect to individual relief, "if an individual plaintiff has shown that he or she was within the class of persons negatively impacted by the unlawful employment practice, then the employer must be given an opportunity to demonstrate a legitimate[,] nondiscriminatory reason why, absent the offending practice, the individual plaintiff would not have been awarded the job or job benefit at issue anyway." *In re Employment Discrimination Litig.,* 198 F.3d at 1315. If the employer fails to make this demonstration, then the court may award individual relief. *Id.* Before an employee can obtain individual relief, the court must make an inquiry similar to the Stage II portion of a pattern or practice disparate treatment case. *Robinson v. Metro–North Commuter R.R. Co.,* 267 F.3d 147, 161–62 (2d Cir.2001), *cert. denied,* 535 U.S. 951, 122 S.Ct. 1349, 152 L.Ed.2d 251 (2002).

The Court agrees with Judge Johnson that even if Plaintiffs could show a prima facie disparate impact of any of Defendant's employment practices, and Defendant could not demonstrate that a particular practice was job-related and consistent with business necessity, Defendant still could avoid liability to an individual proposed class representative or class member if Defendant could demonstrate a legitimate, non-discriminatory reason why Defendant would not have awarded the individual the job or job benefit at issue in the absence of the offending practice. (Report and Recommendation at 166–67.) This demonstration would require individualized, factual determinations that preclude a finding of commonality with respect to Plaintiffs' disparate impact claims.[77]

#### ee. Statistical Evidence

Judge Johnson concluded that the statistical evidence does not show a consistent pattern of adverse treatment of African-

---

**77.** The Court overrules Plaintiffs' Objections to Judge Johnson's conclusion that Plaintiffs' disparate impact claims do not satisfy the commonality requirement of Rule 23(a). For Plaintiffs' benefit, the Court observes that the Court and Judge Johnson have not concluded that class

certification is inappropriate for all disparate impact claims—the Court and Judge Johnson simply have recognized that the disparate impact claims *in this one particular case* do not satisfy Rule 23(a)'s requirements.

Americans by Defendant. (Report and Recommendation at 167–74.) The Court finds that Judge Johnson's analysis of the statistical evidence is proper, and concludes that the statistical evidence simply does not demonstrate that Defendant engaged in a consistent pattern of adverse treatment of African–Americans. (*Id.*) The statistical evidence thus does not support a finding of commonality.[78]

### ff. Varying Employment Practices

Plaintiffs contend that Defendant "channeled" African–American employees and applicants into back-of-the-house positions, thus creating an imbalance in the racial distribution of Defendant's workforce, and that Defendant then perpetuated that imbalance by denying promotion and cross-training opportunities to African–American employees. The Court agrees with Judge Johnson that Plaintiffs' theory of "channeling" is not a discrete employment practice. (Report and Recommendation at 174.) Instead, Plaintiffs' "channeling" theory actually involves many practices, including hiring, PAR movements, cross-training, compensation, and promotion. Defendant has a different set of policies and procedures governing each of those practices, and those policies and procedures primarily are applied by local managers. (*Id.*)

Judge Johnson correctly concluded that a trial attacking the various practices will not raise common issues. (Report and Recommendation at 175.) Specifically, a trial concerning whether Defendant intentionally places new African–American hires into back-of-the-house positions will not raise issues common to the whether Defendant discriminates in PAR movement. (*Id.*) In a challenge to an initial job assignment decision, the parties must present evidence concerning what jobs actually were available, who applied for the jobs, the races of the applicants, the applicants' qualifications, and

the individual managers' reasons for making a specific hiring decision. (*Id.*) In a challenge to a PAR movement denial, however, the parties must present evidence concerning an individual's PAR level, whether the individual passed a performance evaluation (and, if the individual did not pass a performance evaluation, whether his manager evaluated him in a non-discriminatory manner), whether the employee studied sufficiently to pass the PAR test, and whether he attained the next PAR level. (*Id.*) Simply calling Plaintiffs' claim a "channeling" claim does not make that claim worthy of class treatment. (*Id.*)

The Court agrees with Judge Johnson that Plaintiffs' so-called "channeling" claim actually is an improper "across-the-board" proposed class action that attacks all of Defendant's employment practices. (Report and Recommendation at 174.) Although Plaintiffs have attempted to argue that the issue for trial is what caused a disproportionate number of African–Americans to work in back-of-the-house jobs at Defendant's stores, this issue actually is composed of several inquiries that will require individualized, fact-specific determinations pertaining to Defendant's across-the-board employment practices. This case consequently does not satisfy the commonality requirement of Rule 23(a).[79]

Further, the cases cited by Plaintiffs do not require class certification in this case. In two of the cases, the defendant employer had an avowed, overt policy of workforce segregation. *Cox v. Am. Cast Iron Pipe Co.,* 784 F.2d 1546, 1551 (11th Cir.1986); *Drayton v. W. Auto Supply Co.,* 203 F.R.D. 520, 527 (M.D.Fla.2000), *aff'd in part, rev'd in part,* 34 Fed.Appx. 387 (11th Cir.2002). Despite Plaintiffs' arguments to the contrary, such a policy simply is not present in this case.

---

78. Plaintiffs complain that Judge Johnson improperly reviewed the statistical evidence, addressed the merits of Plaintiffs' claims, made impermissible credibility determinations, and weighed the statistical evidence in concluding that the statistical evidence did not support a finding of commonality. For the reasons discussed *supra* Part III.B., the Court overrules this Objection.

79. For those reasons, the Court overrules Plaintiffs' Objection based on Plaintiffs' belief that Judge Johnson improperly determined that Plaintiffs' case is an "across-the-board" class action cleverly disguised as a "channeling" case.

In the remaining cases, the courts found that the multiple practices that constituted "channeling" were united by entirely subjective employment practices. *Carpenter v. Stephen F. Austin State Univ.*, 706 F.2d 608, 617 (5th Cir.1983); *Beckmann v. CBS, Inc.*, 192 F.R.D. 608, 614 (D.Minn.2000); *McClain v. Lufkin Indus., Inc.*, 187 F.R.D. 267, 279–80 (E.D.Tex.1999). That simply is not the case here, because Defendant's selection procedures involve a combination of subjective and objective components. The presence of those components makes an across-the-board claim for channeling inappropriate for this case. *Vuyanich v. Republic Nat'l Bank of Dallas*, 723 F.2d 1195, 1199–1200 (5th Cir. 1984); *Cooper*, 205 F.R.D. at 627.[80]

### gg. Judge Johnson's Findings Concerning Commonality Do not Result in "[T]he Death of the Title VII Class Action"

In their Objections, Plaintiffs contend that Judge Johnson's findings concerning commonality mean "the death of the Title VII class action," and that those findings are contrary to "decades of prior precedent." (Pls.' Objs. Report and Recommendation Class Certification at 6, 25, 27, 29, 30.) The Court observes that neither the Court nor Judge Johnson intend to put an end to all Title VII class actions by denying class certification in this case. The Court and Judge Johnson simply concluded that *based on the facts of this one particular case*, Plaintiffs cannot satisfy the commonality and typicality requirements of Rule 23(a). Plaintiffs' Objections based on their belief that denying class certification in this case will mean "the death of the Title VII class action" consequently are without merit.

### iii. Typicality

■■■■■ The typicality requirement is satisfied if the claims and defenses of the representative parties are typical of the claims and defenses of the class. Fed.R.Civ.P. 23(a)(3).

A representative plaintiff's claim is typical if "it arises from the same event or practice or course of conduct that gives rise to the claims of the other class members, and her or his claims are based on the same legal theory." *Domestic Air*, 137 F.R.D. at 698 (quoting 3 Newburg, supra, § 18.08 at 462). In other words, the Court simply inquires whether the named representatives' claims "have the same essential characteristics as the claims of the class at large." *Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir.1985) (quoting 7A Charles Allen Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1764 (1st ed.1972)). The requirement may be satisfied "even though varying fact patterns support the claims or defenses of individual class members, or there is a disparity in the damages claimed by the representative parties and the other members of the class." *Domestic Air*, 137 F.R.D. at 698 (quoting 7A Charles Allen Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure: Civil § 1764 (2d ed.1986)). For the following reasons, the Court concludes that Plaintiffs cannot satisfy the typicality requirement.

### aa. Proposed Class Representatives

Judge Johnson correctly determined that the proposed class representatives' claims do not have the same essential elements of the claims of the class. (Report and Recommendation at 146–150.) Plaintiffs purport to represent African–Americans who experienced channeling into back-of-the-house positions, who were kept there involuntarily through the lack of opportunities to cross-train or to progress through PAR levels to management positions, and who were subjected to discriminatory pay.

Plaintiffs' evidence, however, reveals that none of the proposed class representatives experienced channeling to back-of-the-house positions at the time of hiring or in initial job assignments.[81] Additionally, Plaintiffs

---

**80.** The Court notes that neither the Court nor Judge Johnson would require an allegation of an overt policy of discrimination for class certification. Plaintiffs' Objection on this ground consequently is without merit.

**81.** It is significant that the proposed class representatives have not experienced such "channeling" into back-of-the-house positions because Plaintiffs have alleged throughout this litigation that Defendant improperly places, or "channels," African–American applicants into back-of-the-

Wilson, Keel, and Alexander allege that Defendant denied them cross-training opportunities for front-of-the-house positions; however, Plaintiffs Rhodes, Regan, and Barbee never sought cross-training in front-of-the-house positions. Further, Plaintiffs Rhodes, Wilson, Regan, Barbee, and Keel complain of problems with PAR testing; however, those complaints relate to PAR tests for back-of-the-house positions, rather than problems with obtaining PAR tests for front-of-the-house positions. In any event, each of the proposed class representatives who actually were employed by Defendant progressed rapidly through the PAR system. Plaintiffs Rhodes, Regan, Barbee, Keel, and Alexander are PAR IV employees, and their pay rates are the best or among the best in their stores.[82] Those five employees have worked for Defendant, on average, for eleven years. Finally, although Plaintiffs Regan and Alexander complain that Defendant denied them management opportunities, most of the proposed class representatives, including Plaintiffs Barbee, Keel, and Rhodes, indicated that they were not interested in moving into management.

The proposed class representatives consequently do not appear to possess the same interests or to have suffered the same injuries as the putative class members. The proposed class representatives' claims thus do not satisfy Rule 23(a)'s typicality requirement.[83]

### bb. Decentralized Decision–Making

As discussed *supra* Part III.F.1.a.ii.bb., Defendant has no central group of individuals or individuals at its corporate headquarters to apply Defendant's human resources guidelines and policies to every store. Instead, Defendant's local managers, who are scattered over 450 stores in forty-one states, apply Defendant's guidelines and policies. The local managers decide whom to interview, whom to hire and in which job to hire those individuals, whom to cross-train, and whom to transfer. Local managers set hourly rates, conduct evaluations, and award raises. Defendant thus has a decentralized system of personnel decision-making. *See* Report and Recommendation at 151 ("No more decentralized system of personnel decision-making could be imagined."). Under similar circumstances, other courts have concluded that typicality is lacking. *Bacon,* 205 F.R.D. at 481; *Lott,* 200 F.R.D. at 555–56; *Troupe,* 1999 WL 552727, at *5; *Betts,* 1999 WL 436579, at *6; *Reyes,* 176 F.R.D. at 658.

Because each proposed class representative suffered injury based on alleged misconduct by his or her own managers, the circumstances of each proposed class representative's case will depend on how a specific manager treated that proposed class representative at his or her store. Defendant can assert specific, non-discriminatory reasons for its manager's actions. Each pur-

---

house positions even though the applicants requested placement in front-of-the-house positions. The Court therefore overrules Plaintiffs' Objection based on Judge Johnson's consideration of whether the named representatives had applied for front-of-the-house positions at the point of hire when determining whether Plaintiffs could satisfy Rule 23(a)'s requirements.

**82.** Plaintiffs have alleged that Defendant discriminated against African–Americans as a class with respect to compensation. Consequently, Plaintiffs claim that the typical class member has received discriminatory pay rates. Whether the proposed class representatives experienced discriminatory pay rates, while certainly not dispositive, is a factor that the Court must consider when determining whether Plaintiffs can satisfy Rule 23(a)'s typicality requirements. The Court therefore overrules Plaintiffs' Objection based on Judge Johnson's consideration of the pay rates received by the proposed class representatives.

**83.** Plaintiffs have objected to Judge Johnson's discussion of Plaintiff Workue's claim in connection with the typicality analysis. According to Plaintiffs, Judge Johnson improperly considered the merits of Plaintiff Workue's claim.

Plaintiffs' Objection is without merit. Plaintiffs must show that Plaintiff Workue's claims are typical of the claims of the putative class. Judge Johnson was required to examine the facts underlying Plaintiff Workue's claim and to determine whether Plaintiffs had demonstrated that Plaintiff Workue's claim was typical of the claims of the putative class members. In making this examination, Judge Johnson did not reach a conclusion with respect to the ultimate merits of Plaintiff Workue's claims. Instead, Judge Johnson simply pointed out that Plaintiff Workue's claim had certain unusual factual circumstances that tended to defeat typicality.

ported class member's claim thus will depend on an individualized factual inquiry. Under these circumstances, Plaintiffs cannot satisfy Rule 23(a)'s typicality requirement.

### cc. Individualized Nature of the Claims—Disparate Treatment

As discussed *supra* Part III.F.1.a.ii.cc., the proposed class representatives' and members' disparate treatment claims will require individualized factual determinations. Plaintiffs consequently cannot satisfy the typicality requirement with respect to their disparate treatment claims.

### dd. Individualized Nature of the Claims—Disparate Impact

For the reasons discussed *supra* Part III. F.1.a.ii.dd., the proposed class representatives' and members' disparate impact claims also will require individualized factual determinations. Plaintiffs consequently have failed to establish that they can satisfy the typicality requirement with respect to their disparate impact claims.

### ee. Statistical Evidence

Judge Johnson concluded that the statistical evidence does not show a consistent pattern of adverse treatment of African–Americans by Defendant. (Report and Recommendation at 167–74.) The Court finds that Judge Johnson's analysis of the statistical evidence is proper, and concludes that the statistical evidence simply does not demonstrate that Defendant engaged in a consistent pattern of adverse treatment of African–Americans. (*Id.*) The statistical evidence thus does not support a finding that Plaintiffs can satisfy Rule 23(a)'s typicality requirement.

### ff. Varying Employment Practices

Plaintiffs contend that Defendant "channeled" African–American employees and applicants into back-of-the-house positions, thus creating an imbalance in the racial distribution of Defendant's workforce, and that Defendant then perpetuated that imbalance by denying promotion and cross-training opportunities to African–American employees. As discussed *supra* Part III.F.1.a.ii, the Court

agrees with Judge Johnson that Plaintiffs' theory of "channeling" is not a discrete employment practice. (Report and Recommendation at 174.) Instead, Plaintiffs' "channeling" theory actually involves many practices, including hiring, PAR movements, cross-training, compensation, and promotion. Defendant has a different set of policies and procedures governing each of those practices, and those policies and procedures primarily are applied by local managers. (*Id.*)

Also, as discussed *supra* Part III.F.1.a.ii., the Court agrees with Judge Johnson that Plaintiffs' so-called "channeling" claim actually is an improper "across-the-board" proposed class action that attacks all of Defendant's employment practices. (Report and Recommendation at 174.) Plaintiffs' claim requires individualized, fact-specific determinations pertaining to Defendant's employment decisions, which are put into effect by various local managers in 450 stores located in forty-one states. This case consequently does not satisfy the typicality requirement of Rule 23(a). *Bacon,* 205 F.R.D. at 481; *Lott,* 200 F.R.D. at 555–56; *Troupe,* 1999 WL 552727, at *5; *Betts,* 1999 WL 436579, at *6; *Reyes,* 176 F.R.D. at 658.

### iv. Adequacy of Representation

■ To satisfy the adequacy requirement, Plaintiffs must show they, as class representatives, will fairly and adequately protect the interests of the class. Fed. R.Civ.P. 23(a)(4). This requirement involves a two-part inquiry: (1) whether Plaintiffs possess interests that are antagonistic to the interests of other class members, and (2) whether the proposed class' counsel possesses the qualifications and experience to conduct the litigation. *Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 726 (11th Cir.1987); *Telecomm Technical,* 172 F.R.D. at 543–44.

■ The Court agrees with Judge Johnson that Plaintiffs do not possess interests that are antagonistic to the interests of other class members, and that proposed class counsel possesses the experience and qualifications necessary to conduct this litigation. (Report and Recommendation at 178–179.) The Court therefore finds, for purposes of

Plaintiffs' Motion for Class Certification, that Plaintiffs can satisfy Rule 23(a)'s adequacy requirement.

### v. Summary

In sum, the Court concludes that Plaintiffs satisfy Rule 23(a)'s numerosity and adequacy requirements. The Court, however, finds that Plaintiffs do not satisfy the commonality and typicality requirements of Rule 23(a). Class certification thus is not appropriate for this case.

### a. Class Certification Under Rule 23(b)(2)

Plaintiffs have requested class certification under Rule 23(b)(2), which states that a class action may be maintained if a party can satisfy Rule 23(a)'s requirements and if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). Here, Plaintiffs challenge virtually thousands of decisions made by numerous different local decision-makers over six years in over 450 stores located in forty-one states. Plaintiffs thus cannot show that Defendant "has acted or refused to act on grounds generally applicable to the class," and Plaintiffs cannot satisfy the requirements of Rule 23(b)(2). The Court therefore adopts Judge Johnson's Report and Recommendation with respect to his conclusion that Plaintiffs cannot satisfy Rule 23(b)(2). (Report and Recommendation at 179–80.)

### b. Subclasses Are Inappropriate

Finally, Plaintiffs contend that Judge Johnson should have permitted Plaintiffs to certify subclasses. The subclasses proposed by Plaintiffs, however, still present many of the problems with commonality and typicality discussed in this Order. The proposed subclasses thus do not make class certification appropriate for this case, and the Court overrules this Objection.

## IV. Conclusion

ACCORDINGLY, the Court **DENIES** Plaintiffs' Motion for Class Certification [82], **ADOPTS** the Report and Recommendation of United States Magistrate Judge Walter E. Johnson [121], and **OVERRULES** Plaintiffs' Objections to the Report and Recommendation Concerning Class Certification [129].